Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (*Pro Hac Vice in related MDL 2672*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
steve@hbsslaw.com
Telephone:  206) 623-7292
Facsimile:  (206) 623-0594

THE PAYNTER LAW FIRM, PLLC
Stuart M. Paynter (SBN 226147)
stuart@paynterlawfirm.com
1200 G Street NW Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JENNIFER NEMET, NORBERT KAHLERT, ANGELA MATT ARCHITECT, INC., EDDIE FIELD, TONYA DREHER, ADAM SCHELL, BRYAN SHEFFIELD, DARRYL LECOURS, GISBEL DE LA CRUZ, DEREK WINEBAUGH, MICHAEL SKENA, MELISSA ST. CROIX, ANDREW OLSON, JOHN KUBALA, BRENDAN DALY, STEVEN FERDINAND, KEN GALLUCCIO, STEVEN RAWCZAK, MARK MILLER, SVEN HOFMANN, THOMAS SIEHL, III, BRADLEY CONNER, BENJAMIN TYLER DUNN, INGRID SALGADO, MICHAEL BOWMAN, and JON MOSLEY, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>          v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN AG, AUDI AG, AUDI OF AMERICA, LLC, ROBERT BOSCH GmbH, ROBERT BOSCH LLC, RICHARD DORENKAMP, HEINZ-JAKOB NEUSSER, JENS HADLER, BERND GOTTWEIS, OLIVER SCHMIDT, and JURGEN PETER<br><br>                              Defendants. | No.<br><br>CLASS ACTION COMPLAINT<br><br>**REDACTED VERSION** |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................1

II. JURISDICTION AND VENUE ..................................................................................7

III. INTRADISTRICT ASSIGNMENT ............................................................................7

IV. PARTIES .....................................................................................................................8

    A. Individual and Representative Plaintiffs ...........................................................8
        1. Alabama Plaintiff .................................................................................8
        2. Arizona Plaintiff ..................................................................................9
        3. California Plaintiffs ............................................................................10
        4. Connecticut Plaintiff .........................................................................16
        5. Georgia Plaintiff ................................................................................17
        6. Illinois Plaintiff .................................................................................18
        7. Maryland Plaintiff .............................................................................19
        8. Massachusetts Plaintiff ......................................................................20
        9. Michigan Plaintiff .............................................................................21
        10. Mississippi Plaintiff ..........................................................................22
        11. Missouri Plaintiff ..............................................................................23
        12. New Jersey Plaintiff ..........................................................................25
        13. New York Plaintiffs ...........................................................................26
        14. North Carolina Plaintiffs ...................................................................28
        15. Ohio Plaintiff ....................................................................................31
        16. Oregon Plaintiff ................................................................................32
        17. Pennsylvania Plaintiff .......................................................................34
        18. Texas Plaintiff ...................................................................................35
        19. Utah Plaintiff .....................................................................................36
        20. Vermont Plaintiff ...............................................................................37
        21. Virginia Plaintiff ...............................................................................38

    B. Defendants .......................................................................................................39
        1. Volkswagen Defendants .....................................................................39
            a. Volkswagen AG ......................................................................39
            b. Volkswagen Group of America, Inc. ......................................40
            c. Audi AG .................................................................................40
            d. Audi of America, LLC ............................................................40
        2. Bosch Defendants ...............................................................................41
            a. Robert Bosch GmbH ..............................................................41
            b. Robert Bosch, LLC .................................................................42
        3. Individual Defendants who participated in the conspiracy. ...............44
            a. Richard Dorenkamp ("Dorenkamp"). ....................................44
            b. Heinz-Jakob Neusser ("Neusser") ........................................45
            c. Jens Hadler ("Hadler") ..........................................................45

d.   Bernd Gottweis ("Gottweis") ............................................45
e.   Oliver Schmidt ("Schmidt") ............................................45
f.   Jurgen Peter ("Peter") ...................................................45
4.   IAV GmbH – (Un-Named Conspirators). .......................................46

V.     COMMON FACTUAL ALLEGATIONS ..................................................46

A.   Volkswagen's Plot to Dominate the Automotive Market ........................46

B.   Defendants' Illegal "Defeat Device" Scheme ...............................53

C.   Bosch LLC and Bosch GmbH Each Played a Critical Role in the Defeat Device
Scheme .......................................................................60
1.   Volkswagen and Bosch Diesel Systems, through both Bosch LLC and
Bosch GmbH, Conspire to Develop the Illegal Defeat Device...................61
2.   Volkswagen and Bosch Conspire to Conceal the Illegal
"Akustikfunktion". .........................................................70
3.   Volkswagen and Bosch GmbH and Bosch LLC Conspire in the U.S.
and Germany to deceive U.S. Regulators. ...................................72
4.   Bosch GmbH and Bosch LLC Keep Volkswagen's Secret Safe and
Push "Clean" Diesel in the U.S. ...........................................76
5.   Bosch's Volkmar Denner Also Played a Critical Role in the Scheme. ...........80

D.   Volkswagen's "Clean" Diesel Advertising Campaign .........................81
1.   VW's False and Misleading Advertisements ...............................82
2.   Audi's False and Misleading Advertisements ...........................91
3.   Volkswagen's Nationwide Advertising Campaign Was Highly
Effective, and Volkswagen Profited Handsomely from Selling the Class
Vehicles ..................................................................95

E.   Defendants' Dirty Diesel Scheme Starts to Unravel .......................97

F.   Once Caught, Volkswagen Admits its Fraud—in Part .......................103

G.   Volkswagen's Failed Attempts at Remedial Action .........................112

H.   Volkswagen Caused Millions of Dollars in Harm to U.S. Consumers ..........112

I.   Volkswagen's Prior Admissions ..........................................115

VI.    TOLLING OF THE STATUTES OF LIMITATIONS ....................................115

A.   Discovery Rule ........................................................115

VII.   CLASS ACTION ALLEGATIONS ..................................................117

VIII.  CLAIMS FOR RELIEF ........................................................124

FEDERAL CLAIMS ..................................................................124

FEDERAL COUNT I: VIOLATION OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") ..........................124

A.  Description of the Emissions Enterprise ................................................................. 125
    1.  The Volkswagen Entity Defendants ................................................................ 127
    2.  The Volkswagen Entity Defendants' Directors, Officers, and Engineers ........ 128
        a.  Martin Winterkorn ................................................................... 129
        b.  Matthias Müller ....................................................................... 129
        c.  Michael Horn ........................................................................... 130
        d.  Rupert Stadler ......................................................................... 130
        e.  Scott Keogh ............................................................................. 131
        f.  Ulrich Hackenberg .................................................................. 132
        g.  Frank Tuch ............................................................................... 132
        h.  Wolfgang Hatz ........................................................................ 133
    3.  The Bosch Defendants ..................................................................................... 133
        a.  IAV ......................................................................................... 137
    4.  Criminal Pleas that Relate to the RICO Claims and Enterprise. .................... 137

B.  The Emissions Enterprise Sought to Increase Defendants' Profits and Revenues ...... 140

C.  Mail and Wire Fraud .......................................................................................... 143

FEDERAL COUNT II: VIOLATIONS OF 15 U.S.C. §§ 2301, *ET SEQ.*, THE
MAGNUSON-MOSS WARRANTY ACT ("MMWA") .................................................. 151

IX.     STATE LAW CLAIMS ................................................................................... 152

COUNT 1  VIOLATIONS OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
        (ALA. CODE § 8-19-1, *ET SEQ.*) (ON BEHALF OF ALABAMA CLASS) .................. 152

COUNT 2  VIOLATIONS OF THE CONSUMER FRAUD ACT (ARIZ. REV. STAT.
        §§ 44-1521, *ET SEQ.*) (ON BEHALF OF ARIZONA CLASS) ............................ 153

COUNT 3  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV.
        CODE § 1750, *ET SEQ.*) .............................................................................. 155

COUNT 4  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
        (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ............................................. 158

COUNT 5  VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW (CAL.
        BUS. & PROF. CODE §§ 17500, *ET SEQ.*) ...................................................... 159

COUNT 6  VIOLATIONS OF THE UNFAIR TRADE PRACTICES ACT (CONN. GEN.
        STAT. ANN. §§ 42-110A, *ET SEQ.*) (ON BEHALF OF CONNECTICUT
        CLASS) ...................................................................................................... 160

COUNT 7  VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA.
        CODE ANN. § 10-1-390, *ET SEQ.*) (ON BEHALF OF GEORGIA CLASS) ................. 162

COUNT 8  VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
        DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.* AND
        720 ILCS 295/1A) (ON BEHALF OF ILLINOIS CLASS) ................................. 163

COUNT 9  VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
(MD. CODE COM. LAW § 13-101, *ET SEQ.*) (ON BEHALF OF MARYLAND
CLASS) ................................................................................................................165

COUNT 10  VIOLATIONS OF MASSACHUSETTS LAW (MASS. GEN. LAWS CH.
93A, § 1, *ET SEQ.*) (ON BEHALF OF MASSACHUSETTS CLASS) ...........................167

COUNT 11  VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
(MICH. COMP. LAWS § 445.903, *ET SEQ.*) (ON BEHALF OF MICHIGAN
CLASS) ................................................................................................................170

COUNT 12  VIOLATIONS OF MISSISSIPPI CONSUMER PROTECTION ACT
(MISS. CODE. ANN. § 75-24-1, *ET SEQ.*) (ON BEHALF OF THE MISSISSIPPI
CLASS) ................................................................................................................172

COUNT 13  VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT
(MO. REV. STAT. § 407.010, *ET SEQ.*) (ON BEHALF OF MISSOURI CLASS) .........174

COUNT 14  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J.
STAT. ANN. §§ 56:8-1, *ET SEQ.*) (ON BEHALF OF NEW JERSEY CLASS)..............176

COUNT 15  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y.
GEN. BUS. LAW § 349) (ON BEHALF OF NEW YORK CLASS)................................178

COUNT 16  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y.
GEN. BUS. LAW § 350) (ON BEHALF OF NEW YORK CLASS)................................180

COUNT 17  VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT (N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*) (ON
BEHALF OF NORTH CAROLINA CLASS) ................................................................182

COUNT 18  VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
(OHIO REV. CODE §§ 1345.01, *ET SEQ.*) (ON BEHALF OF OHIO CLASS)..............184

COUNT 19  VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
(OHIO REV. CODE § 4165.01, *ET SEQ.*) (ON BEHALF OF OHIO CLASS)................187

COUNT 20  VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES
ACT (OR. REV. STAT. §§ 646.605, *ET SEQ.*) (ON BEHALF OF OREGON
CLASS) ................................................................................................................189

COUNT 21  VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *ET SEQ.*) (ON
BEHALF OF PENNSYLVANIA CLASS)......................................................................192

COUNT 22  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND
CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § 17.4, *et seq.*) (ON
BEHALF OF TEXAS CLASS)...................................................................................194

COUNT 23  VIOLATIONS OF UTAH CONSUMER SALES PRACTICES ACT (UTAH
CODE ANN. § 13-11-1, *ET SEQ.*) (ON BEHALF OF UTAH CLASS)..........................196

COUNT 24  VIOLATIONS OF VERMONT CONSUMER FRAUD ACT (VT. STAT.
ANN. TIT. 9, § 2451 *ET SEQ.*) (ON BEHALF OF VERMONT CLASS)........................199

COUNT 25  VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
(VA. CODE ANN. §§ 59.1-196, *ET SEQ.*) (ON BEHALF OF VIRGINIA CLASS) ........201

PRAYER FOR RELIEF ...........................................................................................................203

DEMAND FOR JURY TRIAL ...............................................................................................204

1    Plaintiffs allege the following based upon information and belief, the investigation of

2    counsel, and personal knowledge as to the factual allegations pertaining to themselves.

3    **I.      INTRODUCTION**

4    1.      The Court has admirably presided over the urgent issues created by the hundreds of

5    thousands of polluting vehicles on the road, and consumers who owned these cars as of

6    September 18, 2015, have been compensated.  However, there is another class of consumers who

7    have waited patiently for the environmental issues to be solved via the settlement.  The Class claims

8    here are asserted by consumers who bought polluting VW's and Audi's, paid the diesel premium for

9    such cars, but who sold their vehicles prior to September 18, 2015.  They have been excluded from

10   the prior settlements, but these consumers were unquestionably defrauded and damaged as explained

11   below.

12   2.      On September 18, 2015, the U.S. Environmental Protection Agency announced

13   findings that Volkswagen had installed software on diesel cars that enabled them to cheat on

14   emissions tests. These so-called "defeat devices" reduced nitrogen oxide emissions when the cars

15   were placed on a test machine but allowed higher emissions and improved engine performance

16   during normal driving. The EPA was alerted to the discrepancy in a report from the International

17   Council on Clean Transportation. Ultimately, the scheme was found to include Porsche, Audi,

18   component manufacturer Bosch, as well as numerous individuals at the highest levels of corporate

19   leadership. The manufacturers installed the cheating emissions software on more than a half-million

20   diesel cars in the U.S. and roughly 10.5 million more worldwide. The abhorrent nature of the scheme

21   lies not only in its massive scale, but also its means—knowing lies to government regulators and

22   false advertising to consumers—and its effect of undermining responsible global efforts to lower

23   emissions and mitigate the effects of health-damaging smog and climate change.

24   3.      When Defendants' emissions cheat was exposed, consumers filed hundreds of

25   lawsuits, and federal, state, and local governments have initiated civil actions and criminal

26   investigations. Most U.S. consumer litigation has been coordinated in federal Multi-District

27   Litigation entitled In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products

28   Liability Litigation. There have been three resulting consumer class action settlements. The first

CLASS ACTION COMPLAINT - 1
Case No.:
010549-11  973652 V1

settlement involved affected 2.0 liter models and was given final approval on October 25, 2016. Order Granting Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealership Class Action Settlement, *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, 3:15-md-02672-CRB, Dkt. 2102. The second settlement involved 3.0 liter models and was given final approval on May 17, 2017. Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, *In Re: Volkswagen*, 3:15-md-02672-CRB, Dkt. 3229. The third settlement resolved all claims for 2.0 and 3.0 vehicles against Robert Bosch GmbH and Robert Bosch LLC. Class Action Settlement and Release, *In Re: Volkswagen*, 3:15-md-02672-CRB, Dkt. 2837. This settlement cross-referenced the 2.0 and 3.0 class definitions in order to delineate the class with whom Bosch settled all claims. *Id.* § 2.15. This settlement was given final approval on May 17, 2017. Order Granting Final Approval of the Bosch Class Action Settlement, *In Re: Volkswagen*, 3:15-md-02672-CRB, Dkt. 3230.

4.     Those MDL settlements and the Department of Justice and Federal Trade Commission actions provided substantial benefits to many consumers, including buyback remedies that will relieve current owners and lessees from being forced to continue to drive the polluting vehicles. However, the settlements did not compensate some of the front-line victims of Defendants' scheme—owners who credited Defendants' clean-diesel lies, unwittingly drove hyper-polluting cars for years, but had disposed of the cars before the scheme imploded on September 18, 2015. Although those owners might have escaped the additional injury of lost resale value, they bore the same the primary harm as those compensated by the settlement because they never received the clean emissions performance Defendants' promised during their period of ownership—for some as long as six years. This injury is tangible, quantifiable, and equally deserving of compensation. In lauding the 2.0 liter settlement at the final approval hearing, a lawyer for the Federal Trade Commission observed that the settlement appropriately compensated owners "for the lost opportunity to drive a clean car." But all three consumer settlements excluded tens of thousands of owners deprived of that same opportunity. And these consumers, as detailed below, did suffer financial injury when they sold their car or terminated a lease.

5.      Through the sale and lease of vehicles that purported to—but did not—comply with emissions standards, Defendants unjustly and fraudulently obtained hundreds of millions of dollars from these consumers. Defendants obtained this money regardless of whether consumers sold their vehicles prior to the discovery of the fraud. Excluded from the current settlements, these consumers are entitled have this money restored to them. This lawsuit seeks to hold Defendants accountable to these first casualties of their massive fraud.

6.      The relevant factual allegations are essentially the same as in the cases underlying the MDL settlements. Volkswagen promised low-emission, environmentally friendly vehicles, with high fuel economy and exceptional performance. Consumers believed Volkswagen and bought Volkswagen's VW-, Audi-, and Porsche-branded "clean" diesel vehicles in record numbers. From 2009 to 2015, Volkswagen sold more diesel cars in the U.S. than every other automaker combined.[1] Specifically, Volkswagen sold and/or leased approximately 580,000 dirty diesels that its defeat device disguised as clean (the "Class Vehicles," defined below). In doing so, Volkswagen secretly turned the most environmentally-conscious consumers into some of the biggest polluters on the road—and charged them a premium in the process.

7.      As a result, there were over half a million cars on American roads with illegal emission systems that never should have been leased or sold, and would not have, but for Volkswagen's fraudulently obtained EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs").

8.      Plaintiffs and Class members (defined below) are persons and entities who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015. This group was excluded from the 2.0-liter and 3.0-liter settlements, which limited the class(es) to owners and lessees who maintained those interests on or after September 18, 2015. *See* Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release §§ 2.26–2.30, *In Re:*

---

[1] *Clean Diesel*, Volkswagen (last visited Feb. 8, 2016), *previously available at*, http://www.vw.com/features/clean-diesel/.

1   *Volkswagen*, 3:15-md-02672-CRB, Dkt. 2841 (defining eligible owners, former owners, lessees, and

2   former lessees in the 2.0-liter and 3.0-liter class action settlements); Class Action Settlement and

3   Release § 2.15, *In Re:* Volkswagen, 3:15-md-02672-CRB, Dkt. 2837 (cross-referencing those

4   definitions to settle all claims against Bosch).

5        9.     The Class Vehicles include the following

| 2.0-liter Class Vehicles | |
|---|---|
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta SportWagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf SportWagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |
| **3.0-liter Class Vehicles** | |
| Volkswagen Touareg TDI | 2009-2016 |
| Audi A6 Quattro TDI | 2014-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

10.     Defendants induced Plaintiffs and Class members to purchase or lease the Class

Vehicles—at a cost premium—by advertised them as "clean diesel" cars which would benefit the

environment. They did not. Class Vehicles emitted nitrogen oxide ("NO$_x$") at up to forty times the

legal limit, a fact that Defendants knowingly concealed from Plaintiffs and Class members. Plaintiffs

and Class members never received the cars they bargained for or enjoyed the environmental

performance they were promised. No Plaintiff or Class member would—or could—have purchased

the Class Vehicles but for Defendants' fraudulent scheme, because Defendants obtained EPA COCs

(and CARB EOs) only through deception.

11.     Volkswagen did not act alone. At the heart of the emission scandals involving the

Volkswagen and Audis, as well as diesels made by General Motors, Fiat Chrysler and Mercedes, is a

device made by Bosch called the EDC 17. The Bosch Group, and Robert Bosch GmbH and Robert

Bosch LLC, working with Volkswagen for the express purpose of manipulating vehicle emissions,

programmed the software in the EDC 17 so that it became a defect device.

12.     Class members were originally and primarily injured when Defendants did not provide them with the superior environmental characteristics that Class members bargained for. Defendants induced Class members to buy or lease Class Vehicles by the promise that using them would benefit the environment, contributing to efforts to reduce pollution, oil dependence, and global warming. This was a promise of a specific element of performance which would provide a specific benefit. Defendant's denial of this benefit was an enduring and continuous (albeit unknown) injury throughout the duration of the Class members' ownership, lease, and/or usage of the Class Vehicles. Class member's expectation that their driving was environmentally conscious was not spurious or subjective. The purported environmental benefit of these vehicles was their identifying characteristic and the basis upon which Defendants marketed them. The post-announcement decline in resale value of Class Vehicles confirms that that consumers and the market ascribe independent value to use of a vehicle which is environmentally friendly—value which Class members never received.

13.     Class members who purchased (rather than leased) new vehicles were additionally harmed because those Class members paid a premium to have a new vehicle in the first instance. This "new vehicle" premium is a well-known economic fact in the automobile industry. Kelley Blue Book values indicate that "[n]ew cars typically lose about 20% of their value the moment they're driven off the lot." By definition, this new vehicle premium cannot be recouped by a subsequent sale. Through its fraud, VW obtained hundreds of millions of dollars in new vehicle premiums from Class members that were never returned. Part of this new car premium is the premium paid for the "privilege" of buying or leasing a "clean diesel" vehicle. The depreciation on this premium cannot be recovered in a sale. For example, assume one of the plaintiffs paid a "clean diesel" premium of $6,000 and that the purchase price was $22,000. The clean diesel premium was 27% of the purchase price. Assuming the vehicle depreciated by a total of $8,875 during ownership, the clean diesel feature accounted for approximately $2,400 of that depreciation (27% x $8,875). This $2,400 is an overpayment not compensated for in any sale pre-September 18, 2015. In addition, assuming this plaintiff paid $2,794 in financing charges, $200 (27%) were on account of the "clean diesel premium" they never received. This plaintiff therefore was injured to the tune of $2,600 for paying a

premium on a polluting diesel—an amount which was not recovered in the sale of the vehicle. There are tens of thousands of Class members injured in this fashion.

14.     Similarly, VW obtained tens of millions of dollars from Class members who leased their vehicles and whose leases ended before the discovery of the fraud. These lessees never received the cars they bargained for or enjoyed the environmental performance they were promised, yet VW received (but did not return) millions of dollars for a product not delivered. As with consumers who purchased their vehicles, the amount of this damage is substantial and calculable. Lease rates are based on a vehicle's "residual value," *i.e.*, the vehicle's estimated value at the end of the lease term. That residual value is, in turn, based on the vehicle's initial purchase value—a value that, in the case of the Class Vehicles, included the inflated "clean diesel" premium. Thus, each payment made by lessee Class members over the course of their leases contained an amount directly attributable to the "clean diesel" premium, and Class members were injured in that amount, which they paid for a feature that they did not receive. In addition, in many cases, VW charged an "acquisition fee" at the start of a lease and a "termination fee" at the end of a lease, or collected a fee for the option to purchase the car at the end of the lease. These fees were a product of VW's fraud but were never returned to Class members.

15.     On behalf of themselves, the Nationwide Class, and their respective State Classes, Plaintiffs sue for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")); the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.* ("MMWA")); consumer protection laws of the relevant states and territories, and unjust enrichment.

16.     Plaintiffs seek monetary damages (including treble damages under RICO), appropriate restitution, Class counsel's reasonable attorney fees and expenses, and other equitable relief. In addition, Plaintiffs and Class members are entitled to a significant award of punitive or exemplary damages, given that, for years, Volkswagen deliberately and with malice deceived Plaintiffs and Class members, disregarded their rights, and used them as unwitting puppets in a scheme that jeopardized the safety of the American public.

CLASS ACTION COMPLAINT - 6
Case No.:
010549-11  973652 V1

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961, *et seq.*, as well as the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.* The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), and Cal. Code Civ. P. § 410.10, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Volkswagen has marketed, advertised, sold, and leased the Class Vehicles, and Defendants otherwise conducted extensive business within this District. Earlier litigation substantially related to this case, MDL No. 2672, was adjudicated in this district, and much related litigation is still pending in that MDL. A significant percentage of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Further, CARB maintains a significant presence in this District through its Bay Area Air Quality Management District branch. CARB played an important initial role in investigating and, ultimately, in revealing Volkswagen's illegal use of the defeat devices.

## III.    INTRADISTRICT ASSIGNMENT

19.    This action is properly assigned to the San Francisco Division of this District under N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division. That division is also where *In Re: Volkswagen* is being adjudicated. Volkswagen conducted substantial business in the counties served by this Division, has marketed, advertised, sold, and leased the Class Vehicles in those counties, and has caused harm to Class members residing in those counties.

CLASS ACTION COMPLAINT - 7
Case No.:
010549-11  973652 V1

# IV.     PARTIES

## A.     Individual and Representative Plaintiffs[2]

### 1.     Alabama Plaintiff

20.     Jennifer Nemet is a citizen and resident of Alabama domiciled in Mountain Brook, Alabama. On or about February 4, 2013, Plaintiff purchased a new 2013 Volkswagen Passat TDI, VIN 1VWBN7A33DC087731, for $34,309 from Royal Automotive, an authorized Volkswagen dealer in Birmingham, Alabama. She used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff recalls the price for the Vehicle being significantly higher than the non-diesel, or gas, model. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would not have purchased it. Plaintiff traded in the Vehicle in November 2014 for $20,353.82.

21.     Between the time that Plaintiff purchased the Vehicle and the time that she sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for the "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

22.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 17% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $13,956 during the time Plaintiff owned it

---

[2] Throughout this Section, "Plaintiff" refers to the relevant Plaintiff whose name appears at the beginning of each subset of paragraphs; "Class Vehicle" or "Vehicle" refers to that relevant Plaintiff's vehicle as described in those paragraphs; and "Lease" refers to the lease signed by the relevant Plaintiff as described in those paragraphs.

("Depreciation"), the "clean diesel" feature accounted for approximately $2,441 of that depreciation (Clean Diesel % of Value × Depreciation).

23.     In addition, Plaintiff paid an estimated $1,092.28 in finance charges associated with ownership of the Vehicle—approximately $191.02 of which Plaintiff incurred in order to pay for the "clean diesel" feature she did not receive.

24.     Simply put, Plaintiff paid a substantial amount for something she never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

### 2.     Arizona Plaintiff

25.     Norbert Kahlert is a citizen and resident of Arizona domiciled in Phoenix, Arizona. On or about June 22, 2010, Plaintiff purchased a new 2010 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL8AJ8AM683492, for approximately $32,000 from Larry H. Miller Volkswagen, an authorized Volkswagen dealer in Avondale, Arizona. Plaintiff purchased the Vehicle because it claimed to have "Clean Diesel" technology and good miles per gallon without having to add urea or other additives. He used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle had Defendants not concealed the illegal defeat device. Plaintiff recalls the price for the Vehicle being significantly higher than the non-diesel, or gas, model. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would have likely purchased a different vehicle. Plaintiff sold the Vehicle in September 2014.

26.     Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

CLASS ACTION COMPLAINT - 9
Case No.:
010549-11  973652 V1

27.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**3.     California Plaintiffs**

28.     Angela Matt Architect, Inc. is a corporation organized under the laws of the State of California in May 2010. On or about September 25, 2010, Plaintiff leased a new 2011 Audi A3 2.0 Premium Plus, VIN WAUKJAFM3BA035650, from Audi Mazda in Oakland, California. Plaintiff was looking for a small, environmentally friendly vehicle to lease for business use with the main priorities being excellent gas mileage and low emissions. Plaintiff narrowed down the choices to either a Toyota Prius or the Vehicle. Ultimately, Plaintiff chose the Vehicle over the Toyota Prius because of its reported fuel efficiency and reduced emissions.

29.     Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. The Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased the Vehicle, had Defendants not concealed the illegal cheat device.

30.     Plaintiff signed a 3-year lease with Audi Financial Services. Between the time that Plaintiff leased the Vehicle and the time that Plaintiff turned in the Vehicle, Plaintiff made payments based on the Vehicle's value at the time of the Lease—a value that was artificially inflated by Defendants' representations regarding the "clean diesel" feature. The amount of Plaintiff's loss due to that artificial inflation is substantial and calculable, and Plaintiff was never compensated for that loss.

31.     For example, the Lease reflects a value for the Vehicle of $35,250.00; the "clean diesel" feature accounted for approximately $6,000 (or 17%) of the value of the Vehicle. Thus, of the approximately $23,319 Plaintiff paid over the course of the Lease, Plaintiff paid $3,969 ($23,319 × 17%) for a feature that Plaintiff never received. Plaintiff was never compensated for that loss.

CLASS ACTION COMPLAINT - 10
Case No.:
010549-11  973652 V1

32.     In addition, the Lease committed Plaintiff to pay a $695 acquisition fee and a $350 turn-in fee at the expiration of the Lease—fees that Plaintiff would never have paid had Plaintiff been informed of the fraud either before or during the course of the Lease.

33.     Eddie Field is a citizen and resident of California domiciled in Arcadia, California. On or about December 26, 2008, Plaintiff purchased a new 2009 Volkswagen Jetta TDI, VIN 3VWRL71K09M047298, for $29,552.54 from Pasadena Volkswagen in Pasadena, California. Plaintiff financed his purchase through Volkswagen of Pasadena, at a rate of 5.99% per annum. Plaintiff had been a loyal Volkswagen owner and had owned a Volkswagen Bug for 17 years before his purchase of the Vehicle. When Plaintiff decided to purchase a new vehicle in 2008, he considered purchasing a Toyota Prius; however, the Vehicle was reported to have superior gas mileage, stunning performance, and was being called the "Green Car of the Year". For these reasons, Plaintiff ultimately decided to purchase the Vehicle instead of a Toyota Prius. Plaintiff primarily used the Vehicle for commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. The Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal cheat device. Plaintiff was extremely frustrated and disappointed by the Vehicle's actual gas mileage compared to the advertised gas mileage. Plaintiff also had some mechanical issues with the vehicle such as the windows not rolling down when the weather was hot and a sound coming from the front of the car that the dealer was never able to identify. Additionally, he is appalled by the Vehicle's emissions levels and the amount of environmental pollution.

34.     Plaintiff traded in the Vehicle one year before VW's disclosure of its fraud, receiving $9,500 for the Vehicle at trade-in.

35.     Between the time that Plaintiff purchased the Vehicle and the time that he traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents

1    an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it

2    compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact

3    exist, but was a figment based on Defendants' misrepresentations.

4         36.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the

5    "clean diesel" feature accounted for approximately 20% of the purchase price of the Vehicle.

6    Assuming the vehicle depreciated by $20,052 during the time Plaintiff owned it, the "clean diesel"

7    feature accounted for approximately $4,071 of that depreciation (20% × $20,052).

8         37.    In addition, Plaintiff paid approximately $4,855 in finance charges associated with

9    ownership of the Vehicle—approximately $986 (or 20%) of which Plaintiff incurred in order to pay

10   for the "clean diesel" feature he did not receive.

11        38.    Simply put, Plaintiff paid a substantial amount for something he never received, and

12   was unable to fully recoup that loss through the subsequent sale of the Vehicle.

13        39.    Tonya Dreher is a citizen and resident of California domiciled in Los Angeles,

14   California. On or about February 7, 2011, Plaintiff leased a new 2011 Audi A3 TDI, VIN

15   WAUKJAFM7BA098136, from Pacific Audi in Torrance, California. Prior to leasing the Vehicle,

16   Plaintiff conducted fairly extensive research to identify the most environmentally friendly vehicle

17   available that was not an electric vehicle. Plaintiff believed that the Vehicle fit this description based

18   on the reported gas mileage and emissions levels, so she selected and leased the Vehicle.

19        40.    Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat

20   device designed to bypass emission standards and deceive consumers and regulators. The Vehicle

21   could not deliver the advertised combination of low emissions, high performance, and fuel

22   economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of

23   Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the

24   illegal defeat device.

25        41.    Plaintiff signed a 3-year lease with Pacific Audi, and turned in the Vehicle in

26   February 2014 at the end of the Lease.

27        42.    Between the time that Plaintiff leased the Vehicle and the time that Plaintiff turned in

28   the Vehicle, Plaintiff made payments based on the Vehicle's value at the time of the Lease—a value

1   that was artificially inflated by Defendants' representations regarding the "clean diesel" feature. The

2   amount of Plaintiff's loss due to that artificial inflation is substantial and calculable, and Plaintiff was

3   never compensated for that loss.

4          43.    For example, the Lease reflects a value for the Vehicle of $37,162.81; the "clean

5   diesel" feature accounted for approximately $6,000 (or 16%) of the value of the Vehicle ("Clean

6   Diesel % of Value"). Thus, of the $24,020 Plaintiff paid over the course of the Lease, Plaintiff paid

7   $3,878 (Vehicle Value × Clean Diesel % of Value) for a feature that Plaintiff never received.

8   Plaintiff was never compensated for that loss.

9          44.    In addition, the Lease committed Plaintiff to pay a $695 acquisition fee and a $350

10   turn-in/disposition fee at the expiration of the Lease—fees that Plaintiff would never have paid had

11   Plaintiff been informed of the fraud either before or during the course of the Lease.

12         45.    Adam Schell is a citizen and resident of California domiciled in Calabasas, California.

13   On or about July 2008, Plaintiff purchased a new 2009 Volkswagen Jetta Sportwagen TDI (VIN

14   unknown) (for this paragraph, the "2009 Vehicle"), for approximately $33,000 from New Century

15   Volkswagen in Glendale, California. At the time of purchase of the 2009 Vehicle, Plaintiff was a

16   citizen and resident of California and was domiciled in Los Angeles, California. Plaintiff sold the

17   2009 Vehicle for approximately $21,525 in approximately September 2010 and, subsequently, on or

18   about September 30, 2010, Plaintiff purchased a new 2011 Volkswagen Jetta Sportwagen TDI, VIN

19   3VWPL7AJ1BM624747 (for the purpose of this paragraph, the "2011 Vehicle"), for approximately

20   $28,380 from Carrera Motors in Bend, Oregon. At the time of purchase of the 2011 Vehicle, Plaintiff

21   was a citizen and resident of Oregon and was domiciled in Bend, Oregon. Plaintiff considers himself

22   an environmentalist and chose both Vehicles because they were touted as being environmentally

23   friendly. Plaintiff was so excited about the purported environmentally friendly aspects of the 2009

24   Vehicle that he had his name placed on a waiting list at New Century Volkswagen. Plaintiff used

25   both the 2009 Vehicle and the 2011 Vehicle for personal use and for commuting to work.

26   Unbeknownst to Plaintiff, at the time of acquisition, the 2009 Vehicle and the 2011 Vehicle both

27   contained a defeat device designed to bypass emission standards and deceive consumers and

28   regulators. The 2009 Vehicle and the 2011 Vehicle could not deliver the advertised combination of

CLASS ACTION COMPLAINT - 13
Case No.:
010549-11  973652 V1

low emissions, high performance, and fuel economy—and were illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and absolutely would not have purchased the 2009 Vehicle or the 2011 Vehicle, had Defendants not concealed the illegal cheat device. Plaintiff sold the 2009 Vehicle five years before VW's disclosure of its fraud, for approximately $21,525. Plaintiff traded in the 2011 Vehicle approximately two years before VW's disclosure of its fraud, for $18,500.

46.      Between the time that Plaintiff purchased both Vehicles and the time that he sold or traded each Vehicle in, the Vehicles depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale / trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

47.      For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 18% of the purchase price of the 2009 Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $11,475 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $2,086 of that depreciation (Clean Diesel % of Value × Depreciation).

48.      In addition, Plaintiff paid an estimated $1,100 in finance charges associated with ownership of the Vehicle—approximately 18% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

49.      With respect to the 2011 Vehicle, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 18% of the purchase price of the 2011 Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $9,780 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $2,075 of that depreciation (Clean Diesel % of Value × Depreciation).

50.     In addition, Plaintiff paid an estimated $1,162 in finance charges associated with ownership of the Vehicle—approximately 18% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

51.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

52.     Bryan Sheffield is a citizen and resident of Pennsylvania domiciled in Malvern, Pennsylvania. On or about December 2010, Plaintiff purchased a new 2010 Volkswagen Jetta TDI Cup Edition, VIN 3VWHL7AJXAM155239, for approximately $33,000 from New Century Volkswagen in Glendale, California. At the time of purchase, Plaintiff was a citizen and resident of California domiciled in Los Angeles, California. When Plaintiff was in the market for a new vehicle, he wanted a vehicle with good gas mileage and low emissions levels. Plaintiff ultimately chose to purchase the Vehicle because of its reportedly phenomenal gas mileage and clean emissions, among other factors. Plaintiff primarily used the Vehicle for personal use and for commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. The Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle had Defendants not concealed the illegal cheat device.

53.     Plaintiff sold the Vehicle two and a half years before VW's disclosure of its fraud for $18,500.

54.     Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

55.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 18% of the purchase price of the Vehicle ("Clean

Diesel % of Value"). Assuming the vehicle depreciated by $14,500 during the time Plaintiff owned it ("Depreciation"),[3] the "clean diesel" feature accounted for approximately $2,636.36 of that depreciation (Clean Diesel % of Value × Depreciation).

56.     In addition, Plaintiff paid an estimated $259.14 in finance charges associated with ownership of the Vehicle[4]—approximately 18% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

57.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**4.     Connecticut Plaintiff**

58.     Darryl Lecours is a citizen and resident of Connecticut domiciled in Enfield, Connecticut. On or about August 14, 2010, Plaintiff purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ3AM162876, for approximately $26,936 from Lia Auto Group, an authorized Volkswagen dealer in Enfield, Connecticut. Plaintiff purchased the Vehicle because it claimed to have "Clean Diesel" technology and good miles per gallon without having to add urea or other additives, and Plaintiff believed it was an environmentally conscious purchase. He used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff recalls the price for the Vehicle being significantly higher than the non-diesel, or gas, model. If Plaintiff had known the true emissions

---

[3] In Plaintiff's case, he purchased the Vehicle for approximately $33,000 and sold it for approximately $18,500.

[4] Finance charges are estimated based on Plaintiff's recollection that he financed approximately $9,000 of the purchase, and paid off that loan over the course of approximately 12 months. The amount assumes a 4% annual interest rate.

levels and gas mileage of the Vehicle, Plaintiff would not have purchased the Vehicle. Plaintiff sold the Vehicle in September 2013 for $12,750.

59.     Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

60.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 22% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $14,186 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $3,160 of that depreciation (Clean Diesel % of Value × Depreciation).

61.     In addition, Plaintiff paid an estimated $2,086 in finance charges associated with ownership of the Vehicle—approximately $465 of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

62.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**5.     Georgia Plaintiff**

63.     Gisbel De La Cruz is a citizen and resident of Georgia domiciled in Newman, Georgia. On or about October 22, 2010, Plaintiff purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ6AM178957, for $27,809.23 from Jim Ellis Volkswagen of Chamblee, an authorized Volkswagen dealer in Atlanta, Georgia. She used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. If Plaintiff had known the true emissions levels and gas mileage of the

Vehicle, Plaintiff would not have purchased it, and would likely have purchased another vehicle instead. Plaintiff sold the Vehicle on or about January 16, 2014 for $13,000.

64.      Between the time that Plaintiff purchased the Vehicle and the time that she sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

65.      For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 22% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $14,809 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $3,195 of that depreciation (Clean Diesel % of Value × Depreciation).

**6.      Illinois Plaintiff**

66.      Derek Winebaugh is a citizen and resident of Illinois domiciled in South Beloit, Illinois. In or about April 2011, Plaintiff purchased a new 2011 Audi Q7 TDI for approximately $58,000 from Napleton Auto Werks, a dealer in Loves Park, Illinois. He used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would not have purchased it, and would likely have purchased another vehicle instead. Plaintiff sold the Vehicle in May 2013 for approximately $35,000.

67.      Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it

1   compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact

2   exist, but was a figment based on Defendants' misrepresentations.

3          68.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the

4   "clean diesel" feature accounted for approximately 10% of the purchase price of the Vehicle ("Clean

5   Diesel % of Value"). Assuming the vehicle depreciated by $23,000 during the time Plaintiff owned it

6   ("Depreciation"), the "clean diesel" feature accounted for approximately $2,379 of that depreciation

7   (Clean Diesel % of Value × Depreciation).

8          69.    Simply put, Plaintiff paid a substantial amount for something he never received, and

9   was unable to fully recoup that loss through the subsequent sale of the Vehicle.

10         **7.    Maryland Plaintiff**

11         70.    Michael Skena is a citizen and resident of Maryland domiciled in Mt. Airy, Maryland.

12   On or about January 14, 2011, Plaintiff purchased a new 2011 Volkswagen Jetta SportwagenTDI

13   from King VW, an authorized Volkswagen dealer in Gaithersburg, Maryland. Plaintiff purchased the

14   Vehicle because it claimed to have "Clean Diesel" technology. He used the Vehicle for daily driving

15   and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a

16   cheat device designed to bypass emission standards and deceive consumers and regulators.

17   Consequently, the Vehicle could not deliver the advertised combination of low emissions, high

18   performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct

19   and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had

20   Defendants not concealed the illegal defeat device. Plaintiff recalls the price for the Vehicle being

21   significantly higher than the non-diesel, or gas, model. If Plaintiff had known the true emissions

22   levels and gas mileage of the Vehicle, Plaintiff would have likely purchased another type of vehicle

23   instead. Plaintiff traded in the Vehicle in June 2015.

24         71.    Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the

25   Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the

26   premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents

27   an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it

28

compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

72.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**8.     Massachusetts Plaintiff**

73.     Melissa St. Croix is a citizen and resident of Massachusetts domiciled in Kingston, Massachusetts. On or about December 31, 2012, Plaintiff purchased a new 2013 Volkswagen Jetta TDI, VIN 3VWLL7AJ3DM404284, for $27,137 from Mastria Volkswagen in Raynham, Massachusetts. When Plaintiff was in the market for a new car in 2012, she was looking for good fuel efficiency and a car that would be good for the environment. Plaintiff commutes 70 miles a day to Boston for her job, so fuel efficiency is important to her. Plaintiff specifically purchased the Vehicle because of its reportedly good fuel efficiency and because it was supposed to have been less harmful to the environment. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle had Defendants not concealed the illegal cheat device. Plaintiff no longer owns the Vehicle as she traded it on September 4, 2015, for approximately $9,500.

74.     Between the time that Plaintiff purchased the Vehicle and the time that she traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

75.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 23% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $16,609 during the time Plaintiff owned it

("Depreciation"),[5] the "clean diesel" feature accounted for approximately $3,817 of that depreciation (Clean Diesel % of Value × Depreciation).

76.     In addition, Plaintiff paid an estimated $559 in finance charges associated with ownership of the Vehicle—approximately 23% of which Plaintiff incurred in order to pay for the "clean diesel" feature she did not receive.

77.     Simply put, Plaintiff paid a substantial amount for something she never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

### 9.     Michigan Plaintiff

78.     Andrew Olson is a citizen and resident of Michigan domiciled in Canton, Michigan. On or about May 26, 2011, Plaintiff purchased a new 2011 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ7BM660636, for approximately $29,000 from Vyletel Volkswagen in Sterling Heights, Michigan. Plaintiff purchased the Vehicle because it claimed to have "Clean Diesel" technology and good miles per gallon without having to add urea or other additives. He used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff recalls the price for the Vehicle being significantly higher than the non-diesel, or gas, model. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would have likely purchased a gas-electric hybrid vehicle instead, such as a Toyota Prius. Plaintiff sold the Vehicle in August 2015 for $13,000.

79.     Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents

---

[5] In Plaintiff's case, she purchased the Vehicle for $26,109 and traded it in for approximately $9,500.

1    an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it

2    compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact

3    exist, but was a figment based on Defendants' misrepresentations.

4          80.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the

5    "clean diesel" feature accounted for approximately 21% of the purchase price of the Vehicle ("Clean

6    Diesel % of Value"). Assuming the vehicle depreciated by $16,000 during the time Plaintiff owned it

7    ("Depreciation"),[6] the "clean diesel" feature accounted for approximately $3,310.34 of that

8    depreciation (Clean Diesel % of Value × Depreciation).

9          81.     Simply put, Plaintiff paid a substantial amount for something he never received, and

10   was unable to fully recoup that loss through the subsequent sale of the Vehicle.

11         **10.    Mississippi Plaintiff**

12         82.     John Kubala is a citizen and resident of Mississippi domiciled in Brandon,

13   Mississippi. On or about May 27, 2012, Plaintiff purchased a new 2012 Volkswagen Jetta TDI, VIN

14   3VWLL7AJ9CM406037, for $27,433 from Jackson Imports, an authorized Volkswagen dealer in

15   Jackson, Mississippi. Plaintiff purchased the Vehicle because it claimed to have "Clean Diesel"

16   technology and good miles per gallon without having to add urea or other additives. He used the

17   Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of

18   acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive

19   consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of

20   low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

21   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

22   Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff recalls the price for the

23   Vehicle being significantly higher than the non-diesel, or gas, model. If Plaintiff had known the true

24   emissions levels and gas mileage of the Vehicle, Plaintiff would have likely purchased another type

25   of diesel vehicle instead. Plaintiff traded in the Vehicle in June 2015 for $13.500.

26

27   ───────────────
       [6] In Plaintiff's case, he purchased the Vehicle for approximately $29,000 and sold it for $13,000.

28

CLASS ACTION COMPLAINT - 22
Case No.:
010549-11  973652 V1

83.     Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

84.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 22% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $13,933 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $3,047 of that depreciation (Clean Diesel % of Value × Depreciation).

85.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**11.     Missouri Plaintiff**

86.     Brendan Daly is a citizen and resident of Oregon domiciled in Portland, Oregon. On or about October 3, 2008, Plaintiff leased a new 2009 Volkswagen Jetta TDI, VIN 3VWRL71K69M036208, from Dean Team Volkswagen ("the dealership") in Kirkwood, Missouri. At the time when Plaintiff initially leased the Vehicle, Plaintiff was a citizen and resident of Missouri domiciled in St. Louis, Missouri. Plaintiff chose to lease the Vehicle for its reported fuel efficiency and low emissions. He used the Vehicle primarily for personal use and for commuting to work.

87.     Plaintiff signed a 3-year lease with First National Bank of St. Louis. Then on June 14, 2011, when Plaintiff was still a citizen and resident of Missouri, Plaintiff chose to purchase the Vehicle for $20,893.00. Plaintiff traded in the Vehicle in July 2015 for $6,000.

88.     Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased or purchased the Vehicle, had Defendants not

concealed the illegal defeat device. Plaintiff would have leased and purchased a different vehicle and not have spent the extra money on the Vehicle if he knew there was no environmental benefit. Additionally, Plaintiff had difficulty getting the vehicle to pass inspection in June 2011, and he ultimately had to take the vehicle to the dealership in order to get the vehicle to pass an inspection performed by the dealership

89.     Between the time that Plaintiff leased the Vehicle and the time that Plaintiff turned in the Vehicle, Plaintiff made payments based on the Vehicle's value at the time of the Lease—a value that was artificially inflated by Defendants' representations regarding the "clean diesel" feature. The amount of Plaintiff's loss due to that artificial inflation is substantial and calculable, and Plaintiff was never compensated for that loss.

90.     For example, the Lease reflects an "estimated wholesale value at end of lease term" for the Vehicle of $18,000; the "clean diesel" feature accounted for approximately $6,000 (or 33%) of the value of the Vehicle ("Clean Diesel % of Value"). Thus, of the $11,202 Plaintiff paid over the course of the Lease, Plaintiff paid $3,734 (Vehicle Value × Clean Diesel % of Value) for a feature that Plaintiff never received. Plaintiff was never compensated for that loss.

91.     In addition, between the time that Plaintiff purchased the Vehicle at the end of his Lease and the time that he traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

92.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 29% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $14,893 during the time Plaintiff owned it

("Depreciation"),[7] the "clean diesel" feature accounted for approximately $4,277 of that depreciation (Clean Diesel % of Value × Depreciation).

93.     In addition, Plaintiff paid an estimated $1,062 in finance charges associated with ownership of the Vehicle—approximately 29% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

94.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**12.     New Jersey Plaintiff**

95.     Steven Ferdinand is a citizen and resident of New York domiciled in Long Island City, New York. In or about July 19, 2010, Plaintiff purchased a new 2011 Volkswagen Golf TDI for approximately $32,000 from World Volkswagen, an authorized Volkswagen dealer in Neptune, New Jersey. He used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would not have purchased it, and would likely have purchased another vehicle instead. Plaintiff sold the Vehicle in August, 2015 for approximately $8,000.

96.     Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

97.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 18% of the purchase price of the Vehicle ("Clean

---

[7] In Plaintiff's case, he purchased the Vehicle for $20,893 and traded it in for $6,000.

Diesel % of Value"). Assuming the vehicle depreciated by $26,000 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $4,588 of that depreciation (Clean Diesel % of Value × Depreciation).

98.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**13.     New York Plaintiffs**

99.     Ken Galluccio is a citizen and resident of New York domiciled in Scotia, New York. On or about March 2010, Plaintiff purchased a new 2010 Volkswagen Jetta Sportwagen TDI, VIN 3VWTL7AJ4AM643404, for approximately $28,754 from Langan Motor Car in Schenectady, New York. Plaintiff and his wife have always been environmentally conscious. In the ten years prior to purchasing the Vehicle, Plaintiff and his wife had purchased a Toyota Prius as part of their efforts to be good stewards of the environment. Eventually, Plaintiff and his wife decided they needed a car with more space than their Prius, but they still wanted a vehicle with good gas mileage and that was not bad for the environment. The Vehicle had the space Plaintiff wanted and also reportedly had good gas mileage and clean diesel, so Plaintiff selected and purchased the Vehicle. Plaintiff used the Vehicle for personal use. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff no longer owns the Vehicle as he traded it in May 2015. Plaintiff received $7,500 for the Vehicle at trade-in.

100.     Between the time that Plaintiff purchased the Vehicle and the time that he traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

101.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 21% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $21,254 during the time Plaintiff owned it ("Depreciation"),[8] the "clean diesel" feature accounted for approximately $4,435 of that depreciation (Clean Diesel % of Value × Depreciation).

102.    In addition, Plaintiff paid an estimated $2,549 in finance charges associated with ownership of the Vehicle—approximately 21% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

103.    Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

104.    Steven Rawczak is a citizen and resident of Washington domiciled in Redmond, Washington. On or about July 18, 2013, Plaintiff purchased a new 2013 Volkswagen Passat SEL TDI, VIN 1VWCN7A38DC072971, for approximately $31,544 from Koeppel Volkswagen in Woodside, New York.  Plaintiff initially purchased the Vehicle because of the reportedly high gas mileage and allegedly clean emissions. Plaintiff used the Vehicle for personal use. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal defeat device. Instead of purchasing a TDI model, Plaintiff would have purchased a regular Volkswagen model. Plaintiff no longer owns the Vehicle as he traded it in on September 13, 2015. Plaintiff received $10,000 for the Vehicle at trade-in.

105.    Between the time that Plaintiff purchased the Vehicle and the time that he traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents

---

[8] In Plaintiff's case, he purchased the Vehicle for $28,754 and traded it in for $7,500.

an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

106.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 19% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $21,544 during the time Plaintiff owned it ("Depreciation"),[9] the "clean diesel" feature accounted for approximately $4,097.90 of that depreciation (Clean Diesel % of Value × Depreciation).

107.    In addition, Plaintiff paid an estimated $1,342 in finance charges associated with ownership of the Vehicle—approximately 19% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

108.    Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**14.    North Carolina Plaintiffs**

109.    Mark Miller is currently a citizen and resident of West Virginia domiciled in Milton, West Virginia. On or about June 10, 2013, Plaintiff purchased a new 2013 Volkswagen Beetle, VIN 3VW6L7ATXDM821190, for $27,800 from Flow Volkswagen in Greensboro, North Carolina. Plaintiff purchased the Vehicle primarily because of its reportedly high gas mileage. Plaintiff used the Vehicle for personal use. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emissions standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed the illegal cheat device; instead, Plaintiff would have purchased the regular model and not the diesel model, or Plaintiff would have purchased a different vehicle

---

[9] In Plaintiff's case, he purchased the Vehicle for approximately $31,544 and traded it in for approximately $10,000.

altogether. Plaintiff no longer owns the Vehicle as the clutch wore out when the Vehicle was not very old. The estimated repair cost was approximately $3,000, so Plaintiff traded the vehicle in on July 9, 2015, for $14,500.

110.     Between the time that Plaintiff purchased the Vehicle and the time that he traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for the "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

111.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 22% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $13,300 during the time Plaintiff owned it ("Depreciation"),[10] the "clean diesel" feature accounted for approximately $2,870.50 of that depreciation (Clean Diesel % of Value × Depreciation).

112.     In addition, Plaintiff paid approximately $200 in finance charges associated with ownership of the Vehicle—approximately 22% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

113.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

114.     Sven Hofmann is a citizen and resident of North Carolina domiciled in Greensboro, North Carolina. On or about May 27, 2009, Plaintiff purchased a new 2009 Volkswagen Sportwagen TDI, VIN 3VWTL71K09M340219, for $29,162 from Flow Motors in Greensboro, North Carolina. At the time of purchase, Plaintiff was a citizen and resident of North Carolina and was domiciled in Cameron, North Carolina. Plaintiff chose to purchase the Vehicle because of its reported fuel efficiency, clean diesel, and practicality. Plaintiff tries to do his part for the environment, so the fact

---

[10] In Plaintiff's case, he purchased the Vehicle for approximately $27,800 and traded it in for $14,500.

that the Vehicle was touted as clean diesel was a big selling point for Plaintiff. Plaintiff used the Vehicle for personal use. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would likely not have purchased the Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff no longer owns the Vehicle as he traded it in on August 31, 2015. Plaintiff received $8,500 for the Vehicle at trade-in.

115.   Between the time that Plaintiff purchased the Vehicle and the time that he traded in the Vehicle, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for the "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

116.   For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 21% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $20,662 during the time Plaintiff owned it ("Depreciation"),[11] the "clean diesel" feature accounted for approximately $4,251 of that depreciation (Clean Diesel % of Value × Depreciation).

117.   In addition, Plaintiff paid an estimated $2,195 in finance charges associated with ownership of the Vehicle—approximately 21% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

118.   Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

---

[11] In Plaintiff's case, he purchased the Vehicle for $29,162 and traded it in for $8,500.

1

**15.    Ohio Plaintiff**

2     119.    Thomas Siehl, III is a citizen and resident of Ohio domiciled in Grove City, Ohio. On

3     August 18, 2008, Plaintiff purchased a new 2009 Volkswagen Jetta TDI, VIN

4     3VWAL71K99M015219, for approximately $27,000 from Hatfield Volkswagen in Columbus, Ohio.

5     The Vehicle purchased by Plaintiff was the first TDI Jetta that the dealer received from Volkswagen.

6     Plaintiff chose to purchase the Vehicle because it was touted as being fuel efficient and clean with

7     good gas mileage and decent power. Plaintiff was so excited that he picked up the Vehicle mere

8     hours after it arrived at the dealer. Plaintiff recalls actually bragging to a friend that the Vehicle was

9     actually cleaner and better for the environment than a Prius after taking into account the reported

10    environmentally-friendly features of the Vehicle as well as all of the Prius' battery manufacturing

11    and replacements. Plaintiff used the Vehicle to commute to and from work, for personal use, and for

12    business travel between office sites.

13    120.    Unbeknownst to Plaintiff, at the time of purchase, the Vehicle contained a cheat

14    device designed to bypass emission standards and deceive consumers and regulators. Consequently,

15    the Vehicle could not deliver the advertised combination of low emissions, high performance, and

16    fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result

17    of Defendants' conduct, and would not have purchased the Vehicle, had Defendants not concealed

18    the illegal defeat device. Plaintiff no longer owns the Vehicle as he traded it in on August 23, 2010.

19    Plaintiff received $17,594.86 for the Vehicle at trade-in.

20    121.    Between the time that Plaintiff purchased the Vehicle and the time that he traded it in,

21    the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the

22    premium that consumers paid for the "clean diesel" feature. This "clean diesel depreciation"

23    represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle;

24    nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did

25    not in fact exist, but was a figment based on Defendants' misrepresentations.

26    122.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the

27    "clean diesel" feature accounted for approximately 22% of the purchase price of the Vehicle ("Clean

28    Diesel % of Value"). Assuming the vehicle depreciated by $9,930 during the time Plaintiff owned it

CLASS ACTION COMPLAINT - 31
Case No.:
010549-11  973652 V1

("Depreciation"),[12] the "clean diesel" feature accounted for approximately $2,165 of that depreciation (Clean Diesel % of Value × Depreciation).

123.     In addition, Plaintiff paid an estimated $2,070 in finance charges associated with ownership of the Vehicle—approximately 22% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

124.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**16.     Oregon Plaintiff**

125.     Adam Schell is a citizen and resident of California domiciled in Calabasas, California. On or about July 2008, Plaintiff purchased a new 2009 Volkswagen Jetta Sportwagen TDI (VIN unknown) (for this paragraph, the "2009 Vehicle"), for approximately $33,000 from New Century Volkswagen in Glendale, California. At the time of purchase of the 2009 Vehicle, Plaintiff was a citizen and resident of California and was domiciled in Los Angeles, California. Plaintiff sold the 2009 Vehicle for $18,000 in approximately September 2010 and, subsequently, on or about September 2010, Plaintiff purchased a new 2011 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ1BM624747 (for the purpose of this paragraph, the "2011 Vehicle"), for approximately $35,000 from Carrera Motors in Bend, Oregon. At the time of purchase of the 2011 Vehicle, Plaintiff was a citizen and resident of Oregon and was domiciled in Bend, Oregon. Plaintiff considers himself an environmentalist and chose both Vehicles because they were touted as being environmentally friendly. Plaintiff was so excited about the purported environmentally friendly aspects of the 2009 Vehicle that he had his name placed on a waiting list at New Century Volkswagen. Plaintiff used both the 2009 Vehicle and the 2011 Vehicle for personal use and for commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the 2009 Vehicle and the 2011 Vehicle both contained a defeat device designed to bypass emission standards and deceive consumers and regulators. The 2009 Vehicle and the 2011 Vehicle could not deliver the advertised combination of

---

[12] In Plaintiff's case, he purchased the Vehicle for approximately $27,525 and traded it in for $17,595.

low emissions, high performance, and fuel economy—and were illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and absolutely would not have purchased the 2009 Vehicle or the 2011 Vehicle, had Defendants not concealed the illegal cheat device. Plaintiff sold the 2009 Vehicle five years before VW's disclosure of its fraud, for approximately $18,000. Plaintiff traded in the 2011 Vehicle approximately two years before VW's disclosure of its fraud, for approximately $17,000.

126.    Between the time that Plaintiff purchased the both Vehicles and the time that he sold or traded each Vehicle in, the Vehicles depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for the "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale / trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

127.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 18% of the purchase price of the 2009 Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $15,000 during the time Plaintiff owned it ("Depreciation"),[13] the "clean diesel" feature accounted for approximately $2,727.27 of that depreciation (Clean Diesel % of Value × Depreciation).

128.    In addition, Plaintiff paid an estimated $1,412 in finance charges associated with ownership of the Vehicle—approximately 18% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

129.    With respect to the 2011 Vehicle, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 17% of the purchase price of the 2011 Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $18,000 during the time Plaintiff

---

[13] In Plaintiff's case, he purchased the 2009 Vehicle for approximately $33,000 and sold it for approximately $18,000.

owned it ("Depreciation"),[14] the "clean diesel" feature accounted for approximately $3,085.71 of that depreciation (Clean Diesel % of Value × Depreciation).

130.    In addition, Plaintiff paid an estimated $1,922 in finance charges associated with ownership of the Vehicle—approximately 17% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

131.    Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**17.    Pennsylvania Plaintiff**

132.    Bradley Conner is a citizen and resident of Michigan domiciled in Fort Collins, Colorado. On or about December 21, 2012, Plaintiff leased a new 2013 Volkswagen Golf TDI, VIN WVWDM7AJ8DW007934 from Jim Wynn Volkswagen, an authorized Volkswagen dealer in West Norriton Township, Pennsylvania. Plaintiff was looking for an environmentally friendly vehicle to lease, and believed Volkswagen's claims that the Vehicle contained the "clean" diesel technology advertised by the company. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. The Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased the Vehicle, had Defendants not concealed the illegal cheat device.

133.    Plaintiff signed a 3-year lease with VW Credit Leasing. Then, in approximately February 2015, Plaintiff chose to purchase the Vehicle, and then promptly traded it in for another vehicle.

134.    Between the time that Plaintiff leased the Vehicle and the time that Plaintiff purchased the Vehicle, Plaintiff made payments based on the Vehicle's value at the time of the Lease—a value that was artificially inflated by Defendants' representations regarding the "clean

---

[14] In Plaintiff's case, he purchased the 2011 Vehicle for approximately $35,000 and traded it for approximately $17,000.

diesel" feature. The amount of Plaintiff's loss due to that artificial inflation is substantial and calculable, and Plaintiff was never compensated for that loss.

135.    For example, the Lease reflects a value for the Vehicle of $31,187. Assuming the "clean diesel" feature accounted for approximately $6,000 (or 19%) of the value of the Vehicle, of the approximately $9,467 Plaintiff paid over the course of the Lease, Plaintiff paid $1,821 ($9,467 × 19%) for a feature that Plaintiff never received. Plaintiff was never compensated for that loss. In addition, the Lease committed Plaintiff to pay a $358 start-up fee, as well as a purchase option fee—fees that Plaintiff would never have paid had Plaintiff been informed of the fraud.

### 18.    Texas Plaintiff

136.    Benjamin Tyler Dunn is a citizen and resident of Florida domiciled in Jacksonville, Florida. On or about May 22, 2012, Plaintiff purchased a new 2012 Volkswagen Jetta Sportwagen, VIN 3VWPL7AJ1CM643090, for $28,373 from Volkswagen of Corpus Christi in Corpus Christi, Texas. Plaintiff specifically selected and purchased the Vehicle because of its reportedly good gas mileage and high performance. He drove the vehicle primarily for personal use. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. The Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff suffered concrete injury as a direct and proximate result of Defendants' conduct, and likely would not have purchased the Vehicle had Defendants not concealed the illegal cheat device.

137.    Plaintiff traded in the Vehicle a little less than two years before VW's disclosure of its fraud for $16,000. Plaintiff financed his purchase through Volkswagen of Corpus Christi, at a rate of 1.9% per annum.

138.    Between the time that Plaintiff purchased the Vehicle and the time that he traded it in, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

139.     For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 20% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $13,514 during the time Plaintiff owned it ("Depreciation"),[15] the "clean diesel" feature accounted for approximately $2,747 of that depreciation (Clean Diesel % of Value × Depreciation).

140.     In addition, Plaintiff paid an estimated $365 in finance charges associated with ownership of the Vehicle—approximately 20% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

141.     Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**19.     Utah Plaintiff**

142.     Ingrid Salgado is a citizen and resident of Nevada domiciled in Las Vegas, Nevada. On or about July 30, 2010, Plaintiff purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ6AM152214, for approximately $32,000 from SouthTowne Volkswagen, an authorized Volkswagen dealer in Draper, Utah. She used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would not have purchased it, and would likely have purchased another vehicle instead. Plaintiff traded in the Vehicle in January 2014 for $23,997.

143.     Between the time that Plaintiff purchased the Vehicle and the time that she sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent trade-in of the Vehicle; nor was it

---

[15] In Plaintiff's case, he purchased the Vehicle for $29,514 and traded it in for $16,000.

compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

144.   For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 19% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $8,003 during the time Plaintiff owned it ("Depreciation"), the "clean diesel" feature accounted for approximately $1,501 of that depreciation (Clean Diesel % of Value × Depreciation).

145.   Simply put, Plaintiff paid a substantial amount for something she never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

### 20.   Vermont Plaintiff

146.   Michael Bowman is a citizen and resident of New York, domiciled in Wallkill, New York. In or about March 2013, Plaintiff purchased a new 2010 VW Jetta SportWagen TDI, for approximately $22,000 in Burlington, Vermont. He used the Vehicle for daily driving and commuting to work. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle contained a cheat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. If Plaintiff had known the true emissions levels and gas mileage of the Vehicle, Plaintiff would not have purchased it, and would likely have purchased another vehicle instead. Plaintiff sold the Vehicle in June 2013 for approximately $12,000.

147.   Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the premium that consumers paid for the "clean diesel" feature. This "clean diesel depreciation" represents an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact exist, but was a figment based on Defendants' misrepresentations.

148.   For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 27% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $10,000 during the time Plaintiff owned it

1    ("Depreciation"), the "clean diesel" feature accounted for approximately $2,727 of that depreciation

2    (Clean Diesel % of Value × Depreciation).

3          149.    In addition, Plaintiff paid an estimated $611 in finance charges associated with

4    ownership of the Vehicle—approximately $167 of which Plaintiff incurred in order to pay for the

5    "clean diesel" feature he did not receive.

6    Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to

7    fully recoup that loss through the subsequent sale of the Vehicle.

8          **21.    Virginia Plaintiff**

9          150.    Jon Mosley is currently a citizen and resident of Virginia domiciled in Reston,

10   Virginia. On or about July 30, 2011, Plaintiff purchased a new 2011 Volkswagen Golf TDI, VIN

11   WVWDM7AJ1BW351103, for $26,931 from Lindsay Volkswagen in Sterling, Virginia. Plaintiff

12   used the Vehicle for personal use. Unbeknownst to Plaintiff, at the time of acquisition, the Vehicle

13   contained a cheat device designed to bypass emissions standards and deceive consumers and

14   regulators. Consequently, the Vehicle could not deliver the advertised combination of low emissions,

15   high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a

16   direct and proximate result of Defendants' conduct, and would not have purchased the Vehicle, had

17   Defendants not concealed the illegal cheat device. Additionally, Plaintiff had numerous issues with

18   the Vehicle including recurrent appearances of the "check engine" light and failed inspections due to

19   the vehicle's emissions level. These issues cost Plaintiff both time and money. Plaintiff is appalled

20   that Volkswagen circumvented government regulations and deceived the public and the government

21   concerning fuel efficiency and emissions levels. Plaintiff does not plan to ever purchase another

22   Volkswagen or Audi. Plaintiff no longer owns the Vehicle as he sold it in August 2014 for $12,000.

23         151.    Between the time that Plaintiff purchased the Vehicle and the time that he sold it, the

24   Vehicle depreciated significantly in value. A share of that overall depreciation is allocable to the

25   premium that consumers paid for "clean diesel" feature. This "clean diesel depreciation" represents

26   an amount that was not recovered through Plaintiff's subsequent sale of the Vehicle; nor was it

27   compensated for by the existence of the feature itself, since the "clean diesel" feature did not in fact

28   exist, but was a figment based on Defendants' misrepresentations.

152.    For example, in Plaintiff's case, assuming a "clean diesel premium" of $6,000, the "clean diesel" feature accounted for approximately 22% of the purchase price of the Vehicle ("Clean Diesel % of Value"). Assuming the vehicle depreciated by $14,931 during the time Plaintiff owned it ("Depreciation"),[16] the "clean diesel" feature accounted for approximately $3,326.50 of that depreciation (Clean Diesel % of Value × Depreciation).

153.    In addition, Plaintiff paid an estimated $965 in finance charges associated with ownership of the Vehicle—approximately 22% of which Plaintiff incurred in order to pay for the "clean diesel" feature he did not receive.

154.    Simply put, Plaintiff paid a substantial amount for something he never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.

**B.    Defendants**

　　**1.    Volkswagen Defendants**

　　　　**a.    <u>Volkswagen AG</u>**

155.    Volkswagen AG ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany. VW AG is one of the largest automobile manufacturers in the world, and designs, develops, manufactures, and sells automobiles. VW AG is the parent corporation of VW America and Audi AG. According to VW AG, it sold 10.14 million cars worldwide in 2014—including 6.12 million VW-branded cars, 1.74 million Audi-branded cars, and 189,849 Porsche-branded cars. Combined with other brands, VW AG boasts a 12.9% share of the worldwide passenger car market. VW AG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion). At €12.7 billion (approximately $13.9 billion), VW AG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

156.    VW AG with the assistance of Bosch GmbH engineered, designed, developed, manufactured, and installed the defeat device software on the Class Vehicles equipped with the 2.0-liter and 3.0-liter TDI engines and exported these vehicles with the knowledge and understanding

---

[16] In Plaintiff's case, he purchased the Vehicle for $26,931 and sold it for $12,000.

1  they would be sold throughout the United States. Audi developed the 3.0-liter TDI diesel engine

2  utilized in the VW Touareg and Cayenne Class Vehicles. VW AG also developed, reviewed, and

3  approved the marketing and advertising campaigns designed to sell the Class Vehicles.

4            **b.**    **Volkswagen Group of America, Inc.**

5      157.    Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation

6  with its principal place of business at 2200 Ferdinand Drive, Herndon, Virginia 20171. VW America

7  is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the

8  advertising, marketing and sale of Volkswagen automobiles, in all states. In 2014 alone, VW

9  America sold 552,729 vehicles from its 1,018 dealer locations in all 50 states, including 95,240 TDI

10  "clean" diesel vehicles.

11            **c.**    **Audi AG**

12      158.    Audi AG ("Audi AG") is a German corporation with its principal place of business in

13  Ingolstadt, Germany. Audi AG is the parent of Audi of America, LLC and a subsidiary of the Audi

14  Group, which is a wholly-owned subsidiary of VW AG. Audi AG designs, develops, manufactures,

15  and sells luxury automobiles. According to Audi AG, the Audi Group sold 1.74 million cars

16  worldwide in 2014, with sales revenues in 2014 totaling €53.8 billion (approximately $58.5 billion).

17  Audi AG's operating profit in fiscal year 2014 was €5.15 billion (approximately $5.63 billion).

18      159.    Audi AG with the assistance of Bosch GmbH engineered, designed, developed,

19  manufactured and installed the defeat device software on the Class Vehicles equipped with the 3.0-

20  liter TDI diesel engine, and exported these vehicles with the knowledge and understanding they

21  would be sold throughout the United States. Audi AG also developed, reviewed, and approved the

22  marketing and advertising campaigns designed to sell its Audi Class Vehicles. According to the U.S.

23  government, approximately 80,000 3.0-liter TDI® diesel engine vehicles containing the defeat

24  device were sold by VW and Audi in the United States.

25            **d.**    **Audi of America, LLC**

26      160.    Audi of America, LLC ("Audi America") is a Delaware limited liability company

27  with its principal place of business at 2200 Ferdinand Drive, Herndon, Virginia 20171. Audi

28

1    America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the

2    advertising, marketing and sale of Audi automobiles, in all 50 states.

3            **2.      Bosch Defendants**

4            161.    From at least 2005 to 2015, Bosch GmbH and Bosch LLC were each knowing and

5    active participants in the creation, development, marketing, and sale of illegal defeat devices

6    specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United

7    States. Each Bosch entity participated not just in the development of the defeat device, but in the

8    scheme to prevent U.S. regulators from uncovering the device's true functionality. Moreover, each

9    Bosch entities' participation was not limited to engineering the defeat device (in a collaboration

10   described as unusually close). Rather, each entity marketed "Clean Diesel" in the United States and

11   lobbied U.S. regulators to approve Class Vehicles, another highly unusual activity for a mere

12   supplier.  Each Bosch entity met with U.S. regulators and assured them the vehicles were compliant.

13   These efforts, taken together with evidence of each Bosch's entities' actual knowledge that the

14   "akustikfunction" operated as a defeat device, and participation in concealing the true functionality

15   of the device from U.S. regulators, can be interpreted only one way under U.S. law:  Each Bosch

16   entity was a knowing and active participant in a massive, decade-long conspiracy with VW to

17   defraud U.S. consumers.

18           **a.      Robert Bosch GmbH**

19           162.    Robert Bosch GmbH ("Bosch GmbH") is a German multinational engineering and

20   electronics company headquartered in Gerlingen, Germany. Bosch GmbH is the parent company of

21   Robert Bosch LLC. Bosch GmbH, directly and/or through its North-American subsidiary Robert

22   Bosch LLC, at all material times, designed, manufactured, developed, tailored, reviewed, approved,

23   and supplied elements of the defeat device to Volkswagen for use in the Class Vehicles. Bosch

24   GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of

25   the United States through its management and control over Bosch, LLC, and over the design,

26   development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat

27   devices installed in the Class Vehicles sold or leased in the U.S.

28

1

**b.**     **Robert Bosch, LLC**

2        163.    Robert Bosch LLC ("Bosch LLC") is a Delaware limited liability company with its

3    principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.

4    Bosch LLC is a wholly-owned subsidiary of Bosch GmbH, which wholly owns and controls Bosch

5    LLC. At all material times, Bosch LLC, directly and/or in conjunction with its parent Bosch GmbH,

6    designed, manufactured, developed, tailored, reviewed, approved, and supplied elements of the

7    defeat device to Volkswagen for use in the Class Vehicles.

8        164.    Both Bosch GmbH and Bosch LLC ("Bosch") operate under the umbrella of the

9    Bosch Group, which encompasses some 340 subsidiaries and companies. The Bosch Group is

10   divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial

11   Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector,

12   which supplies parts to the automotive industry, and its Diesel Systems division, which develops,

13   manufacturers and applies diesel systems, are particularly at issue here and include the relevant

14   individuals at both Bosch GmbH and Bosch LLC. Bosch's sectors and divisions are grouped not by

15   location, but by subject matter. Mobility Solutions includes the relevant individuals at both Bosch

16   GmbH and Bosch LLC. Regardless of whether an individual works for Bosch LLC or Bosch GmbH,

17   the individual often holds him or herself out as working for "Bosch." This collective identity is

18   captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity

19   and person within the Bosch Group.[17]  Bosch documents and press releases often refer to the author

20   as "Bosch" without identifying any particular Bosch entity.

21       165.    From at least 2005 to 2015, Robert Bosch GmbH, Robert Bosch LLC, and currently

22   unnamed Bosch employees (together, "Bosch") were knowing and active participants in the creation,

23   development, marketing, and sale of illegal defeat devices specifically designed to evade U.S.

24   emissions requirements in vehicles sold solely in the United States and Europe, not just the vehicles

25   in this case. These vehicles include the Dodge Ram 1500 EcoDiesel and Jeep Grand Cherokee

26

27       [17] Bosch 2014 Annual Report: "Experiencing quality of life," available at
http://www.bosch.com/en/com/bosch_group/bosch_figures/publications/archive/archive-cg12.php.

28

CLASS ACTION COMPLAINT - 42
Case No.:
010549-11  973652 V1

1  EcoDiesel, the GM Silverado and Sierra, and Mercedes BlueTEC vehicles, as well as models made

2  by Volkswagen, Audi, and Porsche.

3       166.    The following is a list of all diesel models in the United States with software supplied

4  by Bosch GmbH whose emissions exceed standards and are beyond what a reasonable consumer

5  would expect from cars marketed as "clean" or "low emission":



22       167.    German authorities are now investigating Bosch and authorities are focusing on

23  certain Bosch employees:

24           https://www.bloomberg.com/news/articles/2017-06-29/three-bosch-
             managers-targeted-as-german-diesel-probe-expands

25

26           **Three Bosch Managers Targeted as German Diesel Probe Expands**

27           A German probe into whether Robert Bosch GmbH
             helped Volkswagen AG cheat on emissions tests intensified as

28

Stuttgart prosecutors said they were focusing on three managers at the car-parts maker.

While Stuttgart prosecutors didn't identify the employees, the step indicates that investigators may have found specific evidence in the probe. Previously, prosecutors have said they were looking into the role "unidentified" Bosch employees may have played in providing software that was used to cheat on emission tests.

"We have opened a probe against all three on suspicions they aided fraud in connection to possible manipulation in emissions treatments in VW cars," Jan Holzner, a spokesman for the agency, said in an emailed statement. "All of them are mangers with the highest in middle management."

Bosch, which is also being investigated by the U.S. Department of Justice, has been caught up in the VW diesel scandal that emerged in 2015 over allegations its employees may have helped rig software that helped the carmaker to cheat emission tests. Earlier this year, Stuttgart prosecutors opened a similar probe into Bosch's role in connection with emission tests of Daimler cars.

A spokesman for Bosch said that while he can't comment on individual employees, the company "takes the overall allegations in diesel cases seriously and has been cooperating fully from the beginning of the probes."

The Stuttgart probe is running parallel to the central criminal investigation in Braunschweig, closer to VW's headquarters. That investigation is targeting nearly 40 people on fraud allegations related to diesel-emission software, including former VW Chief Executive Officer Martin Winterkorn.

Prosecutors' interest extends to multiple units in the VW family -- including luxury brands Audi and Porsche. In addition, Stuttgart prosecutors are also reviewing a third case related to Bosch's cooperation with Fiat Chrysler Automobiles NV on software for diesel engines.

### 3. Individual Defendants who participated in the conspiracy.

#### a. Richard Dorenkamp ("Dorenkamp").

168. From in or about 2003 until in or about December 2012, defendant Dorenkamp worked for VW AG as the head of VW's Engine Development After-Treatment Department in Wolfsburg, Germany. From in or about 2006 until in or about December 2012, Dorenkamp led a team of engineers that developed the diesel engine (the "EA 189" engine) that was used in the class vehicles.

1

**b.    Heinz-Jakob Neusser ("Neusser")**

2

169.    From in or about July 2013 until in or about September 2015, defendant Neusser

3

worked for VW AG as the head of Development for VW Brand, sat on the management board for

4

VW Brand, and also served as head of Engine Development for all of VW AG. From in or about

5

October 2011, when he joined VW from Porsche, until in or about July 2013, Neusser served as the

6

head of the VW Brand Engine Development department.  In his capacity as head of Development for

7

VW Brand, Neusser supervised a group of approximately 10,000 VW AG employees.

8

**c.    Jens Hadler ("Hadler")**

9

170.    From in or about May 2007 until in or about March 2011, defendant Hadler worked

10

for VW AG as the head of the VW Brand Engine Development department.  Before serving as head

11

of Engine Development, Hadler held various positions within VW AG, including as head of Diesel

12

Engine Development for VW from in or about 2003 until in or about October 2006.

13

**d.    Bernd Gottweis ("Gottweis")**

14

171.    From in or about 2007 until in or about October 2014, defendant Gottweis was a

15

supervisor with responsibility for VW AG's Quality Management and Product Safety department

16

who reported to the head of Quality Management. Before serving in that position, Gottweis held

17

various positions within VW AG.

18

**e.    Oliver Schmidt ("Schmidt")**

19

172.    From in or about 2012 through in or about February 2015, defendant Schmidt was the

20

General Manager in charge of EEO, located in Auburn Hills, Michigan.  From in or about March

21

2015 through in or about September 2015, Schmidt returned to VW AG headquarters in Wolfsburg,

22

Germany, to work as a principal deputy to Neusser in Neusser's capacity as head of Engine

23

Development for all of VW AG.

24

**f.    Jurgen Peter ("Peter")**

25

173.    From in or about 1990 until present, defendant Peter worked for VW AG in the

26

certification group. Between about March 2015 and about July 2015, Peter was one of the VW AG

27

liaisons between the regulatory agencies and VW AG.

28

1        **4.**      **IAV GmbH – (Un-Named Conspirators).**

2        174.      IAV GmbH ("IAV") is a limited liability company headquartered in Berlin, Germany.

3   IAV is an engineering company in the automotive industry and designs products for powertrain,

4   electronics and vehicle development.  Volkswagen is an IAV client.

5        175.      IAV Automotive Engineering Inc. is a subsidiary of IAV based in the U.S.

6        176.      IAV employees were part of working group that included Bosch GmbH, Bosch LLC,

7   VW America and VW AG employees that had a common purpose of designing and implementing a

8   defeat device in U.S.-based diesel Volkswagens.

9                        **V.      COMMON FACTUAL ALLEGATIONS**

10  **A.      Volkswagen's Plot to Dominate the Automotive Market**

11       177.      Volkswagen's decade-long illegal scheme was born out of greed and ambition to

12  dominate the global automotive market at any cost. By Volkswagen's own admissions, the seeds for

13  the scandal were planted in 2005, as Volkswagen was repositioning its fleet because of tightening

14  emission regulations in our country with "a strategic decision to launch a large-scale promotion of

15  diesel vehicles in the United States in 2005."[18] While other automakers focused on hybrid or

16  hydrogen-fueled vehicles, Volkswagen pivoted toward "clean" diesel technology as its primary

17  strategy to reach the growing market of environmentally-conscious consumers.

18       178.      In 2004, the second generation Toyota Prius became an explosive success, tripling

19  global sales from years prior and changing environmentally-friendly vehicles from a niche market to

20  a standard consumer option. Although it was the first mainstream hybrid vehicle, the Prius was

21  widely viewed as a "boring" vehicle, as the improvements in fuel efficiency and emissions were

22  offset by relatively bland styling and lackluster driving performance.

23       179.      Volkswagen noted the success and sought to achieve the same (or better) efficiency

24  benchmarks as the Prius, but in a "fun-to-drive," high-performance vehicle. This was to be achieved

25  with a supposedly remarkable breakthrough in diesel technology: the EA 189 TDI engine.

26  _____

        [18] *Volkswagen making good progress with its investigation, technical solutions, and Group
27  realignment*, Volkswagen AG (Dec. 10, 2015),
    http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/12/VW_PK.html.

28

CLASS ACTION COMPLAINT - 46
Case No.:
010549-11  973652 V1

Volkswagen's TDI (short for "turbocharged direct injection,") diesel engines were the culmination of millions of dollars in research and development, and were heralded as the critical factor that would handle Volkswagen's growth and success in the U.S.

180.     In 2007, Defendant Winterkorn left his position at Audi to become VW AG's CEO. Winterkorn set goals for Volkswagen to become a world leader in automobile manufacturing. This included a target of tripling U.S. sales to at least 800,000 vehicles by 2018.[19] Diesel-engine vehicles made up just 5% of the U.S. car market, and Winterkorn recognized this as the perfect opportunity to expand Volkswagen's market share. In a VW America presentation touting the success of "Clean Diesel," this strategy was employed with great success:[20]



181.     To expand its diesel market penetration in the U.S., Volkswagen needed to overcome the stigmas associated with diesel vehicles. Foremost among these was the consumer perception that diesel engines emit thick, toxic smoke full of dangerous and destructive pollutants, relegated to the smog-filled cities of the past. Volkswagen claimed to have solved all of these environmental

[19] William Boston, *Volkswagen Emissions Investigation Zeroes In on Two Engineers*, Wall Street Journal (Oct. 5, 2015), http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602.

[20] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VWoA_DTF_March2015.pdf.

problems with the new EA 189 engine, which it aggressively marketed as the clean, "green" alternative to hybrid engines, such as those in the Prius.

182.    Bosch LLC, acting in concert with and under the direction of Bosch GmbH, joined in the efforts to change the perception of diesel in the United States.  As early as 2005, Bosch Diesel Systems (a division of Bosch Group that contained employees of both Bosch LLC and Bosch GmbH), and specifically Bosch Diesel Systems employees Lars Ulrich and Joerg Rueger, worked with public relations firm Mightycomm to "target NGOs and regulators in California on behalf of Bosch…"[21]

183.    Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints. To do the job, Winterkorn appointed two engineers with whom he had worked closely at Audi (Ulrich Hackenberg and Wolfgang Hatz[22]) to head up R&D and engine development for this project. These two engineers were the chief developers of the TDI engine.[23] Their primary mandate from management was to develop a diesel engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and fuel consumption, all while meeting the strict $NO_X$ emission standards in the U.S. Winterkorn also relied upon and worked closely with Frank Tuch, VW's head of quality assurance, who was intimately familiar with the engines and transmissions across all Volkswagen brands.

184.    $NO_X$ is a generic term for the mono-nitrogen oxides NO and $NO_2$ (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases

---

[21] VW-MDL2672-152932-35.  Like many documents in this case, this letter from Mightycomm is addressed to Ulrich and Rueger, but does not specify whether they hold positions at Bosch GmbH or Bosch LLC at the time of the letter, instead designating only Bosch Diesel Systems, and speaking of the actions of "Bosch". Bosch GmbH and Bosch LLC, however, certainly know on which company's behalf, if not both companies, these employees were working at the time they were involved in these efforts to promote diesel sales in the United States and California.

[22] Hatz, head of engine development at Volkswagen, and formerly at Audi, subsequently became head of development for Porsche.

[23] Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, N.Y. Times (Oct. 5, 2015), http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html.

in the air during combustion. $NO_X$ is produced by the burning of all fossil fuels, but is difficult to control from the burning of diesel fuel. $NO_X$ is a toxic pollutant, which produces smog and a litany of environmental and health problems, as detailed further below.

185.    Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which produces a more efficientfuel. Diesel engines can convert over 45% of diesel's chemical energy into useful mechanical energy, whereas gasoline engines convert only 30% of gasoline's chemical energy into mechanical energy.[24] To make use of this dense diesel fuel, diesel engines combine high pressure to ignite a combination of diesel fuel and air through "compression ignition," as opposed gasoline engines that typically use electric discharge from a spark plug to ignite a combination of gasoline and air through "spark ignition." Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of $NO_X$ and particulate matter ("PM"), or soot, than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion. $NO_X$ emissions can be reduced by adjusting the compression and temperature, but that produces PM, a similarly undesirable hydrocarbon-based emission. $NO_X$ emissions can also be reduced through expensive exhaust gas after-treatment devices, primarily catalytic converters, that use a series of chemical reactions to transform the chemical composition of a vehicle's $NO_X$ emissions into less harmful, relatively inert, and triple bonded nitrogen gas ($N_2$, which makes up just over 78% of the Earth's atmosphere by volume) and carbon dioxide ($CO_2$).

186.    Diesel engines operate according to this trade-off between price, $NO_X$, and PM, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce **both** low PM and low $NO_X$. In 2000, the EPA announced stricter emission standards requiring all diesel models starting in 2007 to produce drastically less $NO_X$ than in years prior.

187.    These strict emission standards posed a serious challenge to Volkswagen's engineers. During a 2007 demonstration in San Francisco, engine R&D chief Hatz lamented presciently that

---

[24] *Just the Basics, Diesel Engine*, U.S. Dept. of Energy, Office of Energy Efficiency and Renewable Energy (last visited Feb. 8, 2016), *available at* http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf.

"[Volkswagen] can do quite a bit and we will do a bit, but 'impossible' we cannot do. . . . From my point of view, the CARB is not realistic . . . I see it as nearly impossible for [Volkswagen]."[25]

188.    But it was imperative for Volkswagen to achieve (or at least appear to achieve) this "impossible" goal, for it could not legally sell a single vehicle that failed comply with the governmental emission regulations. Before introducing a Class Vehicle into the U.S. stream of commerce (or causing the same), Volkswagen was required to first apply for, and obtain, an EPA-administered COC, certifying that the vehicle comported with the emission standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10.

189.    The federal Clean Air Act ("CAA") expressly prohibits automakers, like Volkswagen, from introducing a new vehicle into the stream of commerce without a valid EPA COC. *See* 42 U.S.C. § 7522(a)(1). Vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. *See* 40 C.F.R. §§ 86.1848-10(c)(6).

190.    California's emission standards were even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

191.    In order to successfully grow the U.S. diesel market and meet its ambitious objectives, it was critical that Volkswagen develop the technology to maintain the efficient, powerful performance of a diesel, while drastically reducing NOx emissions to comply with the CAA and state emission standards.

192.    This high-stakes engineering dilemma led to a deep divide within the company, as two divergent technical approaches emerged to exhaust gas after-treatment. One approach involved a selective catalytic reduction ("SCR") system that proved to be effective but expensive. The other,

---

[25] Danny Hakim, *et al.*, *VW Executive Had a Pivotal Role as Car Maker Struggled With Emissions*, N.Y. Times (Dec. 21, 2015), http://www.nytimes.com/2015/12/22/business/international/vw-executive-had-a-pivotal-role-as-car-maker-struggled-with-emissions.html?mtrref=undefined&gwh=7E46E42F7CCC3D687AEC40DFB2CFA8BA&gwt=pay.

which utilized a lean "NOx trap," was significantly cheaper but was less effective and resulted in lower fuel efficiency.

193.    In 2006, Wolfgang Bernhard, then a top executive at VW AG (and former Daimler executive), advocated for the SCR system and championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR emission control system utilizing urea—a post-combustion emission reductant generically referred to as "Diesel Exhaust Fluid" or "DEF" and marketed as "Bluetec" by Mercedes and "AdBlue" by Volkswagen and other German vehicle manufacturers. When injected into the exhaust stream in a catalyst chamber, DEF converts NOx into nitrogen gas, water, and carbon dioxide. This SCR system was expensive, costing $350 per vehicle, and came with other compromises, including primarily the need for installation of a DEF tank that would require regular refills.

194.    Hatz initially supported this solution, stating publicly at the Detroit Auto Show in early 2007 that "Bluetec technology allows us to demonstrate Audi's commitment to always being at the very forefront of diesel technology."[26] Although the SCR system was ultimately utilized for the larger, 3.0-liter TDI engine, Hatz withdrew his support for using the system in the 2.0-liter engine as Volkswagen's leadership balked at the $350 per-vehicle cost of the SCR system. Bernhard ultimately lost the internal battle at Volkswagen and resigned.

195.    Hatz remained and was tasked with implementing the alternative, lower-cost strategy for the 2.0-liter TDI engine: $NO_X$ traps. This technology involved the storage of $NO_X$ emissions in a catalyst substrate during vehicle operation. Once that substrate filled up, the system burned off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then converted the $NO_X$ into less harmful emissions. This method was cheaper and easier to implement than the SCR system. The $NO_X$ trap system was less effective at reducing emissions, however, and, like the more effective SCR system used in the 3.0-liter engine, still resulted in lower miles-per-gallon fuel efficiency, directly contradicting one of the key elements

---

[26] *Id.*

CLASS ACTION COMPLAINT - 51
Case No.:
010549-11 973652 V1

(high miles-per-gallon fuel efficiency) necessary to execute Volkswagen's ambitious diesel sales goals. Accordingly, this option, too, was unacceptable.

196.    But at Volkswagen, failure was not an option. According to *Germany's Sueddeutsche Zeitung*, quoting documents from Volkswagen's internal investigation, which included testimony from a staff member who participated in the fraud: "Within the company there was a culture of 'we can do everything', so to say something cannot be done, was not acceptable. . . . Instead of coming clean to the management board that it cannot be done, it was decided to commit fraud."[27] According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's top brass directed its engineers to meet emission standards despite tight budgetary and technical constraints, or suffer the consequences. VW AG's former CEO, Ferdinand Piëch ("Piëch"), created "a culture where performance was driven by fear and intimidation," and his leadership was "a reign of terror."[28] Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail. Do it, or I'll find somebody who will."[29] Piëch was infamous for firing subordinates who failed to meet his exacting standards: "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piëch, knowing that if he was displeased, they might be fired instantly."[30] He once called several teams of engineers and executives into his conference room to declare "I am tired of all these lousy body fits. You have six weeks to achieve world-class body fits. I have all your names. If we do not have good body fits in six weeks, I will replace all of you. Thank you for your time today." He explained to a German newspaper he "consciously allow[ed] those in whom I've lost trust to starve by the wayside."[31] This was only a

---

[27] Georgina Prodhan, *Volkswagen probe finds manipulation was open secret in department: newspaper*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[28] Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, Road & Track (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.

[29] *Id.*

[30] Doron Levin, *The man who created VW's toxic culture still looms large*, Fortune (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

[31] Geoffrey Smith and Roger Parloff *Hoaxwagen* (March 7 2016), http://fortune.com/inside-volkswagen-emissions-scandal/

slight exaggeration. In his nine years as CEO of VW AG, he removed three CEOs of Audi until finally promoting Winterkorn, who later transitioned to VW to oversee many events giving rise to this case.[32] It was, it seems, out of self-preservation that the defeat device scandal was born. In the words of one whistleblowing engineer: "instead of telling management that they couldn't meet the parameters, the decision was taken to manipulate. No one had the courage to admit failure. Moreover, the engine developers felt secure because there was no way of detecting the deceit with the testing technology that existed at the time."[33] It was, the whistleblower explained, "an act of desperation."[34]

**B.      Defendants' Illegal "Defeat Device" Scheme**

197.    Ultimately, time ran out on Volkswagen's quest to revolutionize the diesel engine. Volkswagen engineers could not devise a solution within the constraints of the law and their self-imposed cost-cutting measures. So instead of being honest (and risk being summarily fired), they and others conspired to cheat by installing a "defeat device" in the new diesel vehicles so those vehicles could "pass" the EPA and CARB emission testing, and Volkswagen could obtain COCs and EOs to sell the vehicles to make its sales targets throughout the U.S. and in California.

198.    Volkswagen had a ready-made solution at hand. As reported by the New York Attorney General, starting as far back as 1999, Audi engineers had come up with a similar solution to a problem they were facing related to the development of the 3.0-liter diesel engine for Audi models sold in Europe. The engineers had eliminated a noise problem associated with diesel engines by injecting additional fuel into the engine on ignition. But as a result, the engine could not meet European emissions standards during testing. To solve this problem, they developed defeat device software that could recognize when the car was being tested and deactivate the fuel injection function during testing, then reactivate it during normal driving conditions. From 2004-2008, Audi incorporated the defeat device software in its 3.0-liter diesel engines sold in Europe. Since the defeat

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

device software was related to the goal of reducing engine noise, it became known as the "Acoustic Function" or, in German, the "Akustikfunktion."

199.   When it became clear that the 2.0-liter TDI engine being developed for the U.S. market could not meet U.S. emission regulations, and initial emission testing failed, the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007 as part of the "US '07 project," had to be delayed.[35] The prospect of failure was unacceptable, so Volkswagen cheated instead. Starting in the mid-2000s, Volkswagen engineers, working with the Bosch entities—as detailed further below—and with the knowledge of management, adapted Audi's "akustikfunktion" concept to the 2.0-liter and 3.0-liter diesel engines for Volkswagen and Audi models to be sold in the U.S. On or about May 17, 2006, a VW engineer, in describing the Audi software, emailed to employees in the VW Brand Engine Development department that described aspects of the software. He cautioned against using it in its current form because it was nothing more than a mechanism to detect, evade and defeat U.S. emissions cycles and tests. As he explained (in German): "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US '07-data set. This function is pure [cycle-beating] and can like this absolutely not be used for US '07."

200.   VW executives, including Richard Dorenkamp (Head of VW's Engine Development After-Treatment Department) and Jens Hadler (Head of VW Brand Engine Development and Head of Diesel Engine Development), authorized the creation and installation of this software. It has been reported that the decision to cheat the EPA, CARB, and countless other regulators worldwide was an "open secret" in Volkswagen's engine development department, as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted."  With the knowledge and assistance of Bosch GmbH, the resulting defeat device was incorporated into the software required to operate the 2.0-liter and 3.0-liter TDI engines in the Class Vehicles.

201.   As explained further below, the defeat device that Defendants installed in the Class Vehicles to evade emission testing is software code residing the vehicles' control unit. All modern

---

[35] *VW delays Jetta TDI diesel into the US*, Clean MPG (last visited Feb. 8, 2016), http://www.cleanmpg.com/community/index.php?threads/7254/.

engines are integrated with sophisticated computer components to manage the vehicle's operation. In diesel vehicles, this software is known as electronic diesel control ("EDC"). The EDC equipped in the Class Vehicles is formally referred to as the Electronic Diesel Control Unit 17 (also known as "EDC Unit 17," "EDC 17," and "EDC17"). Bosch GmbH tested, manufactured, and sold customized EDC Unit 17's to Volkswagen for the Class Vehicles.

202.    With respect to the Class Vehicles, the EDC 17 was used surreptitiously to evade emissions regulations. Bosch GmbH, Bosch LLC and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Class Vehicles, including algorithms to adjust fuel levels, exhaust gas recirculation, air pressure levels, and urea injection rates in vehicles equipped with SCR systems.

203.    Bosch's EDC17 contained the defeat device programming that was necessary for the Class Vehicles to "pass" emission tests in the U.S. When carmakers test their vehicles against EPA emission standards, they place the cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's customized EDC17 controllers created for Class Vehicles detected test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure and even the position of the steering wheel. When the EDC17's algorithm detected that the vehicle was on a dynamometer (and, therefore, undergoing an emission test), software code within the EDC17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration," temporarily reducing emissions to legal levels. Once the EDC17 detected that the emission test was complete, it would then enable a different "road calibration" that caused the engine to return to full power and efficiency while reducing the emissions control systems' performance, and consequently, caused the car to spew up to 40 times the legal limit of NOX emissions. This process is illustrated in this diagram:

**How Volkswagen's defeat device works**

'SWITCH' SOFTWARE

Software in the car's electronic control module (ECM)
determines where the car is being driven (i.e. highway,
road, testing) by analysing a series of factors.

FACTORS ANALYSED

Position of steering   Speed   Duration of engine operation   Barometric pressure

MODE OF THE VEHICLE?

BEING TESTED

Mode switches to "dyno calibration," as software recognises vehicle is taking emission test.

RESULT

EPA compliant emission levels produced.

NORMAL OPERATION

Mode switches to "road calibration," as software recognises vehicle is in normal operation.

RESULT

Effectiveness of emission control system reduced, increasing Nitrogen oxide levels to 10 to 40 times above standards.

Source: U.S. Environmental Protection Agency

J. Wang, 22/09/2015                                          REUTERS

204.    The EDC Unit 17 was widely used throughout the automotive industry, including by BMW, Mercedes, FCA and GM, to operate modern "Clean Diesel" engines. Bosch GmbH and LLC worked with each vehicle manufacturer that utilized an EDC Unit 17 to create a unique set of specifications and software code to manage the vehicle's engine operation.

205.    Make no mistake: this workaround was highly illegal. And, according to the New York Attorney General, Volkswagen management knew this, as they studied the issue extensively during 2006-2007 when preparing to launch their vehicles in the U.S. market.

206.    On or about October 5, 2007, Jens Hadler presided over a contentious meeting regarding the trajectory of the US '07 project. Various technical problems had arisen with the US'07

project that led to internal discussions and disagreements among members of the VW AG team responsible for ensuring vehicles met U.S. emissions standards. At the conclusion of that meeting, Hadler authorized Richard Dorkenkamp to proceed with the project knowing it was only through the use of the defeat device software that the vehicles could hope to pass U.S. emissions tests. On or around October 17, 2007, slides containing explicit engineering terms for the defeat device was sent to Mr. Hadler and other executives. Hadler responded (in German) "We shall never present this anywhere and will also not distribute it." A month later, Hadler sent an e-mail to Dorenkamp that included photos of himself posing with California's governor—then Arnold Schwarzenegger—at an event where VW's cars were promoted as "green diesel."

207.    The CAA expressly prohibits "defeat devices," defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.*, § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defect devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

208.    Thus, in order to obtain the COCs necessary to sell their vehicles, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code that it developed with engineers from EAV, Bosch GmbH and Bosch LLC within the EDC17 from government regulators, thus making that software an illegal "defeat device." In other words, Volkswagen lied to the government, consumers and the public at large.  And at every step of the way, Bosch Diesel Systems, through its employees at Bosch GmbH and Bosch LLC, knew of and aided in the fraud. An example of one of Volkswagen's vehicle stickers reflecting its fraudulently-obtained COCs is pictured below:

CLASS ACTION COMPLAINT - 57
Case No.:
010549-11 973652 V1

209.    Because the COCs were fraudulently-obtained, and because the Class Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Class Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were they EPA and/or CARB compliant, as represented. Volkswagen and Bosch Diesel Systems (in particular employees at Bosch LLC, which appeared to take the lead for Bosch Diesel Systems in interactions with regulators in the United States) hid these facts from the EPA, other regulators, and consumers, and it continued to sell and lease the Class Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

210.    Volkswagen's cheating continued. VW America submitted COC applications on behalf of VW AG, Audi AG, and itself, for the 2.0-liter and VW-and Audi-branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the defeat device. Similarly, Volkswagen America submitted COC applications on behalf of itself and for the Porsche-branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the defeat device.

211.    VW America coordinated the submission of these and other regulatory submissions with Audi to ensure that discrepancies among the companies' submissions did not alert regulators to emission problems with the Class Vehicles.[36]  Executives from the companies even devised a policy of cross-brand communication and coordination to minimize the risk that U.S. regulators would learn

[36] VW-MDL2672-00570461.

CLASS ACTION COMPLAINT - 58
Case No.:
010549-11 973652 V1

of fraudulent representations in regulatory filings.[37]  But the Class Vehicles differed in "material respects" from the specifications described in the COC applications because they had undisclosed auxiliary emissions control devices that functioned as an illegal "defeat device."

212.     James Robert Liang was a member of Volkswagen's development department from 1983 to 2008 and then Leader of Diesel Competence for VW America from 2008 to 2015. Liang was indicted by a federal Grand Jury for his role in the Volkswagen-IAV-Bosch conspiracy. In pleading guilty to fraud and other charges, Liang admitted that he and several co-conspirators knowingly designed, authorized, and managed the production of an EA 189 engine that could only comply with U.S. emissions standards by using an illegal defeat device. He and others knowingly attended meetings with the EPA in Ann Arbor Michigan on or around October 3, 2006, and with CARB in El Monte, California on or around October 5, 2006, where they presented the engine as one which complied with U.S. emissions standards to obtain COCs.

213.     Similarly Mr. Liang and Mr. Dorenkamp met with EPA officials in Ann Arbor on or around March 19, 2007, and with CARB officials on or around March 21, 2007, to summarize the EA 189 engine design and proposed operation of emissions control systems, while concealing its defeat device.

214.     Volkswagen's illegal workaround was enabled by its close partnership with Bosch Diesel Systems, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Volkswagen's diesel vehicles.[38]  Bosch Diesel Systems employees at both Bosch LLC and Bosch GmbH were well aware that Volkswagen was using its emissions control components as a defeat device and, in fact, worked with Volkswagen to develop the software algorithm specifically tailored for the Class Vehicles. Although Bosch GmbH reportedly "advised" Volkswagen as early as 2007 that the components should only be used for internal testing, not for manipulation of the engine in

---

[37] VW-MDL2672-00412718.

[38] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

1   emission testing,[39] it knew (or certainly should have known) that its lip service would be ignored,

2   and that the components would be used as defeat devices.  Bosch Diesel Systems supplied

3   Volkswagen with approximately 11 million such emission control components over seven years

4   which, in itself, belies the official company line that it didn't know.

5       215.    Volkswagen, likewise, knew better—VW itself is a recidivist violator of the CAA.  In

6   July of 1973, the EPA sought legal action against VW America by the Department of Justice based

7   on a claim that defeat devices were installed in 1973 Volkswagen vehicles.  The matter was swiftly

8   settled for $120,000 the following year.[40]  And, in June of 2005, VW America entered into a consent

9   decree with the DOJ, wherein it paid a $1.1 million penalty for failing to notify the EPA of emissions

10  problems in certain vehicles manufactured by Volkswagen in Mexico.[41]

11      216.    Because the COCs were fraudulently obtained, the Class Vehicles were never covered

12  by valid COCs, and thus, were never offered legally for sale. Volkswagen hid these facts from the

13  EPA, CARB and other state regulators, Franchise Dealers (including Plaintiff) and consumers, and it

14  continued to sell and lease the Class Vehicles, despite their illegality, and with the complicity of

15  Bosch Diesel Systems employees at both Bosch LLC and Bosch GmbH.

16  **C.    Bosch LLC and Bosch GmbH Each Played a Critical Role in the Defeat Device Scheme**

17      217.    Each Bosch entity, through the cross-entity Bosch Diesel Systems group, played a

18  critical role in scheme to evade U.S. emission requirements in the Class Vehicles.[42]  In a letter to

19  Volkswagen in 2007, Bosch GmbH acknowledged that use of the defeat device software was illegal.

20  ***In 2008, Bosch GmbH wrote Volkswagen and expressly demanded that Volkswagen indemnify***

21  ***Bosch (the specific entity was referred to by Bosch GmbH as "Bosch") for anticipated liability***

22

23      [39] *VW scandal: Company warned over test cheating years ago*, BBC (Sept. 27, 2015),
       http://www.bbc.com/news/business-34373637.

24      [40] Rich Gardellsa, *et al.*, *VW had previous run-in over 'defeat devices'*, NBC News (Sept. 23,

25      2015), http://www.cnbc.com/2015/09/23/vw-had-previous-run-in-over-defeat-devices.html.

26      [41] Consent Decree, *United States v. Volkswagen of Am., Inc.*, Case No. 1:05-cv-01193-GK
       (D.D.C. June 15, 2005 and Nov. 4, 2005), ECF Nos. 1-2.

27      [42] Plaintiffs' detailed and specific allegations against Bosch are based almost entirely on
       publicly-available documents, Plaintiffs' own research, and information produced by Volkswagen.

28

CLASS ACTION COMPLAINT - 60
Case No.:
010549-11  973652 V1

*arising from the use of the Bosch-created "defect device" (Bosch GmbH's words), which Bosch GmbH knew was "prohibited pursuant to … US Law."*[43] Volkswagen apparently refused to indemnify Bosch GmbH, but Bosch GmbH nevertheless continued to develop the so-called "akustikfunktion" (the code name used for the defeat device) for Volkswagen for another seven years. During that period, Bosch GmbH and Bosch LLC concealed the defeat device in communications with U.S. regulators once questions were raised about the emission control system in the Class Vehicles, and Bosch Diesel Systems, through employees at Bosch LLC, went so far as to actively lobby lawmakers to promote Volkswagen's "Clean Diesel" system in the United States. Bosch LLC's efforts, taken together with evidence of Bosch LLC and Bosch GmbH's actual knowledge that the "akustikfunktion" operated as an illegal defeat device, demonstrate that Bosch LLC and Bosch GmbH were both knowing and active participants in the decade-long illegal enterprise to defraud U.S. consumers, regulators, and franchise dealers.

     **1.    Volkswagen and Bosch Diesel Systems, through both Bosch LLC and Bosch GmbH, Conspire to Develop the Illegal Defeat Device.**

218. Bosch GmbH tightly controlled development of the control units in the Class Vehicles, and actively participated in the development of the defeat device.

219. As discussed above, Bosch Diesel Systems, including employees at Bosch GmbH, introduced a new generation of diesel ECUs for Volkswagen. The development of the EDC17 was a massive undertaking, which began years before Volkswagen began its push into the U.S. market. At least twenty Bosch GmbH engineers, as well as employees at Bosch LLC were working full-time on developing and writing the code for the EDC17 in the 2001 time frame. By 2004, long before the November 20, 2006 meeting at which Volkswagen apparently decided to use the defeat device to "pass" emission certification standards in the U.S., Bosch GmbH and Volkswagen had already entered into preliminary agreements for further development of the EDC17.[44]

---

[43] VW-MDL2672-02570091 (English translation) (emphasis added).

[44] *See* PowerPoint presentation at VW-MDL2672-02559528. This internal Volkswagen PowerPoint describes the "akustikfunktion" as activated in "recognition of emission related environment conditions" and proposed it as a solution to the "registration/certification [problem] in the US."

220.    A February 28, 2006, press release issued by "Bosch" (without specifying the legal entity) introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the press release, "Bosch" touted the EDC17 as follows:

> **EDC17: Ready for future demands**
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[45]

221.    Bosch's EDC17 was the technology behind Volkswagen's ambition. The EDC17 and the development of its underlying software were integral to Volkswagen's entire diesel strategy, which by late 2006 included creating software to sense when the vehicles were in test mode and then manipulate the emission control system at that time. This could not have been accomplished without years of collaborative work with Bosch Diesel Systems employees at both Bosch GmbH and Bosch LLC.

222.    As early as February 2005, an internal feasibility study drafted by Ulrich Hackenberg (Audi Development Chief) mentioned Bosch's EDC17 as part of a strategy to reduce diesel vehicle emissions of nitrogen oxides ("NOx") by creating a change in engine electronics.[46] The study discussed diesel strategies in the U.S. market in light of tightening U.S. emission standards. As

---

[45] *See* Feb. 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[46] VW-MDL2672-00744825.

1    discussed above, shortly after the cheating scandal became public, Volkswagen suspended

2    Hackenberg, and he later resigned.[47]

3        223.   Bosch marketing materials (which did not specify the particular Bosch entity

4    involved) made clear that the EDC17 was not one-size-fits-all. Instead, it was a "[c]oncept tailored

5    for all vehicle classes and markets" that could "be adapted to match particular requirements [and] …

6    be used very flexibly in any vehicle segment on all the world's markets."  The EDC17 was tailored

7    and adapted by modifying the sophisticated software embedded within the electronic control unit

8    ("ECU"). Bosch Diesel Systems, through employees at GmbH and Bosch LLC manufactured,

9    developed, and provided the ECU and its base of software to Volkswagen for the Class Vehicles.

10       224.   Engineers at IAV, Volkswagen and Bosch Diesel Systems (including employees of

11   Bosch LLC and Bosch GmbH) worked together to modify and adapt the software for the EDC17,

12   and to create specifications for each vehicle model. Indeed, customizing a road-ready ECU is an

13   intensive three- to five-year endeavor involving a full-time Bosch Diesel Systems presence at an

14   automaker's facility. Bosch Diesel Systems and its customers work so closely together that it

15   purposefully locates its component part manufacturing facilities close to its carmaker customers'

16   manufacturing plants.

17       225.   All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine

18   management software over which Bosch GmbH and Bosch LLC exert near-total control. In fact, the

19   software is typically locked to prevent customers, like Volkswagen, from making significant changes

20   on their own.  The defeat device was just such a software change—one that would allow

21   modifications to the vehicle's emission control to turn on only under certain circumstances—that

22   Volkswagen could not have made without employees and management of Bosch LLC and Bosch

23   GmbH knowing and participating.

24       226.   The Bosch entities' security measures further confirm that customers (carmakers)

25   cannot make significant changes to Bosch software without Bosch involvement.  Bosch boasts that

26   _____

27   [47] Jack Ewing, *Audi Executive Resigns After Suspension over VW Emissions Scandal*, NY. Times (Dec. 4, 2015), http://www.nytimes.com/2015/12/05/business/international/ulrich-hackenberg-suspended-over-volkswagen-emissions-scandal-resigns.html.

28

CLASS ACTION COMPLAINT - 63
Case No.:
010549-11  973652 V1

its security modules protect vehicle systems against unauthorized access in every operating phase, meaning that no alteration could have been made without either a breach of that security—and no such claims have been advanced—or Bosch GmbH's knowing participation.[48]

227.   Unsurprisingly, at least one car-company engineer has confirmed that Bosch GmbH maintains absolute control over its software as part of its regular business practices:

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves.  Before each dataset is released it goes back to Bosch for its own validation.
>
> Bosch is involved in all the development we ever do.  They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.
>
> All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ….
>
> The car company is *never* entitled by Bosch to do something on their own.[49]

228.   Thus, Bosch GmbH and Bosch LLC cannot convincingly argue that the development of the "akustik" device was the work of a small group of rogue engineers.

229.   In fact, Volkswagen's and Bosch GmbH's work on the EDC17 reflected a highly unusual degree of coordination. It was a massive project that required the work of numerous Bosch engineers and coders for a period of more than ten years, or perhaps more.[50] Although Bosch GmbH publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[51]

---

[48] *Reliable Protection for* ECUs (May 12, 2016), https://www.escrypt.com/company/single-news/detail/reliable-protection-for-ecus/.

[49] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/.

[50] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world.  *See Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[51] Feb. 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

230.    The size and complexity of the development of EDC17 is captured by a spreadsheet that lists entries for work done by Volkswagen and Bosch employees on the EDC17 from late 2003 to 2009. Each entry is given one of six descriptors: enhancement, new feature, service, support, integration, or bug/defect.  In total, the spreadsheet contains 8,565 entries and lists hundreds of Bosch employees, including employees at Bosch LLC and Bosch GmbH.[52]

231.    The joint enterprise is also memorialized in a series of agreements between Bosch GmbH and Volkswagen dating back to as early as mid-2005, reflecting negotiations that date prior to January, 2005.  On April 7, 2005, for example, Bosch GmbH's Ulrich Gralka and Dr. Holfelder executed the "Framework Development Agreement for Software Sharing in EDC/MED17 Control Unit Projects from the Robert Bosch (RB) Diesel Systems (DS) And Gasoline Systems (GS) Motor Vehicle Units."  VW AG countersigned the agreement on September 26, 2005.

232.    Importantly, the agreement defined software sharing as "the handing over of BOSCH software in the form of object code by BOSCH to VW, so that VW can use this BOSCH software as a basis for developing VW modules for specific EDC/ME(D)17 projects using software development environments from BOSCH."  The agreement states that "[p]roviding the VW modules and integrating them to form a complete software product requires close cooperation between the Parties."

233.    The contract also outlined responsibilities for software sharing and co-development. Throughout development, the contract dictated Bosch GmbH was to retain control over the software. While Bosch GmbH provided (and owned) the object code, and Volkswagen developed (and owned) the modules, the parties agreed that "BOSCH carries out any modifications to the BOSCH software that are necessary in order to integrate the intended VW modules at the expense of VW."  The agreement further specifies that "Bosch" would monitor the software, test the implementation of Volkswagen modules, and grant written approval to Volkswagen modules.  Only if everything met Bosch's standards would it then "deliver[] the final complete software product for VW to use in

---

[52] VW-MDL2672-02559780.

combination with a BOSCH control unit."[53]   Thus, Bosch GmbH plainly had knowledge of the

defeat device code and needed to conduct extensive testing before delivering the product to VW.

234.   Yet another document demonstrates the tight grip that Bosch GmbH maintained over

EDC17 software and any modifications made to it. On February 20, 2006, VW AG and Bosch

(signed by Bosch GmbH's Dr. Steffen Berns, Senior Vice President of the Diesel Systems division),

entered into a supplemental agreement concerning the use of "expanded software" documentation for

the EDC17 and EDC16 (its predecessor).[54] Pursuant to this agreement, Bosch GmbH identified 35

named individuals, affiliated with either VW AG or IAV (Ingenieurgesellschaft Auto und Verkehr),

who were granted access to expanded documentation for the EDC17 for specific functions relating to

emissions. Any changes to the list of persons to be given access required the explicit consent of

Bosch GmbH, and the access was temporary and non-transferable. Critically, the agreement stated

that "[t]his right of use shall not include the right to the change, modify or use the

DOCUMENTATION with third-party control units."[55]   Bosch GmbH thereby tightly controlled both

who could access the expanded documentation and the scope of their use of such materials.

235.   A later agreement between Bosch GmbH and Volkswagen, this one from June 12,

2006, governed the implementation, integration, project management, and delivery of certain EDC

17 software functions for diesel vehicles that VW AG had requested from Bosch GmbH.  This

agreement, too, made clear that any changes not explicitly detailed in the agreement would require

further approval from Bosch GmbH.

236.   Along the same lines, several years later, in a February 5, 2011 agreement, Bosch

GmbH granted VW AG a license to further develop Bosch Denoxtronic functions for the treatment

of exhaust from diesel engines. Again, the contract is clear that Bosch maintains rights over the

Denoxtronic functions.

---

[53] Volkswagen produced an English translation of the agreement at VW-MDL2672-03752699.
[54] Volkswagen produced an English translation of the agreement at VW-MDL2672-03752757.
[55] VW-MDL2672-03752757.

237. To recap, as the EA 189 project moved to series production in 2009, Bosch GmbH's documented role was to provide to Volkswagen executable software for installation in the EDC17 controller at the VW production line.[56] Bosch Diesel Systems insisted that it control the definition of the EDC17 software, test the software using bench top and vehicle testing, produce the final software release for series production, and deliver the software to Volkswagen for installation in the EA 189 engines used in the Class Vehicles. Bosch GmbH's firm control over the development of and modifications to EDC17 is undeniable. It is inconceivable, then, that Bosch GmbH and Bosch LLC did not know that the software it was responsible for defining, developing, testing, maintaining and delivering, and that Bosch LLC promoted, lobbied, and coordinated for use in the United States, contained an illegal defeat device.

238. Bosch Diesel Systems employees at Bosch LLC and Bosch GmbH were in on the secret and knew that Volkswagen was using Bosch Diesel System's software algorithm as an "on/off" switch for emission controls when the Class Vehicle was undergoing testing. As noted above, it has been said the decision to cheat was an "open secret" at Volkswagen.[57] It was an "open secret" at Bosch Diesel Systems as well.

239. The roots of the "akustikfunktion"—and likely the cheating—can be traced back to the late 1990's when Audi devised software called the "akustikfunktion" that could switch off certain functions when the vehicle was in a test mode.[58] The "akustik" term is derived from the function's ability to modify the noise and vibration produced by the engine. News articles report that, in 2006, VW AG further developed this "akustikfunktion" for the Class Vehicles.[59]

---

[56] VW-MDL2672-03752699.

[57] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7. *See also* Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules (it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted").

[58] https://global.handelsblatt.com/edition/413/ressort/companies-markets/article/dieselgates-roots-stretch-back-to-audi?ref=MTI5ODU1.

[59] Volkswagen Probe Finds Manipulation Was Open Secret in Department: Newspaper", *Reuters* (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-

240.    Written communications between and within Bosch Diesel Systems and Volkswagen describe the "akustikfunktion" in surprising detail. In emails sent as early as July 2005 from VW AG's Andreas Specht to Bosch's Kilian Bucher, Tobias Lang, Michael Moeker, and Carlos Alvarez, Specht discussed emissions measurements from vehicles using the "akustikfunktion" in connection with U.S. emission compliance.[60] A February 2014 PowerPoint prepared by VW AG explained that the akustikfunktion measured speed, acceleration, and engine operation to determine whether a vehicle is undergoing testing.[61] There is no question that the code comprising the akustikfunktion was developed by Bosch: The technical agreement for it was drafted by Bosch GmbH and contains a legend that "Robert Bosch GmbH reserves all rights in the event of industrial property rights."

241.    On November 13, 2006, VW AG's Dieter Mannigel (Software Design, U.S. Diesel Engines, Drivetrain Electronics) circulated via email a PowerPoint presentation prepared for VW AG's Rudolf Krebs (who joined Volkswagen from Audi in 2005) about how the "akustikfunktion" is activated and deactivated in recognition of emissions-related environmental conditions, such as temperature and pressure. The presentation explained that the existing vehicles functioning with different drive cycles could not pass U.S. emission tests, and thus proposed the release of the "akustikfunktion" to be driving dependent.[62]

242.    On November 20, 2006, Mannigel emailed his colleagues to summarize a meeting with Krebs, at which the PowerPoint described above was likely presented. Krebs had emphasized the importance of not getting caught by U.S. regulators using the "akustikfunktion," and warned that

idUSKCN0V02E7.  VW Group Chairman, Hans Dieter Poetsch, explained that a small group of engineers and managers was involved in the creation of the manipulating software.  *See* VW Chairman Poetsch: Company 'Tolerated Breaches of Rules'", *Auto Week* (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.  *See also* "Scandal Explained", *BBC*, Dec. 10, 2015, http://www.bbc.com/news/business-34324772; Sept. 18, 2015, http://www.autocar.co.uk/car-news/industry/vw-emissions-scandal-how-volkswagens-defeat-device-works.

    [60] VW-MDL2672-02559611.

    [61] VW-MDL2672-02572122.

    [62] VW-MDL2672-02559527. The email attached an internal Volkswagen PowerPoint that describes the "akustikfunktion" as activated in recognition of emission related environment conditions and proposed it as a solution to the registration emissions certification problems in the U.S.  (VW-MDL2672-02559528).

the function must be explainable to regulators. Krebs was skeptical about using the akustikfunktion in the U.S. market due to potential regulatory and legal exposure, and Mannigel was nervous that regulators would be able to detect the "akustikfunktion." Nevertheless, Mannigel reported, Volkswagen was going ahead with the expanded "akustikfunktion" with Bosch GmbH.[63] It is likely this was the meeting at which VW decided to use the "akustikfunktion" as a defeat device to evade compliance with U.S. emission requirements.

243.    Well after the defeat device was developed and integrated into hundreds of thousands of Class Vehicles, Volkswagen and Bosch GmbH and Bosch LLC continued to work together to refine and maintain it. For example, both Bosch GmbH and Volkswagen were involved in the calibration of the defeat devices for the Class Vehicles. A November 2014 email from VW AG's Juergen Hintz, entitled "Akustikfunktion," relayed a telephone call with Bosch GmbH's Alfred Kratt about the "akustikfunktion" and Volkswagen's role. VW AG's C. Arenz responded that while he had been responsible for the operation of the "akustikfunktion," Bosch GmbH was responsible for its calibration. In fact, Arenz disclosed that he planned to meet with Bosch GmbH employees (along with Michael Brand) about calibrating the "akustikfunktion" the following week.[64] In another email, Hintz wrote that Bosch GmbH's Kratt told him that Bosch GmbH would be making certain changes to the "akustikfunktion" based on Volkswagen's specifications.[65]

244.    In sum, Bosch GmbH and Bosch LLC worked hand-in-glove with Volkswagen to develop and maintain the akustikfunktion/defeat device, and to market diesel technology and obtain necessary regulatory approval for Volkswagen's diesel offerings.[66]

---

[63] VW-MDL2672-02559526.

[64] VW-MDL2672-02569895.

[65] Translation at 00387135.

[66] From the information available to date, it appears that at least nine individuals from Bosch were involved in the scheme to develop the illegal defeat device: Bucher, Lang, Moeker, and Alvarez (based on a July 2005 email from VW AG's Specht); Berger (based on a March 2007 email with VW AG's Klaproth and Mannigel); Schuetz, Pfeifle, and Richardt (based on a June 2, 2008 letter attempting to limit Bosch GmbH's liability); and Kratt (recipient of the letter attached to VW AG's June 6, 2008 response). VW-MDL2672-02570091; VW-MDL2672-02559611; VW-MDL2672-02559515.

1

**2.      Volkswagen and Bosch Conspire to Conceal the Illegal "Akustikfunktion".**

2

245.    By 2007, and likely earlier, Bosch Diesel Systems employees at Bosch GmbH were

3

critical not only in developing the "akustikfunktion," but also in concealing it. On March 9, 2007,

4

Bosch's Guenther Berger emailed VW AG's Mathias Klaproth (a technical developer) and Dieter

5

Manniegel with the subject of "Erweiterungen Akustikfunktion" (in English, "Further Development of

6

the Acoustic Function").[67] *Berger confirmed that Bosch GmbH would remove the description of*

7

*the enhanced "akustikfunktion" from Volkswagen's fuel pump specification sheets D2250 and*

8

*D2278*. Klaproth and Manniegel agreed not to list the function in documentation in the U.S., but

9

disagreed whether to disclose it in Europe. Klaproth then took Berger off the email chain and insisted

10

the "akustikfunktion" would be applied to the European projects, to which Manniegel responded that

11

he would contact Klaproth off-line.

12

246.    Bosch GmbH was concerned about getting caught participating in the defeat device

13

fraud. As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a

14

Volkswagen internal inquiry found that in 2007 Bosch warned Volkswagen by letter that using the

15

emissions-altering software in production vehicles would constitute an "offense."[68,69]

16

247.    Bosch GmbH expressed concerns that use of the defeat device it had created would

17

violate U.S. law. These concerns culminated in a June 2, 2008 letter from Bosch GmbH's Dieter

18

Schuetz to Volkswagen's Thorsten Schmidt on Bosch GmbH letterhead in which "Bosch" demanded

19

that Volkswagen indemnify Bosch for any liability arising from the creation of a "defeat device," as

20

Bosch itself called it in English.  Through the letter, Bosch sought to clarify the roles and

21

responsibilities of Volkswagen and Bosch regarding the development of the EDC 17, and demanded

22

that Volkswagen indemnify Bosch for any legal exposure arising from work on the defeat device:

23

24
[67] VW-MDL2672-02559515.

25
[68] Automotive News (Sept. 27, 2015)
(http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-
26
software-use-in-diesel-cars-report-says); VW Scandal: Company Warned over Test Cheating Years
Ago", *BBC*, Sept. 27, 2015, http://www.bbc.com/news/business-34373637.

27
[69] http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-
illegal-software-use-in-diesel-cars-report-says.

28

> The further development [of the EDC17] requested by your company will result, in addition to the already existing possibility of activating enriched data manually, *in an additional path for the potential to reset data to act as a "defeat device."* We ask you to have the attached disclaimers executed by your company.[70]

The letter uses the words "defeat device" in English, and further explained that "**[t]he usage of a defeat device is prohibited pursuant to … US Law (CARB/EPA)** (see definition footnote 2)."[71]

248.    Bosch GmbH's June 2, 2008 letter also warned Volkswagen that the software modifications Volkswagen requested could allow "the certified dataset [to be] replaced with another, possibly non-certified data set[,]" which could, in turn, cause "the vehicle's general operating license (registration) [to] become void."[72] Creating two data sets on emission compliance was illegal under U.S. law.  Bosch GmbH knew this, and that is why it requested indemnification from Volkswagen.

249.    Helmut Pfeifle and Heike Richardt at Bosch GmbH signed the proposed indemnification; the signature lines for Volkswagen were left blank. When Volkswagen's Hermann Middendorf responded to Alfred Kratt at Bosch GmbH. He did not deny the existence of a defeat device, but instead attacked Bosch for involving "the lawyers."[73]

250.    Following Bosch GmbH's June 2, 2008 letter, Bosch GmbH continued to develop and sell to Volkswagen hundreds of thousands of the defeat devices for U.S. vehicles even after its express, written recognition that its software was being used in the Class Vehicles as a "defeat device" that was "prohibited pursuant to . . . US Law."

251.    VW AG and Bosch LLC and Bosch GmbH continued over the next few years to refine the defeat device and market the diesel technology in VW's vehicle offerings. Refinement of the defeat device was a lengthy and complicated process that required concealing its existence from the onboard diagnostic system, which was intended to report emission controls to comply with U.S., and particularly California's, requirements.  In a July 18, 2011 email, Audi's Olaf Busse proposed tying the activation of the "akustikfunktion" more directly to steering angle, instead of vehicle

---

[70] VW-MDL2672-02570091 (English translation) (emphasis added).

[71] *Id.* at -92 (emphasis added).

[72] *Id.* at -93.

[73] *Id.* at -90.

1    temperature, which was proving to be problematic. This request coincided with inquiries from

2    CARB about on-board diagnostics issues. VW AG's Hanno Jelden (Head of Powertrain Electronics),

3    worried that the change would be too obvious and could not be explained to regulators.[74]

4           252.    Top VW executives Denner, Winterkorn, Horn,  Müller, and Stadler were also in on

5    the secret.  Notes from a May 28, 2014 meeting between Bosch and Volkswagen executives at VW

6    headquarters reflect that the topic of "akustikfunktion" was discussed in the context of Volkswagen's

7    and Bosch's partnership in the U.S. market. VW AG's Friedrich Eichler (Powertrain Development

8    Chief) mentioned the importance of the "akustikfunktion" in Bosch diesel engines. Bosch GmbH

9    participants at the meeting included Denner, as well as Rolf Bulander, Dirk Hoheisel, Markus Heyn,

10   Wolf-Henning Scheider, Stefan Kampmann, Joachim Fetzer, Werner Philipp, Juergen Hammer,

11   Klaus Mader, Hans-Peter Hubner, Gurcan Karakas, Walter Schirm, and Frese.  For VW AG,

12   Winterkorn was also present.[75]

13         **3.    Volkswagen and Bosch GmbH and Bosch LLC Conspire in the U.S. and
              Germany to deceive U.S. Regulators.**

14

15         253.    The purpose of the defeat device was to evade stringent U.S. emissions standards.

16   Once Bosch GmbH and VW perfected the defeat device, therefore, VW, Bosch GmbH and Bosch

17   LLC turned their attention to deceiving U.S. regulators.

18         254.    Evidence already shows that Bosch GmbH employees expressly conspired with VW

19   to hide the function of the defeat device.  Shortly after the March 2007 email exchange detailed

20   above, in which VW AG's Klaproth and Mannigel confirmed to Bosch GmbH's Berger that the

21   "akustikfunktion" would not be listed in the U.S. documentation for the Class Vehicles, an internal

22   email from VW AG's Frank Alich (Development, OBD Diesel) to various individuals at VW AG

23   about scheduling a May 9, 2007 meeting, lamented the trouble distinguishing between acoustic and

24

25

26   _____

          [74] VW-MDL2672-0259489.  Jelden was subsequently suspended in connection with the
27   emissions scandal.
          [75] VW-MDL2672-02569909.

28

CLASS ACTION COMPLAINT - 72
Case No.:
010549-11  973652 V1

1    non-acoustic modes relating to soot simulation. Alich complained that he did not know how he

2    would explain the problem to CARB.[76]

3        255.    Bosch LLC, was part of and essential to the fraud.  Bosch LLC worked closely with

4    Bosch GmbH and Volkswagen, in the United States and in Germany, to ensure that the non-

5    compliant Class Vehicles passed U.S. emission tests.  As set forth below, Bosch LLC employees

6    frequently communicated with U.S. regulators, and actively worked to ensure the Class Vehicles

7    were approved by regulators.

8        256.    Employees of Bosch LLC, Bosch GmbH and IAV provided specific information to

9    U.S. regulators about how Volkswagen's vehicles functioned and unambiguously stated that the

10   vehicles met emissions standards.  Bosch LLC regularly communicated to its colleagues and clients

11   in Germany about ways to deflect and diffuse questions from US regulators about the Class

12   Vehicles—particularly CARB.  For example, in a May 15, 2008 email from Audi AG's Martin

13   Hierse to Bosch GmbH's Markus Schroeder (Diesel Systems, Engineering Powertrain Diagnosis),

14   copying Audi's Stefan Forthmann, Hierse noted that auxiliary emission control devices ("AECDs")

15   were a very important subject for certification of U.S. diesels, and admitted discrepancies with the

16   U.S. authorities in AECD documentation.[77] The regulators' questions were chipping away at the

17   discrepancies between on board diagnostic systems, and the emission controls.

18       257.    Accordingly, Hierse worried that there was a possibility that one of the Volkswagen

19   Group's representatives in the U.S. was providing the regulators too much information and data

20   concerning AECD disclosure.  He then asked to discuss the matter with Bosch's Schroeder either by

21   telephone or in private at one of their offices due to the confidentiality of the issue.

22       258.    Bosch GmbH, Bosch LLC and VW worked together to craft responses to CARB's

23   questions.  For example, an April 2009 email, Suanne Thomas (VW America Regulatory Strategist)

24   and Bosch LLC's Bernie Carr discussed results from tests sent from an individual at IAV showing

25   defects in the Class Vehicles' in-use ratios and missing readiness information.

26   _____

27   [76] VW-MDL2672-02555825.
     [77] VW-MDL2672-11873274.

28

CLASS ACTION COMPLAINT - 73
Case No.:
010549-11  973652 V1

259.    On July 1, 2009, VW America's Thomas emailed colleagues, again raising concerns about documenting AECDs in Model Year 2010-11 Class Vehicles to U.S. authorities.  At issue was the "low level of detail in the AECD documents [so that] ARB is not able to confirm which strategies are for component protection." Thomas then relayed that CARB asked whether there was a problem getting Bosch to disclose its strategy.[78] In a related email, Thomas commented: "I was not involved in the discussions … with ARB on diesel, however I get the impression that there is a misunderstanding at VW regarding AECDs.  That this misunderstanding is the root of the issue – why ARB is not satisfied with the AECD disclosure for diesels."[79] CARB was asking the right questions, and not getting honest answers.

260.    Nor can Bosch GmbH persuasively distance itself from the communications with regulators, as Bosch GmbH employees directly participated in meetings with CARB. For example, in January, 2015, Bosch GmbH and Bosch LLC employees (including Bosch LLC's Adam Wienner, Senior Legal Counsel, Dennis Froehlich, Quality Control, and Axel Boeringer, Sales Quality and Warranty) conferred about setting up a conference call with Audi and CARB to explain problems with the diagnostics relating to faulty fuel pumps, issues that likely arose because the defeat device was causing problems with the on board diagnostic system in certain Class Vehicles. Suanne Thomas of VW coordinated the call between Bosch and CARB.

261.    Volkswagen and Bosch LLC and Bosch GmbH held CARB and the EPA at bay with finesse (and fraud) to obtain the necessary COCs and EOs to keep Class Vehicles on the road.  An August 2009 email from Volkswagen America shared a comment from CARB regarding 2009 Volkswagen Jetta TDIs test results that "VW 'blatantly did the wrong thing'" and asked Volkswagen if this "is a base strategy from Bosch." Volkswagen responded, "yes."[80]

262.    This is not the only document crediting Bosch strategies to obtain regulatory approval. A May 17, 2011 email from CARB to Suanne Thomas regarding Volkswagen 2014 TDIs

---

[78] VW-MDL2672-02469411.
[79] VW-MDL2672-02120937.
[80] VW-MDL2672-00912096.

referenced a 2010 conference call where they discussed "the bosch ZFC [Zero Fuel Calibration] strategy and a possible fuel rail pressure disablement." VW AG's Frank Alich then relayed that "ARB accepted our proposal to implement the ZFC 'time to closed loop' monitor with MY [model year] 2013."[81]  And in a May 31, 2013 email regarding 2.0-liter Class Vehicles, Thomas referenced a "[p]roposed strategy" to "get the executive order [from CARB] based on the 'Bosch' strategy."[82] These communications demonstrate Bosch LLC and Bosch GmbH's deep understanding of what regulators allowed and would not allow, and what the Bosch entities did to help VW obtain approval.

263.    In short, there can be no argument that Bosch LLC and Bosch GmbH left communications with the regulators to VW, or that Bosch Diesel Systems employees at Bosch LLC and Bosch GmbH did not understand the regulatory implications of the defeat device software VW paid Bosch GmbH to develop. Employees of Bosch GmbH and Bosch LLC worked together with VW to convince U.S. regulators to approve the Class Vehicles for sale and use in this country.  The examples below identify at least six additional instances in which Bosch entities communicated directly with U.S. regulators to discuss concerns with emissions detection and compliance in the Class Vehicles. During each communication, Bosch LLC provided specific information about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emissions standards:

    a.  In December 2009, Bosch presented CARB with a strategy to allow usage of Injection Quantity Adjustment codes in 2013 Volkswagen diesel models.[83]

    b.  In or around December 2012, Volkswagen and Bosch submitted separate written responses, including requested documents, to the U.S. National Highway Traffic Safety Administration in response to its investigation into high-pressure fuel pump failures in certain Class Vehicles.[84]

    c.  A January 15, 2014 email from CARB to Thomas with the subject, "RE: VW response Re: V6TDI clarifications," CARB's Peter Ho referenced "previous discussions with Bosch," and inquired about false detections in the field.[85]

---

[81] VW-MDL-2672-02464246.

[82] VW-MDL2672-00530556.

[83] VW-MDL2672-07235955.

[84] VW-MDL2672-00762181.

[85] VW-MDL-2672-00465156 (emphasis added).  These discussions began in 2011.

d.  July 23, 2014 notes from Volkswagen referenced a phone call between Volkswagen, Bosch, CARB, and other automakers during which Bosch raised the issue of pin-pointing of wire faults of NOx and particulate matter sensors with a separate control unit.[86]

e.  A February 9, 2015 email from VW AG's Steffen Vieser relayed an update from Bosch GmbH about a discussion between CARB and Bosch LLC's Wienner re: a "non-erasable permanent fault code issue of the fuel pump electronic driver stage diagnostic," which Volkswagen suggested could be fixed by a "software update" requiring Bosch's assistance, which CARB approved.[87]

f.  Notes from a June 10-11, 2015 meeting between CARB and Volkswagen reference a "Bosch discussion with ARB regarding PM [particulate matter] sensor introduction with Fe-doping."  The meeting notes also record that CARB told Volkswagen that CARB did not want the emission monitors in a "contrived condition."[88]

264.  Bosch did not disclose its knowledge of the illegal defeat device in any of these meetings or communications with U.S. regulators.

**4.  Bosch GmbH and Bosch LLC Keep Volkswagen's Secret Safe and Push "Clean" Diesel in the U.S.**

265.  The Bosch entities not only kept Volkswagen's dirty secret safe, they went a step further and actively lobbied lawmakers to push "Clean Diesel" in the U.S., including making Class Vehicles available for regulators to drive.

266.  As early as 2004, Bosch Diesel Systems announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 U.S. emission standards.[89]  Its efforts ended up being a multiple-year, multi-million dollar effort, involving key players from both Bosch GmbH in Germany and Bosch LLC in the U.S.  Following the launch of its new EDC systems in 2006, the Bosch entities hired mcapitol Managers, a lobbying firm to promote its "Clean Diesel" products on Capitol Hill and with the EPA.  In Washington, DC, mcapitol Managers lobbied on Bosch GmbH and Bosch LLC's behalf to defeat a proposal that would have favored hybrid vehicle technology over "Clean Diesel" vehicles.

---

[86] VW-MDL2672-00887996.

[87] VW-MDL2672-00902633; VW-MDL2672-02449923.

[88] VW-MDL2672-02296983.

[89] Mar. 8, 2004, Edmund Chew, Autonews.

267.    Bosch also coordinated studies to advance diesel technology in the U.S.  In September 2006, Bosch LLC's Diesel Products Director, Bill Rutecki, reached out to Volkswagen and Audi to request their participation in the "Martec Light Duty Diesel Market Opportunity Assessment." The study's goal was to develop coordinated strategies to accelerate advancements of light duty diesel technology in the U.S.[90]

268.    Bosch's promotion of diesel technology specifically targeted the U.S. For example, Bosch LLC put on "Diesel Days in California," "Deer Conference: EGT Focus," and "SAE World Congress in Detroit." In 2008, Bosch LLC and VW America co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends and engage in a vital dialogue with industry leaders and policymakers."[91]

269.    Bosch LLC hosted multi-day conferences open to many regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the specifics of Volkswagen technology, including calibrations necessary for the Class Vehicles to comply with emissions regulations.

270.    For example, in April 2009, Bosch LLC organized and hosted a two-day "California Diesel Days" event in Sacramento, California. Bosch LLC invited a roster of lawmakers, journalists, executives, regulators, and NGOs with the aim of changing perceptions of diesel from "dirty" to "clean." The event featured Class Vehicles as ambassadors of "Clean Diesel" technology, including a 2009 VW Jetta "green car." The stated goals were to "generat[e] a positive perception of Clean Diesel in passenger vehicles" and to "educate California stakeholders about the immediate benefits [of] Clean Diesel passenger vehicles" in reducing emissions. A key feature of the event included "Bosch Vehicles Being Deployed."[92] Attendees included Bernd Boisten (Bosch Regional President, Diesel Systems, Bosch LLC); Dr. Joerg Reuger (Senior Vice President, Diesel Engineering, Bosch

[90] VW-MDL2672-06136031.

[91] VW-MDL2672-00234383.

[92] *Id.* 115-45; VW-MDL2672-03331605.

CLASS ACTION COMPLAINT - 77
Case No.:
010549-11 973652 V1

Support Staff, Bosch GmbH); Brad Warner (Manager, Marketing, Diesel Systems, Bosch LLC); and Norman Johnson (Director, External Affairs, Bosch LLC).

271.   In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars. One of this advocacy group's purposes included "generating awareness to legislators and regulators on the benefits of "Clean Diesel" technology for passenger cars, through engagement in policy, regulatory and advocacy activities."

272.   Another example of Bosch LLC's U.S. lobbying is the 2009 "California Green Summit." As part of its "Clean Diesel" partnership with Volkswagen, Bosch LLC deployed two 2009 Jetta TDI Volkswagens to attendees with the express purpose of "Influencing California," and inviting CARB, the Western Automotive Journalist Organization, and many others.

273.   In September 2009, Bosch held a Diesel Technology Forum in California. Dirk Naber (Diesel Systems/Engineering; Vehicle and Engine Laboratory of Bosch GmbH) attended, as did VW's Stuart Johnson, R. Dorenkamp and G. Pamio, along with Juergen Peter. Following this forum, in October 2009, Mightycomm (Bosch's California lobbyist) outlined a proposal for "OEM Vehicle Placement Program targeting influential California NGOs and Regulators."[93] This memo was addressed to Bosch's Lars Ulrich and Joerg Rueger at "Bosch Diesel Systems." **Mightycomm specifically stated "[v]ehicles placed with CARB would have to be … *newer models that can withstand possible dynamometer testing. While we do not anticipate a vehicle placed with CARB would be inspected, examined, or tested on a dynamometer, there is no assurance some CARB staff won't want to do this.*"**[94] On the other hand, Mightycomm advised not to worry about a vehicle being tested by the California Energy Commission ("CEC") "as the CEC is not equipped to conduct such inspections."[95]

---

[93] VW-MDL2672-15182932

[94] *Id.* (emphasis added).

[95] *Id.*

CLASS ACTION COMPLAINT - 78
Case No.:
010549-11  973652 V1

274.    In 2010, Bosch LLC sponsored the Virginia International Raceway with the support of the 2010 Volkswagen Jetta Cup Series.  This included the 2009 "Sidewinder" which Bosch featured for its "performance exhaust system."

275.    In its lobbying on behalf of "Clean Diesel," Bosch LLC had to continually cover up the dirty secret of the defeat device in the Class Vehicles. In a January 13, 2010 memo addressed to Bosch's Lars Ullrich and Brad Warner, Mightycomm noted that "Clean Diesel has been ranked the green car of the year" two years in a row—2009 and 2010. And yet Bosch Diesel Systems employees at Bosch GmbH and Bosch LLC knew the Class Vehicles could not obtain the results being advertised without activating the defeat device.

276.    Bosch LLC's Andreas Sambel (Director of Marketing and Business Excellence) presented on "Clean Diesel" technology before the CEC on June 19, 2013, specifically pinpointing "key influencers," such as specific NGOs that have not traditionally engaged CARB, "who we need to reach, rally and motivate."[96]

277.    In its efforts to promote "Clean Diesel," including the Class Vehicles, Bosch acted on behalf of its global Bosch Diesel Systems group. As an example, Bosch put on a two-day presentation on June 27-28, 2007, about meeting the demands of U.S. emission legislation, where it focused on lowering emissions in diesel vehicles. Each of the presentation's 30 pages bears both the "Bosch" name and "Bosch Engineering GmbH" but makes no mention of Bosch LLC.[97]  The aforementioned memo from Mightycomm was addressed to "Bosch Diesel Systems." And each page of the presentation for California Diesel Days bears the label "BOSCH' in emboldened red type without distinguishing between Bosch GmbH and Bosch LLC.[98] This is consistent with the ongoing representations that the Bosch entities, overseas and in the U.S. were "one-for-all-and-all-for-one" in promoting "Clean Diesel" technology to U.S. stakeholders.

---

[96] VW-MDL2672-00885348.
[97] VW-MDL2672-05676990.
[98] VW-MDL2672-03331605.

1

### 5.     Bosch's Volkmar Denner Also Played a Critical Role in the Scheme.

2

278.     Prior to becoming CEO in 2012, Volkmar Denner climbed the corporate ladder in

3     Bosch GmbH's Engine ECU Development division, managing the development and sale of

4     automotive engine computers, such as the EDC units that Volkswagen used as defeat devices. In

5     2006, Denner joined Bosch Germany's Board of Management and was later responsible for research

6     and advance engineering, product planning, and technology coordination across the company's three

7     business sectors from July 2010 until his appointment as CEO. Denner has agitated for the company

8     to become more like a "start-up,"[99] and to develop a "culture of failure,"[100] where risk taking is

9     rewarded, in an attempt to replicate the "California venture capitalist model."[101] Denner set the tone

10     at the top of Bosch as a member of Bosch's Board of Management and later CEO. He embraced the

11     Silicon Valley culture of moving fast, taking risks, and asking for forgiveness rather than permission.

12

279.     As he rose in the ranks, Denner worked to foster Bosch GmbH's relationship with key

13     corporate partners, like Volkswagen, which brought in billions of dollars in annual revenues. Denner

14     immersed himself in the day-to-day business of Bosch's important customers. Illustrating how

15     important Volkswagen was to Bosch, Denner communicated directly with Volkswagen's Winterkorn

16     about the companies' relationship and Bosch products sold to Volkswagen. For example, when

17     Bosch ran out of oxygen sensor parts that Volkswagen ordered for its vehicles, Denner reached out

18     directly to Winterkorn. Denner and Winterkorn directly communicated over parts delays and

19     shortages, implying that each was not a manager who governed from afar, but rather was intricately

20     involved in the details of operations.

21

22

[99] *See* Interview with Bosch GmbH Director Volkmar Denner, Jan. 21, 2015, available at
23     http://www.uni-stuttgart.de/forschung-leben/forschung-persoenlich/persoenlich_artikel0005.en.html.

[100] *See* Martin-Werner Bucdhenau, The Multinational Start-up: The engineering and electronics
24     giant Bosch is putting aside its conservative tendencies and investing in a new innovation unit that it
hopes will rival successful start-up incubators, Handelsblatt, Nov. 28, 2014, available at
25     https://global.handelsblatt.com/edition/64/ressort/companies-markets/article/the-multinational-start-
up.

26     [101] *See* Nick Gibbs, German auto firms try to nurture Silicon Valley boldness, Automotive News,
Nov. 22, 2015, available at http://www.autonews.com/article/20151122/OEM06/
27     311239956/german-auto-firms-try-to-nurture-silicon-valley-boldness.

28

280.     In May 28, 2014, Denner participated in a meeting with Winterkorn and other Bosch GmbH, Bosch LLC and Volkswagen executives at Volkswagen headquarters concerning their partnership in the U.S. market. Among other topics, participants discussed the "akustikfunktion" in Volkswagen diesel vehicles.[102] Thus, Denner and Winterkorn were aware of the illegal use of the defeat devices at least by May 2014.

281.     In sum, Bosch GmbH and Bosch LLC each played a crucial role in the fraudulent enterprise and profited handsomely from it. It is no exaggeration to say that Bosch GmbH provided Volkswagen with the most critical elements necessary to create an engine capable of being (fraudulently) represented as achieving the most stringent U.S. emission standards and Bosch LLC directly participated in selling the fraud. All of the Bosch components provided to the Volkswagen production line combined—including the ECU, software, fuel system, sensors, and harness—accounted for a sizeable portion of the total material cost of the engines. Volkswagen is very big business for Bosch Diesel Systems, in particular for Bosch GmbH and Bosch LLC.

**D.     Volkswagen's "Clean" Diesel Advertising Campaign**

282.     While secretly using defeat devices to bypass emission testing, Volkswagen publicly declared a landmark victory—touting that it had successfully optimized its engines to maintain legal emissions, while simultaneously enjoying the cost savings and convenience factors of a lean $NO_X$ trap system. Volkswagen claimed it accomplished this by monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce initial emissions, while neutralizing the remaining ones with a lean $NO_X$ trap to comply with U.S. law.[103] Volkswagen branded and advertised this purportedly revolutionary technology to American consumers as "Clean Diesel" TDI technology.

283.     As we now know, Volkswagen's "clean" diesel campaign was built upon a lie. Indeed, the Class Vehicles were so "dirty" that they could not pass the minimum emission standards

---

[102] VW-MDL2672-02569909.

[103] *See* Hadler, *et al.*, Volkswagen's New 2.0l TDI Engine Fulfils the Most Stringent Emission Standards, Internationales Wiener Motorensymposium 2008; *see also* Self Study Program 826803: 2.0 Liter TDI Common Rail BinS ULEV Engine, Volkswagen of America, Inc. (2008).

in the U.S., and Volkswagen had to lie to the EPA to sell them in the U.S. But Volkswagen marketed and sold these Class Vehicles without ever disclosing to consumers that they were unlawful to sell or drive due to their high levels of $NO_X$ emissions.

### 1. VW's False and Misleading Advertisements

284.   VW's "clean" diesel campaign was its key selling point for consumers increasingly concerned about the environment. Its marketing mission was to "get clean-diesel power the recognition it deserves as a true 'green' technology," thereby growing Volkswagen's market share to match Winterkorn's lofty goals.[104] The objective was to change the way consumers thought of diesel technology, by replacing the mental image of sulfur emissions amid clouds of thick soot with that of heightened efficiency and reduced $CO_2$ emissions. The VW website stated: "This ain't your daddy's diesel. Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI 'clean' diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."

285.   Dubbing these diesel engines "Clean Diesel" was a symptom of the brazen arrogance underlying the fraud. VW's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing consumers that the Class Vehicles were not merely compliant with emission regulations, but that they exceeded them. This deception culminated in a Guinness World Record attempt in a 2013 Volkswagen Passat TDI, which ironically won an award for "lowest fuel consumption—48 U.S. states for a non-hybrid car."[105]

286.   VW professed that its diesel-based technology was equal or superior to hybrid and electric options offered by its competitors. As described by Mark Barnes (COO of VW America) when asked, "What is the advantage of a diesel over a hybrid?"

> It's a fantastic power train. It gives very good fuel economy. It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by

---

[104] *See, e.g., TDI Clean Diesel*, http://www.venturavw.com/TDI-clean-diesel.html.

[105] Nick Palermo, *Volkswagen Passat TDI Sets World Record for Fuel Economy*, Autotrader (July 2013), http://www.autotrader.com/car-news/volkswagen-passat-tdi-sets-world-record-for-fuel-economy-210689.

90% and the emissions of nitrous oxide are cut by 95%. So, a very clean running engine. Clean enough to be certified in all 50 states. It's just like driving a high-powered gasoline engine so you are not giving up one bit of the driving experience that you'd expect from a regular gasoline engine.[106]

287. Facing skepticism, Barnes had a ready, if imaginative, response to the question, "How do you re-brand something that's dirty like diesel as something that's green?"

The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older diesels versus the current TDI clean diesel. And one of the things we do is we put coffee filters over the exhaust pipes of both cars. We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter. Ours is very clean. In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it.[107]

288. VW also advertised that its vehicles performed better on the road than in test conditions, touting in a 2008 press release: "While the Environmental Protection Agency estimates the Jetta TDI at an economical 29 mpg city and 40 mpg highway, Volkswagen went a step further to show real world fuel economy of the Jetta TDI. Leading third-party certifier, AMCI, tested the Jetta TDI and found it performed 24 percent better in real world conditions, achieving 38 mpg in the city and 44 mpg on the highway."[108] This discrepancy between the EPA certified mpg figures (which are reverse calculated based on vehicle performance on a dynometer) and the real world mpg figures came about because, in real world driving, Volkswagen's defect device *disabled* the full functioning of the $NO_X$ trap system exhaust gas after treatment control (which needed to burn more fuel to work properly), thereby decreasing vehicle operating costs at the expense of massively increased $NO_X$ emissions.

289. Volkswagen distinguished the TDI "clean" diesel engines from other, "stinky, smoky, sluggish" diesels, proclaiming its "eco-conscious" status and failing to disclose that the Class

---

[106] Gayathri Vaidyanathan, *Volkswagen: Our Diesel Cars Whup The Prius And Other Hybrids,* Business Insider (Oct. 9, 2009), http://www.businessinsider.com/volkswagen-preps-for-a-diesel-revolution-2009-10.

[107] *Id.*

[108] Jake Fisher, *Did Volkswagen Use 'Cheat Mode' as a Selling Point?*, Consumer Reports (Oct. 19, 2015), http://www.consumerreports.org/volkswagen/did-volkswagen-use-cheat-mode-as-a-selling-point?loginMethod=auto.

Vehicles were "dirty" themselves. These messages were prevalent in Volkswagen's extensive marketing campaign.

290.    Some advertisements specifically emphasized the low emissions and eco-friendliness of the vehicles:





291.    Others touted the combination of fuel efficiency and power:









292. Yet others addressed the full package, implying that in contrast to the "stinky, smoky, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean, efficient, and powerful all at once:



1
2
3
4
5
6
7
8
9
10



11   293.   In addition, VW directed consumers to the www.clearlybetterdiesel.org website,

12   which partnered with affiliates Audi and Porsche, and Bosch, Mercedes, and BMW. This website

13   touted the benefits of newly developed diesel technology as "clean" and environmentally friendly.

14   Although it has been scrubbed of all content, the website previously contained false and misleading

15   statements, such as:

16
17
18
19
20   
21
22
23

24   294.   The website also offered a graphic slider, specifically representing that "clean" diesel

25   produced fewer emissions and dramatically reduced smog, as shown by the following:

26
27
28

1
2
3
4
5
6
7
8
9



10    295.    This website may have accurately portrayed the environmental advantages of BMW

11  diesel vehicles, which have not been implicated in the defeat device scandals, to date. However,

12  Volkswagen's partnership with "www.clearlybetterdiesel.org" falsely or misleadingly portrayed the

13  Class Vehicles as an environmentally friendly, low-emissions choice for discerning and socially

14  responsible consumers.

15    296.    VW also produced TV advertisements for the U.S. market, intended to debunk myths

16  about diesel engines. One ad, titled "Three Old Wives Talk Dirty," featured three elderly women

17  debating whether diesels, though "beautiful," are dirty vehicles:

18
19
20
21
22
23
24
25
26
27



28

1    297.    To ostensibly debunk the "Old Wives' Tale" that diesel produced dirty exhaust and

2    hazardous emissions, one of the women held her white scarf to the exhaust to convince the

3    passengers that the exhaust was environmentally friendly, and not dirty:



15    298.    She removed the scarf, gestured at it, and asked her friends "see how clean it is?"



299.   Like others in VW's "clean" diesel campaign, this ad falsely or misleadingly portrayed the exhaust emissions from the Class Vehicles as clean and safe. In reality, the Class Vehicles actually emitted invisible and extremely hazardous levels of $NO_X$.

300.   These themes extended to print brochures at dealerships and to VW's website. The brochures emphasized that VW's "clean" diesel was "clean," "green," and low-emission. For example, a "2012 Volkswagen Family" brochure for all VW models, states:

> Let TDI "clean" diesel set you free from the filling station. Our TDI engines achieve astonishing mileage and range—up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to the TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.*** On most models, you can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.[109]
> [Emphasis added.]

301.   Similarly, a "2013 Volkswagen Family" brochure, applicable to all models, states:

> When you've had your fill of filling stations, hit the road in your TDI "clean" diesel Volkswagen. These engines achieve astonishing mileage and range-up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to the TDI technology that uses a direct injection system, and runs on ultra-low-sulfur diesel, helping reduce emissions by up to 90% compared to previous diesels.*** Far and away, it's our best diesel yet.[110] [Emphasis added.]

302.   And a 2012 "Volkswagen TDI "clean" diesel" brochure for the six models of Volkswagen TDIs then on the market (Jetta, Jetta SportWagen, Golf, Passat, Beetle, and Touareg) states:

> **These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler.** Clean diesel vehicles meet the strictest EPA standards in the U.S. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.
>
> . . .
>
> **Think beyond green.** TDI represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging eco-

---

[109] Brochure: 2012 Volkswagen Family, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2012-family.pdf.

[110] Brochure: 2013 Volkswagen Family, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2013-volkswagenfamily.pdf.

conscious products and behaviors. Join us in being more responsible on the road and on the planet.[111]

303.   Further, a Volkswagen 2010 TDI Jetta and Jetta SportWagen brochure states:

The 2.0L TDI® "clean" diesel engine gives you 140hp and 236 lbs-ft of torque. This engine is the toast of Europe for its quickness, low emissions, and fuel efficiency—a staggering 38 city/44 highway mpg (automatic) based on real-world AMCI-certified testing (30 city/42 highway mpg. EPA estimates).

. . .

Jetta TDI "clean" diesel offers fuel efficiency, power, performance, and a $1,300 tax credit from Uncle Sam because it qualifies as an Advanced Lean Burn Credit. ***Or, in other words, lean, mean, cleaner burning machines. Volkswagen believes in delivering a no-compromise German-tuned auto that performs, and still leaves a small carbon footprint. The Volkswagen TDI engine is cleaner than conventional diesels, emitting as much as 95% less soot than previous diesel engines, as well as a reduction in oxides of nitrogen and sulfur.*** It's powerful, with the kind of low-end torque that racers and tuners demand. It's efficient, using a turbocharger and smart exhaust design to burn fuel more effectively. So much so, in fact, that Volkswagen was the first automaker to make clean diesel cars certified in all 50 states. And best of all, it will help save you money with an out-of-this-world AMCI-estimated mileage of 38 city/44 highway mpg (automatic) and over 594 miles on a single tank of fuel.

There's even a Jetta SportWagen TDI "clean" diesel, with the same astonishing clean diesel technology, plus a whopping 66.9 cubic feet of cargo room.[112] [Emphasis added.]

304.   And a Volkswagen 2011 Golf TDI brochure states:

Regardless of which Golf model you get, you'll be seeing a lot fewer gas stations and a lot more road. The 2.5L Golf comes standard with a 170-hp, in-line five-cylinder engine with 177 lbs/ft torque and impressive fuel efficiency rated at 23 city/30 highway mpg. Opt for the Golf TDI model and you'll enjoy a turbocharged clean diesel engine with 140 hp and 236 lbs/ft of torque that will run you even farther at a whopping 30 city/42 highway mpg. That's up to 609 miles per tank. ***And you'll do it all with 95 percent fewer sooty emissions than diesel engines of old, making it cleaner for both you and the planet.*** So whether you're in the market for IntelliChoice's 2010 "Best Overall Value Compact Car over $17,000," or you want to go for a variation on that theme and get the ever-popular TDI model, you can't go wrong. In fact, you can go very right for a long, long time."[113]

---

111 Brochure: 2012 Volkswagen TDI® Clean Diesel, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2012-family.pdf.

112 Brochure: 2010 Volkswagen Jetta and Jetta SportWagen, http://www.slideshare.net/SteveWhiteVW/2010-volkswagen-jetta-brochure-greenville.

113 Brochure: 2011 Volkswagen Golf, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2011-golf.pdf.

305. A Volkswagen 2012 Passat TDI brochure states:

Let the Passat TDI "clean" diesel set you free from the filling station. It achieves an astonishing 43 highway mpg and travels 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to its TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.*** You can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.

. . .

The TDI "clean" diesel engine was designed and engineered around one simple belief: driving is more fun than refueling. So besides the reduced emissions and torque-filled benefits you experience behind the wheel of the Passat TDI, it also saves you money at the pump.[114] [Emphasis added.]

306. A Volkswagen 2013 Beetle TDI brochure states:

Start the TDI® "clean" diesel model and hear the surprisingly quiet purr of ***the first clean diesel Beetle,*** designed for both power and efficiency.[115] [Emphasis added.]

307. A Volkswagen 2014 Beetle TDI brochure states:

2.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Beetle TDI has lower $CO_2$ emissions compared to 84% of other vehicles. ***So every getaway you make will be a cleaner one.***[116] [Emphasis added.]

308. A Volkswagen 2014 TDI Touareg brochure states:

3.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Touareg TDI has lower $CO_2$ emissions compared to 88% of other vehicles. ***So every getaway you make will be a clean one.***[117] [Emphasis added.]

**2.    Audi's False and Misleading Advertisements**

309. Audi, like VW, pitched its 2.0-liter and 3.0-liter diesel engines as environmentally friendly, powerful, and efficient. Drawing heavily from the themes in VW's advertisements, Audi deceptively portrayed its Class Vehicles as clean and safe for the environment, unlike the diesels of yesteryear. Examples of such advertisements include:

---

[114] Brochure: 2012 Volkswagen Passat, https://static.beepi.com/Brochures/17001.pdf.

[115] Brochure: 2013 Volkswagen Beetle, https://static.beepi.com/Brochures/22980.pdf.

[116] Brochure: 2014 Volkswagen Beetle, https://static.beepi.com/Brochures/23900.pdf.

[117] Brochure: 2014 Volkswagen Touareg, https://static.beepi.com/Brochures/18663.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





310.     Audi proclaimed that "[d]iesel [was] no longer a dirty word," but failed to disclose that its vehicles were so dirty that they could not pass emission standards in the U.S. and that the only reason they were introduced into the stream of commerce here is because Audi fraudulently obtained COCs from the EPA for these vehicles. With equal audacity, Audi advertised that, by driving an Audi TDI, you could "[p]rotect the environment and look good doing it," while failing to disclose the pernicious $NO_X$ spewed into the environment.

311.    Audi also ran numerous TV commercials for its "clean" diesel vehicles, many of which touted the "eco-friendly" characteristics of its diesel technology. One ad, "The Green Police" (which aired during the 2010 Super Bowl) portrayed a world in which the environmental police ("Green Police") arrested people for using Styrofoam cups, failing to compost, asking for plastic bags at the grocery store, throwing out batteries, and drinking water from plastic bottles. And at a highway checkpoint, the "ECO ROADBLOCK," the Green Police flagged cars that were harmful to the environment:



312.    When the Green Police at the ECO ROADBLOCK see an Audi A3 TDI SportWagen, they give the car a "thumbs up" and allow the driver to bypass the roadblock.



CLASS ACTION COMPLAINT - 93
Case No.:
010549-11 973652 V1

313.   After the white A3 TDI cruises past the other vehicles, the screen fades to black and falsely touts the supposed "green credentials" of the A3 TDI.

314.   Like VW, Audi also provided false representations in print brochures at dealerships and on Audi's website. For example, an Audi 2011 A3 TDI brochure states:

> With the potent combination of direct diesel injection and turbocharging, the 2.0-liter TDI® clean diesel engine delivers an impressive 236 lb-ft. of torque and produces 140hp. The power and performance is complemented with impressive EPA-estimated 30 MPG city and 42 MPG highway ratings. ***Producing 30 percent fewer $CO_2$ emissions than a comparable gasoline engine, the 2.0 TDI clean diesel also meets or exceeds the 50 state emissions requirements.***
>
> . . .
>
> Long gone are the days of dirty, smoking diesel engines. Audi TDI clean diesel technology is responsible for the cleanest diesel engines in the world, with 30 percent fewer $CO_2$ emissions than comparable gasoline engines, making it an environmentally friendly alternative to gasoline power. In fact, TDI clean diesel is compliant with California's ULEV II requirement—the world's most stringent emission standard. The result is a significant reduction in emissions that contribute to global warming.[118] [Emphasis added.]

315.   Audi's 2016 A6 and A7 brochures similarly (and falsely) stated that the 3.0-liter TDI versions of these cars meet emission rating "ULEV II," and the 2016 A6, A7, and Q5 brochures all similarly stated:

> Taking advantage of the greater power density of diesel fuel over traditional gasoline, the available 240-hp 3.0-liter TDI® clean diesel V6 delivers incredible torque (428 lb-ft) and passing power, while boasting impressive fuel efficiency numbers. ***It also produces fewer emissions with a combination of Piezo direct injection, a high compression ratio, and innovative after-exhaust treatment that helps eliminate up to 95% of diesel NOx emissions.***[119] [Emphasis added.]

316.   An Audi 2016 A8 brochure also listed the TDI models as meeting emission rating "ULEV II," and stated:

> With 240 hp and 428 lb-ft of torque on tap, the available 3.0-liter TDI® clean diesel engine's elasticity in the passing lane is almost as impressive as its ability to take on even the longest road trips. ***And with features like AdBlue® exhaust after-treatment helping to make***

---

[118] Brochure: 2011 Audi A3, http://www.slideshare.net/MichiganCarSales/2011-audi-a3-detroit-mi-fred-lavery-company.

*every journey a little cleaner, this is a performance win for all sides.*[120] [Emphasis added.]

317.     Contrary to these advertisements, Audi employees knew the Class Vehicles' real world $NO_X$ and other emissions exceeded the allowable EPA emission standards. Ulrich Weiβ was head of powertrain development at Audi beginning on or around July 2011 and remained in that position through and after November 2015. According to the German publication Der Spiegel, Weiβ gave testimony to a German labor court he "again and again" "brought up the delicate issue in various task forces of the Volkswagen Group."[121] Many of these tasks forces reported directly to Audio CEO, Rupert Stadler.[122] Weiβ presented documents to the German labor court establishing that Stadler knew that certain "clean diesel" Audis employed illegal defeat devices.[123] He also presented an Audi document discussing the use of cycle beating which noted that "volume and image risks" were to be avoided in all circumstances.[124]

**3.     Volkswagen's Nationwide Advertising Campaign Was Highly Effective, and Volkswagen Profited Handsomely from Selling the Class Vehicles**

318.     Volkswagen's massive advertising campaign for the Class Vehicles proved highly successful, as Volkswagen took a commanding lead in U.S. diesel vehicle sales. Volkswagen's diesel vehicles were profiled on environmental websites and blogs as the responsible choice, relying on Volkswagen's representations of high mileage and low emissions.[125]

---

[121] Bertel Schmitt, *Audi Engineer Airs The So Far Dirtiest Laundry Of The Dieselgate Scandal. Stadler Soiled*, Forbes (Feb. 19 2017), http://www.forbes.com/sites/bertelschmitt/2017/02/19/audi-engineer-airs-the-so-far-dirtiest-laundry-of-the-dieselgate-scandal-stadler-soiled/2/#47b4fcbf1ce2.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *See, e.g.*, Jim Motavalli, *Clean diesel: What you need to know*, Mother Nature Network (Apr. 5, 2013), http://www.mnn.com/green-tech/transportation/blogs/clean-diesel-what-you-need-to-know; Anthony Ingram, *2015 VW Golf, Beetle, Passat, Jetta All Get New Clean Diesel Engine*, Green Car Reports (Mar. 19, 2014), http://www.greencarreports.com/news/1090957_2015-vw-golf-beetle-passat-jetta-all-get-new-clean-diesel-engine (last visited on Sept. 28, 2015).

319.    And the success of Volkswagen's advertising campaign resulted in skyrocketing sales. In 2007, VW America sold 230,572 cars in the United States—a far cry from Winterkorn's goal of 800,000 sales in 2018—and a negligible number of those were diesel vehicles. In fact, in 2007 only approximately 16,700 light-duty diesel vehicles were sold in the United States.[126] As Volkswagen released its "clean" diesel lineup and fraudulent advertising campaign, sales of the Class Vehicles grew dramatically, from 43,869 in 2009 to a peak of 111,285 in 2013. This largely accounted for VW America's sales growth to over 400,000 sales in 2013, nearly double the sales in 2007.[127] Likewise, the Class Vehicles contributed significantly to Audi's growth from 93,506 sales in 2007 to 182,011 in 2014.[128] According to the U.S. government, approximately 80,000 of the illegal vehicles sold by VW and Audi in the United States had 3.0-liter TDI diesel engines.

320.    Volkswagen reaped considerable benefit from their fraud, charging premiums of thousands of dollars for the "clean" diesel models of the Class Vehicles.

321.    Volkswagen also engaged in an aggressive lobbying campaign for federal tax credits for the Class Vehicles, akin to the credits offered for electric cars.[129] These efforts were met with some success, as many of the Class Vehicles were deemed eligible for federal income tax credits in order to spur "clean" diesel technology. In fact, at least $78 million was earmarked for TDI Jetta buyers in 2009 and 2010.[130]

---

[126] Paul Eisenstein, *Volkswagen Scandal Delivers 'Black Eye' to Diesel Tech as a Whole*, NBC News (Sept. 24, 2015), http://www.nbcnews.com/business/autos/volkswagen-scandal-delivers-black-eye-diesel-tech-whole-n433016.

[127] *Volkswagen Reports December 2013 and Year-End Results*, Volkswagen (Jan. 3, 2014), http://media.vw.com/release/592/.

[128] *Audi achieves fifth straight year of U.S. record sales with 182,011 vehicles in 2014*, Audi USA (Jan. 5, 2015), https://www.audiusa.com/newsroom/news/press-releases/2015/01/audi-achieves-fifth-straight-year-of-us-record-sales-with-182011-vehicles-in-2014.

[129] Steve Birr, *Volkswagen Lobbied Obama Administration For Green Tax Credits*, The Daily Caller (Oct. 13, 2015), http://dailycaller.com/2015/10/13/volkswagen-lobbied-obama-administration-for-green-tax-credits/.

[130] *Volkswagen shares plunge on emissions scandal; U.S. widens probe*, Reuters (Sept. 21, 2015), https://finance.yahoo.com/news/volkswagen-shares-plunge-most-six-071319964.html.

**E.     Defendants' Dirty Diesel Scheme Starts to Unravel**

322.     Defendants' illegal scheme started to unravel approximately five years after Volkswagen introduced its first diesel model containing the defeat device into the U.S. stream of commerce. In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the International Council on Clean Transportation ("ICCT"), which found that certain of the Class Vehicles' real world $NO_X$ and other emissions exceeded the allowable EPA emission standards.[131]

323.     The ICCT researchers had been comparing the real-world performance of "clean" diesel vehicles in Europe with reported results and noted numerous discrepancies. Since the U.S. emission regulations were more stringent than its European counterparts, the ICCT sought to test the equivalent U.S. "clean" diesel cars, presuming that they would run cleaner. West Virginia University's team of emissions researchers was a qualified and enthusiastic partner, as they had already been engaged in the study of heavy truck emissions.

324.     Shockingly, the study showed that, contrary to testing lab results, real world driving of Volkswagen "clean" diesel vehicles produced levels of $NO_X$ up to 40 times higher than legal limits promulgated by the EPA and CARB:

---

[131] *See Final Report: In Use Emissions Testing of Light-Duty Diesel Vehicles in the United States*, International Council on Clean Transportation (May 15, 2015). http://www.theicct.org/sites/default/files/publications/WVU_LDDVin-use_ICCT_Report_Final_may 2014.pdf.

Average emissions of nitrogen oxides in on-road testing

GRAMS OF NITROGEN OXIDES PER KILOMETER

2011 Volkswagen Jetta

HIGHWAY — 15 times limit
URBAN (LOS ANGELES) — 25 times
URBAN (SAN DIEGO) — 37 times
RURAL (UP AND DOWNHILL) — 38 times

2012 Volkswagen Passat

HIGHWAY — 9 times limit
URBAN (LOS ANGELES) — 20 times
URBAN (SAN DIEGO) — 17 times
RURAL (UP AND DOWNHILL) — 17 times

U.S. limit
.04 grams/kilometer

Source: Arvind Thiruvengadam, Center for Alternative Fuels, Engines and Emissions at West Virginia University

325.     VW, and key members of the conspiracy, leaned of the results of this study prior to its publication on or around May 15, 2014. Oliver Schmidt was the General Manager in charge of VW's Engineering and Environmental Office in Auburn Hills, Michigan from around 2012 to around February 2015. In the course of that work, he knew of the illegal defeat device and, at various times, concealed it from the EPA and the public. Between March and September 2015 Schmidt worked in Wolfsburg, Germany as a principal deputy to Neusser (Head of Engine Development).

326.     On or around April 2, 2014, Oliver Schmidt opened an email which, in part, stated that "current diesel PEMS measurements in USA on road by CARB, WVU with ICCT show significantly increased NOx-RDE factors. (study to be published soon.)." In this email, the term PEMS refers to the device used to measure vehicle emission on the road and RDE refers to real-drive emissions. Later that day, Schmidt wrote to a colleague about VW's compliance with U.S. emissions regulations, saying: "[i]t should first be decided whether we are honest. If we are not honest, everything stays as it is. ICCT has stupidly just published measurements of N[orth] A[merica] R[egion] diesel off-cycle, not good." In this context, NAR refers to the North America region.

327.     On or about April 7, 2014, ICCT engineers received an e-mail from a VW of America official seeking to verify which vehicles in the study were manufactured by VW.

CLASS ACTION COMPLAINT - 98
Case No.:
010549-11  973652 V1

328.    On or about April 15, 2014, Schmidt forwarded a copy of the ICCT presentation to Bernard Gottweis. Gottweis formally led a team called the "Product Safety Taskforce," which concentrated on crisis prevention and management. But he was primarily known within VW as the "fire-fighter." He had come out of retirement to help with the diesel emissions issue. Schmidt's email to Gottweis concluded by saying "[w]ithin VW GOA, the study is known only to EEO, and we want to keep it that way for the time being."

329.    On or about April 28, 2014, members of the VW task force presented the findings of the ICCT study to Bernard Gottweis. Their presentation included an explanation of the potential financial consequences VW could face if the defeat device was discovered by U.S. regulators, including but not limited to fines per vehicle, which were substantial.

330.    Around the same time (late April 2014), a presentation in Wolfsburg noted that "[o]ne option was for Volkswagen to offer to update the engine software. But the update would not bring emissions down to the required levels."

331.    Michael Horn, former President and CEO of VW America, admitted in his December 14, 2015 responses to additional questions from the House of Representatives Subcommittee on Oversight and Investigations Committee on Energy and Commerce he may have learned of the study as early as April 2014 and no later than May of 2014.

332.    On or about May 9, 2014, a VW employee emailed to Schmidt and others which, in part, read:

> As mentioned orally, VW currently in [North American Region] has the problem of high off cycle emissions, that the EPA has now found out about and we must respond. Oliver Schmidt as head of EEO plans to speak directly with [a VW supervisor] here in Herndon at the end of May. I cannot tell you anything before that because the investigations are still underway in [Wolfsburg]. Dr. Neusser is directly involved in it as head of development.

Schmidt replied "Are you crazy? Recall the email."

333.    The ICCT study was formally published on May 15, 2014. On that same day, Schmidt emailed to Michael Horn with an attachment that, in part, says "[t]he contents of this [ICCT] study cannot be ignored." The attachments also outlined the possible penalties VW was facing. The fines and cars in the attachment could justify a fine of up to $18 billion dollars. Michael Horn admitted

that, shortly after the publication of the study, he was briefed about the penalties for non-compliance with U.S. emissions standards and that the EPA may detect "defeat devices."

334.     Dissatisfied with Volkswagen's explanations, EPA and CARB officials finally threatened to withhold the COCs for Volkswagen's 2016 diesel vehicles until it adequately explained the anomaly of the higher emissions. Volkswagen's executive management requested a briefing on the situation, to take place on July 27, 2015.

335.     Prior to this meeting, VW employees fully briefed Schmidt and Neusser on the defeat device. Their briefing included a chart showing the possible consequence of a meeting that Schmidt was scheduled to have with CARB the following week. That chart showed that if the outcome was "positive for VW," VW would obtain approval for model year 2016 vehicles, but that if it was "negative for VW" and there was "no explanation for [the vehicles with EA 189 engines]," there could be an "Indictment."

336.     On July 27, 2015, Schmidt and other VW employees gave a presentation to VW executive management in Wolfsburg, Germany. Winterkorn, Neusser, Diess, and another manager named Thorsten Duesterdieck were present.[132] Briefing documents for the presentation described the change in emissions which were released by Class Vehicles in "acoustic mode," which was a code word for the defeat device software.[133] The presentation outlined (in German) two possible approaches to the upcoming discussions with American authorities.[134] The first was a "defensive" strategy which the German newspaper BILD summarized as "continue lying."[135] It noted that this approach risked "very high financial penalties."[136] During the meeting, managers preliminarily

---

[132] *See* Bertel Schmitt, *VW's Winterkorn Directly Involved, Damning Dieselgate Revelations Say,* Forbes (Jan. 15, 2017), //www.forbes.com/sites/bertelschmitt/2017/01/15/vws-winterkorn-directly-involved-damning-dieselgate-revelations-say/#2edeaa991f4b; Volkswagen Press Release, *Volkswagen considers shareholder lawsuit to be without merit* (March 2 2016), https://www.volkswagen-media-services.com/en/detailpage/-/detail/Volkswagen-considers-shareholder-lawsuit-to-be-without-merit/view/3259846/45d3a7a50202286bd358a98c25c96a2a?p_p_auth=99hkJRs8

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

settled on an "offensive" strategy of disclosure but they subsequently failed to implement it.[137] Winterkorn's demeanor throughout the presentation was "surprisingly calm."[138] The most disparaging comment he was reported making during or after the meeting was a short remark to a VW engineer who was part of the defeat device development to the effect of: "[y]ou and your software."[139]

337.    On or about August 17 and 18, 2015, Schmidt and other co-conspirators developed a plan for what VW employees would say during a meeting scheduled with CARB on August 19, 2015, in El Monte, California. The plan, approved by senior VW managers, envisioned VW employees continuing to conceal the existence of the defeat device and cheating on U.S. emissions tests from U.S. regulators, to obtain certification for the model year 2016 vehicles. Top executives, including Neusser, even approved a script for employees to use in response to questions. On or about August 17, 2015, Schmidt wrote to a manager at VW that another manager had just "explained to me on the telephone why [one of his colleagues] should not come along [to the CARB meeting]—so he would not have to consciously lie."

338.    On or about August 19, 2015, in a meeting with CARB in El Monte, California, that colleague (who Schmidt had been warned about) disclosed, in direct contravention of instructions from his management, that certain VW diesel vehicles used different emissions treatment depending on whether the vehicles were on the dynamometer or on the road, thereby effectively admitting that VW had cheated U.S. emissions tests.

339.    That very day, back in Germany, "some executives and engineers began deleting documents related to U.S. emissions. Hadler told an assistant to dispose of a hard drive containing e-mails from him and other supervisors".

340.    In fact, from around August 2015 through around September 2015, approximately forty or more VW AG and Audi employees altered, concealed, or destroyed or caused to be altered,

---

[137] *Id.*

[138] *Id.*

[139] *Id.*

CLASS ACTION COMPLAINT - 101
Case No.:
010549-11 973652 V1

concealed, or destroyed thousands of documents. On or about August 26, 2015, as VW employees were preparing to possibly admit to the use of a defeat device in 2.0-Liter vehicles, a VW attorney in Wolfsburg received an email from another VW AG attorney entitled: "Legal Hold Notice—Emissions Certification of MY-2009-2016 2.0L TDI Volkswagen and Audi vehicles." The email indicated that a litigation hold notice would be issued to certain VW employees the following day. On or about August 27, 2015, that Wolfsburg attorney met with several VW AG engineers to discuss the technology behind the defeat device. The attorney indicated that a litigation hold would be issued imminently, and that these engineers should check their documents. At least several engineers at this meeting understood that to mean that they should delete documents prior to the hold being issued. The attorney had a similar discussion with supervisors in the VW Brand Engine Development on or around August 31, 2015, before they were formally issued litigation holds. Those supervisors subsequently deleted documents related to U.S. emissions issues with diesel vehicles.

341.    On or about September 1, 2015, a litigation hold was issued to VW AG. On or about September 1, 2015, several employees in the VW Brand Engine Development department at VW AG discussed the fact that their counterparts at Bosch also possessed documents related to the defeat device and/or emissions of diesel vehicles. At least two VW AG employees contacted Bosch employees and asked them to delete documents relating to the defeat device and emissions of diesel vehicles. On or about September 3, 2015, Neusser approached Hadler's assistant and requested that Hadler's assistant search in Hadler's office for a hard drive on which documents were stored containing emails of VW AG supervisors, including Neusser. Hadler's assistant recovered the hard drive and gave it to Neusser. Neusser later asked his assistant to throw away the hard drive.

342.    On or about September 15, 2015, a supervisor within the VW Brand Engine Development department convened a meeting with approximately 30–40 employees, during which the Wolfsburg attorney described above informed the VW AG employees present about the current situation regarding disclosure of the defeat device in the United States. During this meeting, a VW AG employee asked the attorney what the employees should do with new documents that were created, because they could be harmful to VW AG. The attorney indicated that new data should be

kept on USB drives and only the final versions saved on VW AG's system, and then, only if

"necessary."

**F.      Once Caught, Volkswagen Admits its Fraud—in Part**

343.    On September 3, 2015, Volkswagen officials finally disclosed in writing and at a

meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-

liter Class Vehicles, which could detect when the car was undergoing emission testing on a test

bench and switch the car into a cleaner running mode. During that meeting, Volkswagen admitted

that the software was a "defeat device" forbidden by the CAA and state regulations.

344.    On September 18, 2015, the EPA issued a Notice of Violation of the CAA (the "First

NOV") to VW AG, Audi AG, and VW America for installing illegal defeat devices in 2009-2015

Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines. That same day, CARB sent

a letter to VW AG, Audi AG, and VW America, advising that it had initiated an enforcement

investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

345.    Two days later, Volkswagen made its first public admission of wrongdoing in a

written statement and video by VW AG's then-CEO Winterkorn (who would soon resign because of

this scandal), posted on VW AG's website. Winterkorn's statement read, in pertinent part:

> I personally am deeply sorry that we have broken the trust of our
> customers and the public. We will cooperate fully with the responsible
> agencies, with transparency and urgency, to clearly, openly, and
> completely establish all of the facts of this case. Volkswagen has
> ordered an external investigation of this matter. . . . We do not and will
> not tolerate violation of any kind of our internal rules or of the law.[140]

346.    In his video, Winterkorn further apologized by stating:

> The irregularities in our group's diesel engines go against everything
> Volkswagen stands for. To be frank with you, manipulation at
> Volkswagen must never happen again. . . . I personally am deeply
> sorry that we have broken the trust of our customers. I would like to

---

[140] *See Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG*, Volkswagen AG
(Sept. 20, 2012),
http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/statement_ceo_of_volk
swagen_ag.html.

make a formal apology to our customers to the authorities and to the general public for this misconduct.[141]

347.     That same day, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines.[142] Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

348.     On September 21, 2015, Volkswagen spokesman John Schilling stated in an email that Volkswagen was "committed to fixing this issue as soon as possible" and to "developing a remedy that meets emissions standards and satisfies our loyal and valued customers."[143]

349.     Michael Horn, President and CEO of VW America, echoed this sentiment when he took the stage later that evening at a launch event for the 2016 Volkswagen Passat in Brooklyn, New York, telling reporters:

> Our company was dishonest, with the EPA and the California Air Resources Board, and with all of you and in my German words, *we have totally screwed up*. We have to make things right, with the government, the public, our customers, our employees and also very important, our dealers.[144] [Emphasis added.]

Horn's presentation on the new Passat, notably, did not promote the environmental efficiency of the car's "clean" diesel model.

350.     On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by

---

[141] *See* Joe Lorio, *VW Chairman Martin Winterkorn Releases Video Addressing Scandal, Is Not Stepping Down*, Car and Driver (Sept. 22, 2015), http://blog.caranddriver.com/vw-chairman-martin-winterkorn-releases-video-addressing-scandal-is-not-stepping-down/.

[142] Jack Ewing, *Volkswagen to Stop Sales of Diesel Cars Involved in Recall*, N.Y. Times (Sept. 20, 2015), http://www.nytimes.com/2015/09/21/business/international/volkswagen-chief-apologizes-for-breach-of-trust-after-recall.html.

[143] Jad Mouadwad, *et al.*, *The Wrath of Volkswagen's Drivers*, N.Y. Times (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/business/the-wrath-of-volkswagens-drivers.html.

[144] Christine Seib, *Volkswagen's US Boss: We Totally Screwed Up*, CNBC (Sept. 22, 2015), http://www.cnbc.com/2015/09/21/volkswagen-us-ceo-screwed-up-on-eca-emissions-diesel-test-rigging.html.

U.S. regulators. Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter.[145]

351.    On September 23, 2015, Winterkorn resigned from his position as CEO of VW AG. In his resignation statement, Winterkorn insisted that he was not personally involved in the emissions scandal: "Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group. I am doing this in the interests of the company even though I am not aware of any wrongdoing on my part."[146]

352.    Following Winterkorn's resignation, Volkswagen released a statement that it had set up a special committee to lead its own inquiry into the scandal and expected "further personnel consequences in the next days." It added: "The internal group investigations are continuing at a high tempo. All participants in these proceedings that have resulted in immeasurable harm for Volkswagen will be subject to the full consequences." However, the committee insisted that Winterkorn "had no knowledge of the manipulation of emissions data."[147]

353.    On September 25, 2015, Matthias Müller, the Chairman of Porsche AG, was named as Winterkorn's successor. Immediately upon assuming his new role, Müller issued a press release stating:

> My most urgent task is to win back trust for the Volkswagen Group—
> by leaving no stone unturned and with maximum transparency, as well
> as drawing the right conclusions from the current situation. Under my
> leadership, Volkswagen will do everything it can to develop and
> implement the most stringent compliance and governance standards in
> our industry.[148]

---

[145] Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

[146] Graham Ruddick, *Volkswagen chief quits over emissions scandal as car industry faces crisis*, The Guardian (Sept. 23, 2015), http://www.theguardian.com/business/2015/sep/23/volkswagen-chief-martin-winterkorn-quits-emissions-scandal.

[147] *Id.*

[148] *Matthias Müller appointed CEO of the Volkswagen Group*, Volkswagen AG (Sept. 25, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/CEO.html.

354.     On October 8, 2015, Michael Horn made frank admissions of culpability in his testimony before the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations. Under oath, Horn testified: "On behalf of our Company, and my colleagues in Germany, I would like to offer a sincere apology for Volkswagen's use of a software program that served to defeat the regular emissions testing regime." In response to a question from the Subcommittee Chairman, Representative Tim Murphy, whether the software was installed "for the express purpose of beating tests," Horn testified, "it was installed for this purpose, yes."

355.     On November 2, 2015, the EPA issued a second Notice of Violation of the CAA (the "Second NOV") to VW AG, Audi AG, and VW America, this time directed at the larger 3.0-liter, 6-cylinder diesel models—the same vehicles that Volkswagen continued to sell after the First NOV. The Second NOV disclosed that the EPA had sent a letter to manufacturers on September 25, 2015, stating it was assessing all diesel engine cars for defeat devices. The Second NOV stated that Volkswagen had installed illegal defeat devices in certain vehicles equipped with 3.0-liter diesel engines for model years 2014–16. Although not identical, the cheating alleged of Volkswagen in the Second NOV concerned essentially the same mechanism Volkswagen used—and admitted to using—in the First NOV.

356.     However, shortly after it received the Second NOV, Volkswagen fired back at the EPA's new claims of fraud, denying that it installed defeat device software in the identified 3.0-liter diesel vehicles. In response to the Second NOV, Volkswagen issued the following bold statement: "Volkswagen AG wishes to emphasize that no software has been installed in the 3.0-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."

357.     Yet, the following day, despite Volkswagen's insistence that the 3.0-liter diesel emission system was legal, Volkswagen ordered dealers to stop selling all six models at issue in the Second NOV, in addition to the Audi Q7, which was also equipped with a 3.0-liter diesel engine.

358.     On November 4, 2015, following its directive to halt sales of the 3.0-liter diesel models, Volkswagen announced that an internal investigation revealed "unexplained inconsistencies" with the carbon-dioxide output of 800,000 of its gasoline-powered vehicles.

359.    At a meeting on November 19, 2015, after almost three weeks of denying the EPA's allegations in the Second NOV, Audi finally admitted that defeat device software was installed not only in the vehicles identified in the Second NOV, but in all 3.0-liter Class Vehicles sold by Volkswagen and Audi. Specifically, Audi stated that it had failed to disclose three auxiliary emissions control devices in its 3.0-liter diesel engines to U.S. regulators, and admitted: "One of them is regarded as a defeat device according to applicable U.S. law. Specifically, this is the software for the temperature conditioning of the exhaust-gas cleaning system." On November 20, 2015, the EPA and CARB issued notices giving a complete list of 3.0-liter Class Vehicles affected. On November 25, 2015, CARB sent a letter to Audi and Volkswagen stating that the same 3.0-liter engine, with the same defeat device, was used in all of the 3.0-liter Class Vehicles sold by Volkswagen and Audi. Volkswagen had publicly acknowledged in a press release dated November 23, 2015, that the 3.0-liter engine "was developed by Audi."

360.    This admission came almost three months after Volkswagen's initial, more limited *mea culpa*. It came years after Audi employees first learned that their 3.0-liter diesel vehicles, even when equipped with the more expensive SCR system, still could not pass $NO_X$ emission tests. Moreover, Audi had known for years that, with the installation of the defeat device, its 3.0-liter diesel engines exceeded the legal limits of $NO_X$ levels when operated in real world conditions.

361.    It also came years after employees first attended meetings with Bosch to discuss the diesel engine, began coordinating regulatory submissions regarding $NO_X$ levels with Audi and Volkswagen America, and learned, following the installation of the defeat device, that their vehicles exceeded the legal limits of $NO_X$ levels when operated in real world conditions.

362.    Still, despite the admissions and apologies that followed each time a Volkswagen lie was exposed, it became apparent that Volkswagen was not ready to fully accept responsibility for its actions. Merely one month after Volkswagen admitted to the findings in the Second NOV, Hans-Gerd Bode, Volkswagen's Group Communications Chief, told a group of reporters: "I can assure you that we certainly did not, at any point, knowingly lie to you. . . . We have always tried to give you the information which corresponded to the latest level of our own knowledge at the time."

363.     On January 4, 2016, the DOJ, on behalf of the EPA, filed a civil complaint against VW AG, VW America, Volkswagen Group of America Chattanooga Operations LLC, Audi AG, and Audi for injunctive relief and the assessment of civil penalties for their violations of the CAA. Besides alleging the violations of the CAA, the complaint states that the Defendants impeded the government's efforts to learn the truth about the emission irregularities related to the Class Vehicles with material omissions and misleading information.

364.     On January 10, 2016, in an interview with NPR at the North American International Auto Show, Müller claimed that Volkswagen **did not lie** to U.S. regulators about emissions problems with its diesel engines, and suggested that the whole thing had been a misunderstanding of U.S. law. Müller stated:

> Frankly spoken, it was a technical problem. We made a default, we had a . . . not the right interpretation of the American law. And we had some targets for our technical engineers, and they solved this problem and reached targets with some software solutions which haven't been compatible to the American law. That is the thing. And the other question you mentioned—it was an ethical problem? I cannot understand why you say that. . . . We didn't lie. We didn't understand the question first. And then we worked since 2014 to solve the problem.[149]

365.     Since the fraud was first exposed, Volkswagen has consistently denied that its top executives were involved with, or knew of, the fraudulent scheme, instead pinning the blame on the work of a few rogue engineers.

366.     As an alternative tactic, during Horn's Congressional hearing on October 8, 2015, Horn testified that the installation of the defeat device in certain Volkswagen diesel vehicles was the work of "a couple of software engineers who put this in for whatever reason."[150] Horn's explanation is not only contrary to prior admissions, but entirely implausible.

---

[149] Sonari Glinton, *'We Didn't Lie,' Volkswagen CEO Says Of Emissions Scandal*, NPR (Jan. 11, 2016), http://www.npr.org/sections/thetwo-way/2016/01/11/462682378/we-didnt-lie-volkswagen-ceo-says-of-emissions-scandal.

[150] Paul A. Eisenstein, *Could Rogue Software Engineers Be Behind VW Emissions Cheating?*, NBC News (Oct. 9, 2015), http://www.nbcnews.com/business/autos/could-rogue-software-engineers-be-behind-vw-emissions-cheating-n441451.

367. To date, at least eleven of Volkswagen's top executives have either resigned under pressure or been fired. Among the top executives dismissed are Martin Winterkorn, CEO and Chairman of Volkswagen, who resigned almost immediately once the scandal became public; Dr. Ulrich Hackenberg, a top engineering boss in the Audi Group, who was suspended and later resigned; Heinz-Jakob Neusser, described as a Volkswagen "development" boss, who was suspended and later resigned; and Wolfgang Hatz, Porsche's "development" boss and previously Volkswagen's head of engine development, who was suspended and then resigned. One of Volkswagen's top advertising executives purportedly "resigned" (although the company has said that the resignation was unrelated to the present scandal), and VW America has replaced their general counsel and head of public affairs, David Geanacopoulos. Frank Tuch, VW AG's head of quality assurance, resigned on February 8, 2016—his departure likely tied to leadership overhauls as Volkswagen's internal investigations continue. Michael Horn, head of VW America, resigned on March 9, 2016.

368. That a few rogue engineers could orchestrate this massive, worldwide scheme is implausible not only because of the firings of the above-listed executives, but also because Volkswagen has been implicated using not just one, but *two* sophisticated defeat device software programs, in *two* separate engines designed and manufactured by different engineers in different corporate facilities. The design facilities are three hundred miles apart and the engineers at each share little in common except that they answer to the same upper-level executives. And yet each set of teams manufactured and updated different engines employing similar defeat devices over a period of at least seven years; this makes it inconceivable that they were working in parallel with no instructions or guidance from their superiors. In addition, more than a dozen different Class Vehicles, involving three separate brands—Volkswagen, Audi and Porsche—have been implicated in a fraud that began more than a decade ago.

369. On October 17, 2015, Reuters reported that anonymous insiders, including a Volkswagen manager and a U.S. official close to the government's investigation of the company, claimed that Volkswagen made several modifications to its emission defeat device software over the

seven years the company has admitted to cheating.[151] Such incremental updates to the software, which were made to accommodate new generations of engines during that timeframe, evidences a larger group of employees trying to continue their deception.

370.    For example, in or around 2012, Volkswagen engineers looking into hardware failures in 2.0-liter Class Vehicles determined that many vehicles were improperly operating in test mode (with reduced performance) while driving in normal conditions. They hypothesized that remaining in test mode for too long, which the cars were not designed to do, was stressing their exhaust systems. In or around July 2012, engineers from the VW Brand Engine Development department explained this theory to Neusser and Gottweis in separate meetings. Neusser and Gottweis encouraged further concealment of the software and instructed the engineers to destroy the document(s) they had used to illustrate the operation of the defeat device and the effects it could have on the exhaust system.

371.    In or around February 2013, during a "Summer Drive" event in South Africa, Volkswagen and Audi management discussed the defeat device software.[152] According to witnesses, and the minutes from the meeting, Axel Eiser, the head of Audi's powertrain division, said "the shifting program needs to be configured so that it runs at 100% on the treadmill but only 0.01% with the customer."[153]

372.    In or around April 2013, Neusser authorized engineers to add a new steering wheel angle detecting function to the software, to optimize its performance and prevent Class Vehicles from operating under testing protocols unnecessary (and ensure it properly recognized test conditions). These new software functions were added to new 2.0-Liter Class Vehicles sold in the United States. It was later installed in existing 2.0-Liter Class Vehicles during maintenance. In or around 2014, this function was part of the software updates that VW employees falsely told U.S.

---

[151] Andreas Cremer, *et al.*, *VW made several defeat devices to cheat emissions tests: sources*, Reuters (Oct. 17, 2015), http://www.reuters.com/article/us-volkswagen-emissions-software-idUSKCN0SB0PU20151017.

[152] Wall Street Journal (Nov. 11 2016), "New Cheating Allegation Broadens VW's Crisis."

[153] *Id.*

regulators would fix the problems with the 2.0-Liter Class Vehicles when, in fact, they were actually

improving the accuracy of the defeat device.

373.     At a December 10, 2015, press conference, during which Volkswagen discussed

preliminary results of their internal investigation, executives summed up the state of affairs, and

admitted that Volkswagen had installed defeat devices to take shortcuts around engineering

challenges. Faced with "[s]trict and significantly toughening $NO_X$ limits," Volkswagen knew those

"$NO_X$ limits could not be met with [their] technological design" for lean $NO_X$ traps so instead they

dealt with the problem by installing defeat devices on those Class Vehicles. The Class Vehicles with

urea treatments faced a separate problem: the urea tanks were too small for consumers to maintain

urea levels at standard maintenance intervals. Volkswagen also took shortcuts around these

engineering challenges by implementing a defeat device to reduce urea consumption and illegally

stretch the capacity of its urea tanks outside of test conditions. Volkswagen concluded this

presentation by implicitly acknowledging the toxicity of its corporate culture, as Volkswagen

announced it would establish a "new mindset" among Volkswagen leadership that has "[m]ore

capacity for criticism."[154]

374.     An after-the-fact chronology and explanation of how and why Volkswagen

perpetrated its fraud is set forth in its December 10, 2015 presentation:

---

[154] *Volkswagen AG, The Volkswagen Group is moving ahead: Investigation, customer solutions, realignment*, Volkswagen AG (Dec. 10, 2015),
http://www.volkswagenag.com/content/vwcorp/info_center/en/talks_and_presentations/2015/12/Presentation_MUE_POE.bin.html/binarystorageitem/file/2015_12_10_Pr%C3%A4sentation+PK_Final_ENG.pdf.

**VOLKSWAGEN**

## What have we already learned about the origins of the NO$_X$ Issue (continuation)



| Market launch EA189 (Gen 1) in the US: | Further development: | Problem: | Dealing with the problem: | Market launch EA189 (Gen 2) in the US: |
|---|---|---|---|---|
| Motor control software recognizes test cycle and uses e.g. more intense exhaust recirculation to reduce NO$_X$ values on the test bench | Generation 2 of EA189 was supposed to be more effective in reducing NO$_X$ by utilizing active exhaust gas recirculation ("SCR system") | Tank for reduction medium ("Diesel Exhaust Fluid") needs to be large enough for oil change interval (approx. 16,000 km) because Diesel Exhaust Fluid could only be refilled at repair garages | Maintain dual exhaust gas strategies for the test bench and the road in order to cope with the conflicting goals by varying "Diesel Exhaust Fluid" dosages | Motor control software recognizes test cycle and uses e.g. higher "Diesel Exhaust Fluid" dosage to reduce NO$_X$ values on the test bench |

Spring 2008       Early 2011

17

### G.  Volkswagen's Failed Attempts at Remedial Action

375.    While Volkswagen has repeatedly expressed its commitment to fix the problem and restore the public's trust, its attempts at remedial action have been wholly inadequate.

376.    Volkswagen's "goodwill package" and proposed recalls include no benefits for prior owners and lessees who are no longer in possession of a Class Vehicle.

377.    The total value of Volkswagen's "goodwill package" would not have been sufficient to adequately compensate Class members.

### H.  Volkswagen Caused Millions of Dollars in Harm to U.S. Consumers

378.    Volkswagen's illegal scheme duped hundreds of thousands of U.S. consumers into buying Class Vehicles that never should have left the factory, let alone been sold, at a cost of millions of dollars.

379.    Volkswagen engaged in a false and misleading advertising campaign that the "clean" diesel engine system was a high performance engine that still managed to be fuel efficient and low-emission. Plaintiffs and Class members bought or leased the Class Vehicles based on these claims, and would not have purchased or leased them otherwise. In fact, Class members paid a premium for this purportedly clean diesel engine, but never received the benefit of their bargain. Using recent pricing figures, it has been estimated that Volkswagen charged premiums from 7 to 27 percent for its

2.0-liter diesel models.[155] For example, the non-diesel 2015 Passat started at $21,340, while the "clean" diesel fetched at least $27,100.[156] Though the "clean" diesel model achieves greater mileage, the premium—some $5,755—would buy enough gas to drive the non-diesel model approximately 88,000 miles at current gas prices.[157]

380.    Despite paying this "clean diesel premium," Class members never obtained the promised environmental benefits. Defendants' denial of these promised benefits is itself an injury that was enduring and continuous throughout the length of Class members' ownership or lease of the vehicle. Class members were promised that their vehicles would be environmentally friendly low-emission vehicles. This was the identifying characteristic of the Class Vehicles, and formed the basis for Defendants' marketing of them. The value of the promised environmental "clean" performance is quantifiable. Class Vehicles leased at a higher per-month rate than other vehicles with otherwise similar traditional performance. And following Volkswagen's September 2015 admission, the sale values of Class Vehicles plummeted.[158]

381.    Class members who purchased (rather than leased) new vehicles were additionally harmed because those Class members paid a premium to have a new vehicle in the first instance. This "new vehicle premium" is a well-known economic fact in the automobile industry. Kelley Blue Book values indicate that "[n]ew cars typically lose about 20% of their value the moment they're driven off the lot." Through its fraud, VW obtained tens of millions of dollars in new vehicle premiums that have never been returned to Class members.

382.    That some Class members sold their vehicles before the announcement does not offset that injury. Even if Class Vehicles were worth slightly more at the time of resale because of the perceived environmental benefits, that value was diminished by the fact that fewer years were left in the life of the car. In other words, Class members had already bought and paid for "clean diesel"

---

[155] Kyle Stock, *Volkswagen's Other Diesel Ruse: Premium Pricing,* Bloomberg (Sept. 23, 2015), http://www.bloomberg.com/news/articles/2015-09-23/volkswagen-s-other-diesel-ruse-premium-pricing.

[156] *Id.*

[157] *Id.*

performance *during the initial term of ownership*—performance which they did not receive. Nor could Class members have recouped the full premium that they paid for that initial clean diesel performance; buyers of used vehicles do not pay for the vehicle's *past* performance—they pay for the performance of the vehicle in the *future*. Likewise, Class members could not have recouped the "new vehicle" premium even by immediate sale following purchase, since by definition that premium disappears the moment a vehicle becomes "used."

383. Similarly, VW obtained tens of millions from Class members who leased their vehicles but terminated those leases prior to the discovery of the fraud. For example, VW typically charges an "acquisition fee" at the start of a lease and a "termination fee" at the end of a lease. That is, VW charged a fee to lease a car that VW knew did not comply with U.S. law and did not deliver the promised "clean" performance. VW then charged a fee to terminate a lease that it knew was not enforceable due to its fraud. These fees were a product of VW's fraud but never returned to Class members.

384. Class members would not have purchased Class Vehicles were it not for Defendants' misrepresentations and fraudulent conduct. None of the sales or leases to Class members *could* have been completed absent Defendants' fraudulent conduct. Class members could only purchase or lease Class Vehicles because Defendants fraudulently obtained regulatory approval, and illegally introduced them into the U.S. stream of commerce.

385. Notwithstanding prior fallout from the emissions scandal, in 2016, Volkswagen became—for the first time—the largest car manufacturer in the world (measured by sales volume).[159] VW has achieved the goal that formed a major impetus for the creation and deployment of the defeat device—expansion of its international market penetration. The potential for VW to see its use of the defeat device as essentially "successful" from a pure business perspective underscores the case for punitive and exemplary damages—VW and other companies must receive a clear signal that defrauding United States consumers is not a profitable business strategy.

---

[159] The Guardian (Jan. 30, 2017), "VW becomes world's No 1 carmaker despite diesel emissions scandal," https://www.theguardian.com/business/2017/jan/30/vw-diesel-emissions-scandal-volkswagen-audi-porsche-skoda-toyota.

1    **I.**      **Volkswagen's Prior Admissions**

2         386.    In its plea agreement with the Department of Justice, Volkswagen AG admitted to

3    knowingly conspiring to commit wire fraud by materially misrepresenting Class Vehicles'

4    compliance with the Clean Air Act and that they did so intending to defraud the buyers and lessees of

5    those vehicles. *See* Rule 11 Plea Agreement at 3–6, *United States of America v. Volkswagen AG*, 16-

6    CR-20394, *available at* https://www.justice.gov/opa/press-release/file/924436/download.

7    Volkswagen AG also stipulated to certain factual allegations in Exhibit 2 of the plea, which it agreed

8    it will "neither contest the admissibility of, nor contradict . . . in any proceeding." *Id.* at 43–73; 7.

9    Plaintiffs have included these admissions as Exhibit A and incorporate by reference each allegation

10   in Exhibit A as though fully set forth herein.

11            **VI.      TOLLING OF THE STATUTES OF LIMITATIONS**

12   **A.      Discovery Rule**

13        387.    The tolling doctrine was made for cases of concealment like this one. Plaintiffs and

14   Class members did not discover, and could not have discovered through the exercise of reasonable

15   diligence, that Defendants had conspired to install software that would evade emissions regulations,

16   and that Volkswagen was concealing and misrepresenting the true emissions levels of its vehicles.

17        388.    Defendants' fraud was elaborate and well concealed. Indeed, the EPA and CARB

18   uncovered the software manipulation only through a sophisticated and costly investigation involving

19   highly technical equipment.

20        389.    Plaintiffs and Class members had no realistic ability to discover the defeat devices, or

21   to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the

22   public through the September 18, 2015, and November 2, 2015 NOVs.

23        390.    Any statutes of limitation otherwise-applicable to any claims asserted have been

24   tolled by the discovery rule.

25                        **American Pipe Tolling**

26        391.    Plaintiffs and Class members here have tolling of any statutes of limitation by virtue

27   of there being named as class members in some of the original complaints.  *See, e.g.*, *Levin v.*

28   *Volkswagen Group of America, Inc.*, 3:15cv05638.  However, they were not included in the class

definition of the 2.0-liter and 3.0-liter settlements, and they have never had a request for class certification denied.

**Fraudulent Concealment**

392.   All statutes of limitation have also been tolled by Volkswagen's knowing, active and ongoing fraudulent concealment of the facts alleged.

393.   Defendants have known of the defeat devices installed in the Class Vehicles since at least 2009 when Volkswagen began installing them. Since then Volkswagen has intentionally concealed from or failed to notify Plaintiffs, Class members, and the public of the defeat devices and the true emissions and performance of the Class Vehicles.

394.   Volkswagen installed the defeat devices intentionally to deceive regulators and the public, as Volkswagen has publicly conceded.

395.   Despite knowing about the defeat device and unlawful emissions, Volkswagen did not acknowledge the problem, and actively concealed it, until after the EPA issued its NOVs on September 18, 2015, and November 2, 2015.

396.   Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and Volkswagen's active concealment of the facts alleged.

**Estoppel**

397.   Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including their emissions systems and their compliance with applicable federal and state law. Instead, Volkswagen actively concealed the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Class Vehicles.

398.   Plaintiffs and Class members reasonably relied upon Volkswagen's knowing and affirmative misrepresentations and/or active concealment of these facts.

399.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense.

## VII.    CLASS ACTION ALLEGATIONS

400.    Plaintiffs sue as a class action under Federal Rules of Civil Procedure 23(a); (b)(3); and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"); on their federal and state claims as the purchasers and lessees of the following Class Vehicles:

| 2.0-liter Class Vehicles | |
| --- | --- |
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta SportWagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf SportWagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |

| 3.0-liter Class Vehicles | |
| --- | --- |
| Volkswagen Touareg TDI | 2009-2016 |
| Audi A6 Quattro TDI | 2014-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

401.    The proposed Classes are defined as:

### Nationwide Class

All persons and entities in the United States, including its territories, excluding Volkswagen dealers or dealerships, who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on or after September 18, 2015.

The foregoing would include all persons and entities whose ownership or leases ended before September 18, 2015, and were not part of the classes in the 2.0-liter and 3.0-liter settlements which used that date as a cut off for eligibility. *See* Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release at 12–14, *In Re: Volkswagen*, 3:15-md-02672-CRB, Dkt. 2841 (defining eligible owners, former owners, lessees, and former lessees in the 2.0-liter and 3.0-liter class action settlements in sections 2.26–2.30).

### Alabama Class

All persons and entities in Alabama, excluding Volkswagen dealers or dealerships, who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.

1

## **Arizona Class**

2

All persons and entities in Arizona, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

3

4

## **California Class**

5

All persons and entities in California, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

6

7

8

## **Connecticut Class**

9

All persons and entities in Connecticut, excluding Volkswagen dealers
or dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

10

11

## **Georgia Class**

12

All persons and entities in Georgia, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

13

14

## **Illinois Class**

15

All persons and entities in Illinois, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

16

17

## **Maryland Class**

18

All persons and entities in Maryland, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

19

20

## **Massachusetts Class**

21

All persons and entities in Massachusetts, excluding Volkswagen
dealers or dealerships, who owned, leased, or otherwise acquired an
Eligible Vehicle and no longer owned, held an active lease for,
or otherwise had a legal interest in that Eligible Vehicle on September 18,
2015.

22

23

24

## **Michigan Class**

25

All persons and entities in Michigan, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

26

27

28

CLASS ACTION COMPLAINT - 118
Case No.:
010549-11  973652 V1

1

**Mississippi Class**

2

All persons and entities in Mississippi, excluding Volkswagen dealers
or dealerships, who owned, leased, or otherwise acquired an Eligible

3

Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

4

**Missouri Class**

5

All persons and entities in Missouri, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible

6

Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

7

**New Jersey Class**

8

All persons and entities in New Jersey, excluding Volkswagen dealers

9

or dealerships, who owned, leased, or otherwise acquired an Eligible
Vehicle and no longer owned, held an active lease for, or otherwise

10

had a legal interest in that Eligible Vehicle on September 18, 2015.

11

**New York Class**

12

All persons and entities in the state of New York, excluding
Volkswagen dealers or dealerships, who owned, leased, or otherwise

13

acquired an Eligible Vehicle and no longer owned, held an active lease
for, or otherwise had a legal interest in that Eligible Vehicle on

14

September 18, 2015.

15

**North Carolina Class**

16

All persons and entities in state of North Carolina, excluding
Volkswagen dealers or dealerships, who owned, leased, or otherwise

17

acquired an Eligible Vehicle and no longer owned, held an active lease
for, or otherwise had a legal interest in that Eligible Vehicle on
September 18, 2015.

18

**Ohio Class**

19

All persons and entities in state of Ohio, excluding Volkswagen

20

dealers or dealerships, who owned, leased, or otherwise acquired an
Eligible Vehicle and no longer owned, held an active lease for, or

21

otherwise had a legal interest in that Eligible Vehicle on September 18,
2015.

22

**Oregon Class**

23

All persons and entities in Oregon, excluding Volkswagen dealers or
dealerships, who owned, leased, or otherwise acquired an Eligible

24

Vehicle and no longer owned, held an active lease for, or otherwise
had a legal interest in that Eligible Vehicle on September 18, 2015.

25

**Pennsylvania Class**

26

All persons and entities in Pennsylvania, excluding Volkswagen

27

dealers or dealerships, who owned, leased, or otherwise acquired an
Eligible Vehicle and no longer owned, held an active lease for, or

28

otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.

### Texas Class

All persons and entities in Texas, excluding Volkswagen dealers or dealerships, who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.

### Utah Class

All persons and entities in Utah, excluding Volkswagen dealers or dealerships, who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.

### Vermont Class

All persons and entities in Vermont, excluding Volkswagen dealers or dealerships, who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.

### Virginia Class

All persons and entities in Virginia, excluding Volkswagen dealers or dealerships, who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.

402.    Excluded from the Classes are: (A) Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; (B) the Judges to whom this case is assigned, their staff, and their immediate families; and (C) governmental entities. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

403.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

404.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

**Numerosity and Ascertainability**

405.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are no less than 50,000 in the Nationwide Class, and at least hundreds of members in each State Class. The precise number and identities of Nationwide Class and State Class members may be ascertained from Volkswagen's books and records and motor vehicle regulatory data. Defendants have comprehensive lists of Class Vehicle owners and lessees in their possession, and are using them to communicate in writing to the Class members. Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court. Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**Typicality**

406.    The claims of the representative Plaintiffs are typical of the claims of the other Class members in that the representative Plaintiffs, like all Class members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Volkswagen, which was equipped with a defeat device designed, manufactured and supplied by Bosch. The representative Plaintiffs, like all Class members, have been damaged by Defendants' misconduct because they have incurred similar or identical losses relating to the Class Vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

**Adequate Representation**

407.    Plaintiffs are members of the Nationwide and State Classes and will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products generally, and defective automobile systems and parts specifically. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Predominance of Common Questions**

408.    There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members. The answers to these common questions will advance the adjudication or resolution of the litigation as to all Class members. These common legal and factual questions include:

a.  Whether Volkswagen, Bosch LLC and Bosch GmbH engaged in the conduct alleged herein;

b.  Whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.  Whether the Clean Diesel engine system in the Class Vehicles contains a defect in that it does not comply with U.S. EPA requirements and federal and state emissions regulations;

d.  Whether the Clean Diesel engine systems in Class Vehicles can be made to comply with EPA and state standards without substantially degrading the performance and/or efficiency of the Class Vehicles;

e.  Whether Volkswagen and Bosch LLC and Bosch GmbH knew about the defeat device and, if so, how long Volkswagen and the Bosch entities have known;

f.  Whether Bosch GmbH and Bosch LLC designed and manufactured a defeat device and worked with VW to obtain approval for sale of cars equipped with such device;

g.  whether Bosch GmbH supplied the "defeat device" to Volkswagen with the knowledge that Volkswagen would use it in production of Class Vehicles;

h.  whether Bosch LLC and Bosch GmbH acted in concert with Volkswagen and aided and abetted Volkswagen's fraud;

i.  whether Class members overpaid for their Class Vehicles;

j.  whether Defendants made material misrepresentations regarding the Class Vehicles.

k.  whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

l.  whether Defendants omitted, actively concealed and/or failed to disclose material facts about the Class Vehicles;

m.  whether Defendants' concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to their detriment by purchasing and/or leasing the Class Vehicles;

n.   whether Bosch supplied the "defeat device" to Volkswagen knowing that Volkswagen would use it in production of Class Vehicles;

o.   whether Bosch acted in concert with Volkswagen and aided and abetted Volkswagen's fraud;

p.   whether Defendants' conduct violated RICO, the MMWA, consumer protection statutes, warranty laws, and other laws as alleged herein;

q.   whether Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, restitution; and

r.   whether Plaintiffs and Class members are entitled to damages and other monetary relief, and, if so, of what types and under what formula.

### Superiority

409.   Defendants' scheme treated consumers as a Class to be uniformly deceived. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs and Class members have all suffered economic harm and damage because of Defendants' unlawful and wrongful conduct, which was directed toward Class members and the public, rather than specifically or uniquely against any individual Class members.

410.   Defendants have acted in a uniform manner with respect to the Plaintiffs and Class members. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct.

411.   Class treatment in this Court, as a court with original jurisdiction over the Class claims, which adjudicated a prior related case as an MDL Transferee Court under 28 U.S. § 1407, will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing common answers to the common questions of knowledge, conduct, duty and breach, that predominate in this action.

412.   Classwide equitable relief is appropriate under Rule 23(b)(1) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Classwide relief and Court supervision under

Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class Vehicles.

## VIII.   CLAIMS FOR RELIEF

### FEDERAL CLAIMS

### FEDERAL COUNT I:

**Violation of 18 U.S.C. § 1962(c)-(d)**
**The Racketeer Influenced And Corrupt Organizations Act ("RICO")**

413.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

414.    Plaintiffs bring this Count on behalf of the Nationwide Class against these Defendants: VW AG, Audi AG, Bosch GmbH, Bosch LLC, Dorenkamp, Neusser, Hadler, Gottweis, Schmidt and Peter (inclusively, for this Count, the "RICO Defendants").

415.    Volkswagen conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, each of which is a separate legal entity. Bosch also conducts its business, both legitimate and illegitimate, through hundreds of subsidiaries and affiliates.[160] At all times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they can hold, and hold, "a legal or beneficial interest in property."

416.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

417.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

418.    For many years, the RICO Defendants aggressively sought to increase their sales of the Class Vehicles (and components contained therein) to bolster their revenues, augment profits,

---

[160]http://www.bosch.com/en/com/bosch_group/business_sectors_divisions/business_sectors_divisions_2.php (last visited on Feb. 20, 2016).

and increase their market share of the diesel vehicle market. Finding it impossible to achieve their ambitious goals lawfully, however, the RICO Defendants resorted to cheating through their fraudulent scheme and conspiracy. The illegal scheme was hatched overseas by VW AG and Audi AG, ("the German Volkswagen Defendants"), brought to U.S. shores through the vehicles of VW America and Audi America (collectively, the "American Volkswagen Defendants"), and executed with Bosch and with the Individual Defendants. In particular, the RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "Emissions Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles complied with emission standards, were "clean," and "environmentally friendly" so as to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Class Vehicles and the defeat devices installed therein. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of millions of dollars from Plaintiffs and the Class. As explained below, the RICO Defendants' years-long misconduct violated Sections 1962(c) and (d).

419.    The purpose of the conspiracy was for each of the defendants and their co-conspirators to unlawfully enrich VW and themselves by, among other things, (a) deceiving U.S. regulators in order to obtain the necessary Certificates to sell diesel vehicles in the United States; (b) selling VW diesel vehicles to U.S. customers knowing that those vehicles were intentionally designed to detect, evade and defeat U.S. emissions standards; (c) deceiving U.S. customers by marketing VW diesel motor vehicles as "clean diesel" and otherwise environmentally-friendly; and (d) concealing VW's intentional emissions cheating from U.S. regulators, U.S. customers, and the U.S. public.

## A.    Description of the Emissions Enterprise

420.    To expand its global reach, market share, and standardized marketing and sales in the U.S., VW AG, a publicly-traded German company, formed VW America, a separate New Jersey company, which is headquartered in Virginia. VW America is not publicly traded and thus has no SEC reporting obligations, but it has reporting obligations, protections and responsibilities unique to

1    the State of New Jersey. VW AG also controls Audi AG which, in turn, formed a separate U.S.

2    subsidiary that is not publicly traded—Audi America—to market and sell the Class Vehicles

3    throughout the U.S. At all relevant times, VW AG maintained tight control over the design,

4    manufacture, and testing of the Class Vehicles.

5        421.   At all relevant times, the RICO Defendants, along with other individuals and entities,

6    including unknown third parties involved in the design, manufacture, testing, and sale of the Class

7    Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of

8    fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to import and sell the

9    Class Vehicles containing the defeat device throughout the U.S., and through which they conducted a

10   pattern of racketeering activity under 18 U.S.C. § 1961(4).

11       422.   Alternatively, each of the American Volkswagen Defendants constitutes a single legal

12   entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants

13   conducted their pattern of racketeering activity in the U.S. Specifically, VW America is the entity

14   through which Volkswagen applied for, and obtained, the EPA COCs for the VW-and Audi-branded

15   Class Vehicles with material misrepresentations and omissions about their specifications to introduce

16   them into the U.S. stream of commerce.  And, on information and belief, the German Volkswagen

17   Defendants and the Individual Defendants used each of the American Volkswagen Defendants to

18   distribute and sell the illegal Class Vehicles throughout the U.S. Finally, Bosch participated, either

19   directly or indirectly, in the conduct of the enterprise's affairs by developing, supplying, and

20   concealing the emission scheme. The American Volkswagen Defendants' separate legal statuses

21   facilitated the fraudulent scheme and provided a hoped-for shield from liability for the RICO

22   Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are

23   referred to collectively as the "Emissions Enterprise."

24       423.   At all relevant times, the Emissions Enterprise constituted a single "enterprise" or

25   multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as

26   individuals and legal entities associated-in-fact for the common purpose of engaging in the RICO

27   Defendants' profit-making scheme.

28

CLASS ACTION COMPLAINT - 126
Case No.:
010549-11  973652 V1

424.     The association-in-fact Emissions Enterprise consisted of the following entities and individuals.

**1.      The Volkswagen Entity Defendants**

425.     Each Volkswagen Entity Defendant is a distinct legal entity, but they are all controlled (directly or indirectly) by Defendant VW AG.[161] Specifically, Audi AG is a majority-owned subsidiary of VW AG. Audi America is also a subsidiary of VW AG.

426.     As noted previously, the Volkswagen RICO Defendants made it their mission to become the dominant automotive manufacturing conglomerate in the world. When they articulated this goal, however, Volkswagen was struggling to retain its foothold in the U.S. market. The strategy of wooing customers with premium products was not paying off, and VW America's costly plant in Chattanooga, Tennessee was "woefully underutilized."[162]

427.     In response to these obstacles, VW AG and its leader at the time, Martin Winterkorn, set in motion an ambitious plan to triple Volkswagen's sales in the U.S. The linchpin of this strategy was increasing sales of "diesel-powered cars . . . [and] promising high mileage and low emissions without sacrificing performance."[163]

428.     Additionally, to achieve their lofty sales goals, the Volkswagen RICO Defendants made a business-driven decision to move away from the original selective catalytic reduction ("SCR") emission control systems they had previously used in their vehicles and focused instead on a less expensive and easier to maintain lean $NO_X$ trap system.[164] Critically, however, the $NO_X$ trap

---

[161] http://www.volkswagenag.com/content/vwcorp/content/en/brands_and_products.html; http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf.

[162] Anton Watts. VW Drama: *Why Piech Wants Winterkorn Out-and What the Future May Hold*. Car and Driver (Apr. 16, 2015).

[163] Danny Kim, Aaron Danny Hakim, Aaron Kessler, and Jack Ewing, "*As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal*," New York Times (Sept. 26, 2015).

[164] The term "NOx trap" refers to any device whose purpose is to reduce the oxides of nitrogen. *See* https://en.wikipedia.org/wiki/NOx_adsorber. However, the term here is used as a shorthand, informal reference to the emissions control system developed by the Volkswagen Defendants as an alternative to the SCR system. Unlike the NOx trap, SCR systems require vehicles to carry an onboard tank of an exhaust additive, often urea crystals in mineralized water, that has to be refilled

1    technology that the Volkswagen RICO Defendants implemented could not effectively reduce the

2    Class Vehicles' toxic $NO_X$ emissions to lawful levels under normal operating conditions.

3        429.    Working with the other members of the Emissions Enterprise, including the Bosch

4    Defendants, the Volkswagen RICO Defendants devised a scheme to illegally circumvent the U.S.'s

5    stringent emissions standards by incorporating a "defeat device" into the Class Vehicles' Electronic

6    Diesel Control Units. Employing this technology, Defendants fraudulently obtained COCs (and EOs)

7    for the Class Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere

8    during normal operating conditions.[165]

9        430.    In order to profit from the scheme and increase their sales according to plan, the

10   Volkswagen RICO Defendants falsely marketed the Class Vehicles as not only compliant but

11   "*clean*" and "*environmentally friendly*" vehicles.[166]

12       431.    In sum, as part of their effort to become the dominant automotive manufacturing

13   conglomerate in the world, the Volkswagen RICO Defendants controlled and directed a decade-long

14   enterprise with the common purpose of deceiving regulators and the public through lies and

15   deception to increase their market shares and profits, and minimize losses.

16       **2.      The Volkswagen Entity Defendants' Directors, Officers, and Engineers**

17       432.    Volkswagen's leaders—including Winterkorn, Müller, Horn, and Stadler and their co-

18   conspirators—Ulrich Hackenberg ("Hackenberg"), Frank Tuch ("Tuch"), Wolfgang Hatz ("Hatz"),

19   Scott Keogh ("Keogh"), and Detlev von Platen ("von Platen")—and the Individual Defendants

20   played pivotal roles in the Emissions Enterprise's unlawful scheme, common course of conduct, and

21   conspiracy.

---

24   every 10,000 miles at a cost of around $300. Additionally, SCR systems also increase the vehicles'
     initial purchase price.

25   [165] *Id.*

26   [166] *See* Jad Mouawad & Sydney Ember, *VW's Pitch to Americans Relied on Fun and Fantasy*,
     New York Times (Sept. 27, 2015), http://nytimes.com/2015/09/28/business/media/vws-pitch-to-
     americans-relied-on-fun-and-fantasy.html?ref=business.

28

### a.    Martin Winterkorn

433.    Martin Winterkorn took the helm of VW AG in 2007 and was the chief architect of Volkswagen's strategy to triple sales in the U.S. market by relying more heavily on "clean" diesel vehicles.[167]

434.    Winterkorn quickly realized his strategy could not succeed if Volkswagen relied on the same SCR technology that they had used until then. Winterkorn instead advocated an alternative course of action that enabled Volkswagen to cut costs and offer the public lower-priced diesel vehicles. To that end, he appointed Hackenberg and Hatz, two former Audi engineers and unnamed co-conspiring members of the Emissions Enterprise, to lead the research and development facet of the "clean" diesel project.

435.    Despite Hackenberg and Hatz's efforts, the technological hurdles were too formidable, and a lawful alternative could not apparently be found. Although Winterkorn was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive cost-cutting, profit driven plan he had originally envisioned. In so doing, he set into motion the fraudulent scheme to defraud regulators and consumers.

436.    Winterkorn knew that the Class Vehicles could not comply with emission standards and thus utilized defeat devices to evade federal and state emission standards.

### b.    Matthias Müller

437.    Müller has worked at Volkswagen for nearly his entire life, starting as an Audi toolmaker and climbing the corporate ladder to become VW's Head of Product Management in 2007, and later, became the CEO of Porsche AG in October 2010. As CEO of Porsche AG, Müller was a trusted "longtime lieutenant of Mr. Winterkorn,"[168] and grew sales and profits at Porsche AG dramatically.

---

[167] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VWoA_DTF_March2015.pdf.

[168] Danny Hakim and Jack Ewing, *Matthias Müller, in the Driver's Seat at Volkswagen*, New York Times (Oct. 1, 2015), http://www.nytimes.com/2015/10/02/business/international/matthias-muller-in-the-drivers-seat-at-volkswagen.html.

438.     During Müller's reign over Porsche AG, he oversaw the release of the Cayenne Diesels discovered by the EPA to have defeat devices.

439.     Further, after the revelation of Volkswagen's fraud, Müller was appointed CEO of VW AG on September 25, 2015. He is suspected to be a protégé of VW AG's former CEO Ferdinand Piëch, whom some blame for propagating the Volkswagen culture that ultimately led to the defeat device conspiracy alleged herein.[169]

440.     Müller knew or recklessly disregarded that the Class Vehicles utilized defeat devices to evade federal and state vehicle emissions standards.

### c.     Michael Horn

441.     On January 1, 2014, Horn became CEO and President of VW America after 23 years working at Volkswagen in various sales leadership positions, until he resigned on March 9, 2016. Horn was tasked with continuing Winterkorn's aggressive ambitions to reach 800,000 in U.S. sales by 2018. As part of his position, Horn oversaw VW America emissions labs, regulatory compliance efforts, and development of new vehicles.

442.     As alleged above, Horn admitted to Volkswagen's intentional use of defeat devices to overcome state and federal regulation.

443.     Moreover, Horn admittedly knew about Volkswagen's use of defeat devices at least as early as 2014, and also knew (and concealed) the existence of defeat devices in Class Vehicles when Volkswagen initiated a recall in December 2014 to purportedly update emission control software in the Class Vehicles without notifying regulators, or the Class, about the use of the illegal defeat devices.

### d.     Rupert Stadler

444.     In 1990, Stadler joined Audi AG, assuming various roles in Audi and VW as he ascended the ranks at Volkswagen. On January 1, 2010, he was appointed CEO of Audi AG, which he remains to present day. As the CEO of Audi AG, Stadler was tasked with implementing

---

[169] Victor Luckerson, *5 things to know about Volkswagen's new CEO Matthias Müller*, Fortune (Sept. 25, 2015), http://fortune.com/2015/09/25/volkswagen-ceo-muller/.

Winterkorn's lofty growth goals, as well as overseeing unnamed co-conspirators Hatz and Hackenberg's development of the "clean" diesel engines in Audi vehicles.

445.     Though presumed by many to be Winterkorn's heir apparent, the revelation of Volkswagen's emissions and Audi's extensive involvement in the conspiracy caused Stadler to be passed over for the position of VW AG CEO in favor of Matthias Müller.[170]

446.     Stadler knew or recklessly disregarded that the Class Vehicles utilized defeat devices to evade federal and state vehicle emissions standards.

**e.     <u>Scott Keogh</u>**

447.     Since June 2012, unnamed co-conspirator Keogh has served as President of Audi America, after a six year period as the Chief Marketing Officer of Audi America. His primary mission was "rallying the company's internal and external constituencies to focus on Audi goals for further expansion in the U.S. market,"[171] as promulgated by Winterkorn.

448.     After the revelation of Volkswagen's fraud, Keogh publicly apologized for Audi America's involvement in the defeat device scandal[172] and agreed to return "Green Car of the Year" awards,[173] though he continues to tout the future of Audi diesel vehicles in the U.S.[174]

449.     Keogh knew or recklessly disregarded that the Class Vehicles utilized defeat devices to evade federal and state vehicle emissions standards.

---

[170] *Audi CEO Rupert Stadler to continue with his post*, THE ECONOMIC TIMES (Sept. 25, 2015), http://auto.economictimes.indiatimes.com/news/industry/audi-ceo-rupert-stadler-to-continue-with-his-post/49103955.

[171] *Scott Keogh*, AUDI USA (last visited Feb. 27, 2016), https://www.audiusa.com/newsroom/corporate/executive-team/scott-keogh.

[172] Michael Walker, *L.A. Auto Show: VW, Porsche, Audi Execs Address Diesel Emissions Scandal*, THE HOLLYWOOD REPORTER (Nov. 20, 2015), http://www.hollywoodreporter.com/news/vw-porsche-audi-execs-apologize-842581.

[173] Jackie Wattles, *Volkswagen stripped of two 'Green Car of the Year' titles*, CNN MONEY (Oct. 1, 2015), http://money.cnn.com/2015/10/01/news/companies/volkswagen-green-car-of-year-awards-rescinded/.

[174] Mike Duff, *Audi Chief Thinks Diesel Has a Future in the U.S.*, CAR AND DRIVER (Jan. 19, 2016), http://blog.caranddriver.com/audi-chief-thinks-diesel-has-a-future-in-the-u-s/.

### f.   Ulrich Hackenberg

450.    On February 1, 2007, unnamed co-conspirator Hackenberg was appointed to Volkswagen's Brand Board of Development. In this capacity, he handled the technical development of all of the Volkswagen Defendants' brands.[175]

451.    On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi AG and made responsible for its Technical Development department. In this capacity, Hackenberg spearheaded the development of Audi's TDI "Clean Diesel" engines, which ultimately contained the illegal defeat devices at issue in this case. As he explained in a press release, Hackenberg's strategy for Audi's technical development included the following:

> [P]ushing forward with development in . . . our TDI engines in the USA -- our clean diesel offensive is bearing substantial fruit. In China, too, we are already introducing the first clean diesel models and watching developments there very closely. We also expect a great deal from g-tron technology, the most sustainable type of gas drive.[176]

Hackenberg's statement is illustrative of the Volkswagen Defendants' efforts to falsely bill Class Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

### g.   Frank Tuch

452.    In 2010, unnamed co-conspirator Tuch was appointed head of quality control across the various Volkswagen Defendants' brands. Winterkorn hoped Tuch would bring the Volkswagen Defendants "forward in the USA."[177] Volkswagen's in-house magazine reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the company." In his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen and Audi engines and transmissions. Among his duties was "the development and production of components such as engines,

---

[175] https://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg.

[176] "Gentlemen Start Your Engines," http://audi-encounter.com/magazine/technology/01-2015/126-gentlemen-start-your-engines(2014).

[177] http://www.marketwatch.com/story/volkswagen-suspends-quality-control-chief-2015-10-20-84855452.

CLASS ACTION COMPLAINT - 132
Case No.:
010549-11  973652 V1

transmissions, seats and suspension parts" for small, compact, midsize, and full size product lines, including all the Class Vehicles.[178]

453.    Significantly, Tuch also oversaw "36 laboratory locations throughout the world in terms of training and auditing and also finds staff to fill laboratory manager positions," including the Volkswagen Defendants' laboratories in the United States, which were primarily responsible for emissions testing of the Class Vehicles.[179]

454.    Tuch knew or recklessly disregarded that the Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### h.    Wolfgang Hatz

455.    Unnamed co-conspirator Hatz directed engine development for the Porsche, Audi and Volkswagen brands. In this role, he supervised the development of the engines and transmissions for the Class Vehicles at issue and had intimate knowledge of their technical details. Hatz knew or recklessly disregarded that the Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### 3.    The Bosch Defendants.

456.    As explained above, Bosch supplied the EDC Unit 17 used as the defeat device in the Class Vehicles.[180]

457.    Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies. It wholly owns Defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. As explained above, Bosch's sectors and divisions are grouped by subject matter, not location. The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services group, and it encompasses employees of Bosch GmbH and Bosch

---

[178] Jack Ewing. "Volkswagen Suspends 5th Executive in Emissions Scandal," The New York Times (Oct. 20, 2015).

[179] http://www.volkswagen-larriere.de/en/what_we_do/corporate_divisions/quality_assurance.html.

[180] http://www.bosch-presse.de/presseforum/details.htm?txtID=7421&tk_id=108.

LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the defeat device to Volkswagen for use in the Class Vehicles.

458.    Unnamed co-conspirator Volkmar Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that Volkswagen and Bosch GmbH modified to serve as defeat devices. Denner fostered Bosch's relationship with key corporate partners, such as Volkswagen, which brought in billions of dollars in annual revenue for Bosch GmbH. Denner communicated directly with Winterkorn about products sold to Volkswagen. For example, when Bosch GmbH had a shortage of oxygen sensor parts that Volkswagen had ordered, Denner reached out directly to Winterkorn. Further, Denner met in 2014 in person with Winterkorn at VW AG headquarters to discuss, among other topics, the "akustikfunktion" in diesel engines.

459.    Engineers and other employees at Bosch GmbH and Bosch LLC worked with Volkswagen to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations. Bosch GmbH customized their EDC Unit 17s for installation in the Class Vehicles with unique software code to detect when vehicles were undergoing emissions testing, as described above.[181]

460.    Bosch GmbH and Bosch LLC were well aware that the EDC17 would be used by Volkswagen to cheat on emissions testing. As described above, on June 2, 2008, Bosch GmbH's Dieter Schütz wrote to his counterparts at Volkswagen, seeking legal indemnification from Volkswagen for the "expanded use" of the EDC17s which it called a "defeat device."[182] Schütz explained that "[t]he usage of a defeat device is prohibited pursuant to … US Law (CARB/EPA) (see definition footnote 2),"[183] and warned that the agreed-to software modifications would allow "the certified dataset [to be] replaced with another, possibly non-certified data set," which could cause

---

[181] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

[182] VW-MDL2672-02570091 (English translation).

[183] *Id.* at -92.

"the vehicle's general operating license (registration) [to] become void."[184]  Volkswagen rebuffed Bosch's request, yet Bosch GmbH nonetheless shipped the modified software to Volkswagen for use in the Class Vehicles for another seven years. Bosch GmbH and Bosch LLC were also critical to the concealment of the defeat device in communications with U.S. regulators and went even further to actively lobby U.S. lawmakers on behalf of Volkswagen and its "Clean Diesel" vehicles.

461.    The emission systems in the Class Vehicles could not effectively lower $NO_X$ emissions to legal levels during normal operating conditions. In order to pass the emissions test, then, the EDC17 is equipped with a "defeat device," which is software that allows the vehicle to determine whether it is being operated under normal conditions or testing conditions. Under normal operating conditions, the software downgrades exhaust gas recirculations and shuts off the LNT or SCR after-treatment system thereby allowing the vehicle to perform with high power and efficiency, but also allowing many times more toxic pollutants than is allowable under law. By contrast, under testing conditions, the software ups exhaust gas recirculation and turns on the LNT or SCR after-treatment system, which reduces the $NO_X$ emissions enough to pass the emissions test with flying colors, but negatively impacts the vehicle's gas mileage and performance.[185]

462.    As was publicly reported, Bosch GmbH, seeking to shield itself for its and Bosch LLC's involvement in the unlawful Emissions Fraud Enterprise, sent a letter to Volkswagen AG in 2007 stating that Class Vehicles *could not be lawfully operated* if the LNT or SCR after-treatment system was disabled.[186]

463.    Indeed, notwithstanding their knowledge that the Class Vehicles *could not be lawfully operated* if the emissions system was disabled, the Bosch Defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell approximately *eleven million* EDC17s to the Volkswagen Defendants over an eight year period.[187]

---

[184] *Id.* at -93.

[185] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

[186] http://jalopnik.com/feds-are-now-investigating-volkswagen-supplier-bosch-ov-1743624448.

[187] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

464.    Bosch GmbH's decision to continue the sale of EDC17s to the Volkswagen Defendants for years on end is remarkable considering that:

a.    The Bosch Defendants knew the "defeat device" was not necessary for any legitimate purpose.

b.    None of the varied emissions control systems the Bosch Defendants tested, manufactured and sold to other diesel vehicle manufacturers relied on the same technology the Volkswagen Defendants were utilizing. Indeed, the Volkswagen Defendants' competitors, including technologically sophisticated brands like BMW, continued using exclusively the more expensive SCR technology.[188]

c.    Even for SCR systems in Volkswagen's Gen2 and Gen3 SCR-equipped engine systems, the amount of exhaust fluid the system used and was able to store was too low for normal driving conditions, suggesting that the quantity was calculated to meet just the testing time and not meant to be engaged during normal usage.

465.    Absent an extraordinary engineering breakthrough—for which there was no external evidence—the programming of the EDC17 presented a practical impossibility.  Bosch Diesel Systems, including employees at Bosch GmbH and Bosch LLC, as highly sophisticated actors in the engine control space must have known that the Volkswagen Defendants had *not* actually engineered revolutionary emissions control systems that enabled Class Vehicles to maintain performance, fuel efficiency, reduce emissions *and* reduce costs.[189]

---

[188] http://www.nytimes.com/2015/09/27/business/as-vw-pushed-to-be-no-1-ambitions-fueled-a-scandal.html?_r=0.

[189] Upon information and belief, sophisticated entities like the Bosch Defendants were also likely aware that Wolfgang Bernhard, a former high-level executive with Mercedes-Benz with a reputation for implementing cost-cutting measures, had been removed from the "clean diesel" project at Volkswagen AG shortly before the Volkswagen Defendants abandoned the SCR systems and inexplicably developed what was purportedly an even cheaper technology.  *See*, http://www.foxbusiness.com/features/2015/10/05/vw-emissions-probe-zeroes-in-on-two-engineers.html.

1

        **a.**    **IAV**

2      466.    IAV engineers were part of the enterprise that developed the emissions systems that

3  contained a defeat device. In the plea agreement of Volkswagen engineer Robert Liang, IAV is

4  identified as "Company A" that aided and abetted Liang and other co-conspirators.

5      **4.**    **Criminal Pleas that Relate to the RICO Claims and Enterprise.**

6      467.    On June 1, 2016, an indictment was filed in the United States District court, Eastern

7  District of Michigan in *United States of America v. James Robert Liang*. The indictment arises from

8  Robert Liang's role in VW's violations of the Clean Air Act and wire fraud and alleges that he and

9  others at VW and elsewhere engaged in a conspiracy:

10
> The purpose of the conspiracy was for LIANG and his co-conspirators
11
> to unlawfully enrich VW and themselves by, among other things, (a)
> deceiving U.S. regulators in order to obtain the necessary certificates to
12
> sell diesel vehicles in the United States; (b) selling VW diesel vehicles
> to U.S. customers knowing that those vehicles did not meet U.S.
> emissions standards; (c) deceiving U.S. customers by marketing VW
13
> diesel motor vehicles as "clean diesel" knowing that those vehicles
> emitted NOx at levels well above U.S. standards; and (d) concealing
14
> the defeat device from U.S. regulators, VW customers, and the U.S.
> public.

15

16      468.    On September 9, 2016, Liang entered into a Plea Agreement for one count of wire

17  fraud. The factual basis of the plea supports the plausibility of the RICO claim set forth below and

18  states in pertinent part:

19
> The following facts are a sufficient and accurate basis for defendant's
> guilty plea:

20
> From 1983 to May 2008, defendant JAMES ROBERT LIANG was an
21
> employee of Volkswagen AG ("VW AG"), working in VW AG's
> diesel development department in Wolfsburg, Germany.

22
> In about 2006, LIANG and his co-conspirators began to design a new
23
> "EA 189" diesel engine. They soon realized, however, that the engine
> could not meet both customer expectations as well as new, stricter U.S.
24
> emissions standards. As a result, LIANG and his co-conspirators
> pursued and planned the use of a software function to cheat standard
> U.S. emissions tests (the "defeat device"). LIANG used the defeat
25
> device software while working on the EA 189 and assisted in making
> the defeat device software work. The co-conspirators needed to do so
26
> to obtain a certificate of conformity from the United States
> Environmental Protection Agency ("EPA") in order to sell vehicles in
27
> the United States. LIANG understood that EPA would not certify
> vehicles for sale in the United States if EPA knew that the vehicles
28
> contained a defeat device.

In or around 2008, LIANG worked with his co-conspirators to calibrate and refine the defeat device. This defeat device recognized whether the affected VW diesel vehicles were undergoing standard U.S. emissions testing on a dynamometer or being driven on the road under normal driving conditions. The defeat device accomplished this by recognizing the standard drive cycles used in EPA's emissions tests. If the vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. emissions standards for nitrogen oxide ("NOx"). If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit substantially higher amounts of NOx, sometimes forty times higher than U.S. standards.

LIANG moved to the United States in May 2008 to assist in the launch of VW's diesel vehicles with EA 189 engines. From about May 2008 to the present, LIANG was the Leader of Diesel Competence for VW Group of America ("VW GOA"), a VW subsidiary. In that role, LIANG assisted in certification, testing, and warranty issues for VW diesel vehicles in the United States.

For each new model year of VW's diesel vehicles, VW employees met with EPA to seek the certifications required to sell the vehicles to U.S. customers. During one of these meetings, which LIANG attended personally in Ann Arbor, Michigan with EPA on March 19, 2007 and on March 21, 2007 with the California Air Resources Board ("CARB"), LIANG participated as his co-conspirators misrepresented that VW diesel vehicles complied with U.S. NOx emissions standards. During this meeting, LIANG's co-conspirators described VW's diesel technology and emissions control systems in detail to the staffs of the EPA and CARB but intentionally omitted LIANG and his co-conspirators' plan to include a defeat device in VW diesel vehicles. LIANG knew that VW was cheating by implementing the defeat device and that he and his co-conspirators were deceiving EPA in this meeting.

As part of the certification process for each new model year, including model years 2009 through 2016, LIANG knew his co-conspirators continued to falsely and fraudulently certify to EPA and CARB that VW diesel vehicles met U.S. emissions standards and complied with the Clean Air Act. During this time, LIANG and his co-conspirators knew that VW marketed VW diesel vehicles to the U.S. public as "clean diesel" and environmentally-friendly, and promoted the increased fuel economy. LIANG and his co-conspirators knew that these representations made to U.S. customers were false, and that VW's diesel vehicles were not clean.

As VW's "clean diesel" vehicles in the United States began to age, they experienced higher rates of warranty claims for parts and components related to emissions control systems. Some of LIANG's coconspirators believed that the increased claims were a result of the vehicle operating in testing mode too long, rather than switching to "road mode." Because of these increased claims, LIANG worked with his co-conspirators to enhance the defeat device to allow the vehicle to more easily recognize when the vehicle was no longer in testing mode.

1

2

3

4

LIANG knew that his co-conspirators falsely and fraudulently told U.S. customers and others that a software update in about 2014 was intended to improve the vehicles when, in fact, LIANG and his co-conspirators knew that part of the update was intended to improve the defeat device's precision in order to reduce the stress on the emissions control systems.

5

6

7

8

9

10

11

In the spring of 2014, a non-government organization published the results of a study which identified substantial discrepancies in the NOx emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA standard drive cycle tests on a dynamometer. Following the study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in VW diesel vehicles on the road as opposed to the dynamometer. LIANG and his co-conspirators discussed how they could answer the regulatory agencies' questions without revealing the defeat device. LIANG knew that, after these discussions, his co-conspirators intentionally made fraudulent explanations to the EPA and CARB when providing testing results, data, presentations, and statements to the EPA and CARB by failing to disclose the fact that the primary reason for the discrepancy was the defeat device.

12

13

14

15

LIANG knew that his co-conspirators also falsely and fraudulently told U.S. customers, EPA, and CARB that a voluntary recall in or around early 2015 was intended to "fix" the issues that were causing the discrepancy, when, in fact, LIANG and his co-conspirators knew that although the update lowered the NOx emissions in certain VW diesel vehicles on the road, the update did not remove the defeat device software that was the true reason for the discrepancy.

16

17

18

LIANG and his co-conspirators caused defeat device software to be installed in all of the approximately 500,000 VW diesel 2.0 liter light-duty passenger vehicles sold in the United States from 2009 through 2015.

19

20

21

22

469.    On January 11, 2017, Volkswagen AG plead guilty to federal conspiracy, fraud and false statements in connection with its role in the criminal enterprise. The 30-page Statement of Facts admits and describes Volkswagen and IAV's role on the emissions fraud and is attached as Exhibit A, and incorporated herein.

23

24

470.    The foregoing facts provide an additional plausible basis supporting the allegations of a conspiracy and the existence of a RICO enterprise.

25

26

471.    Bosch LLC employees provided specific information to U.S. regulators on how the vehicles operated and stated that the vehicles met emissions standards.

27

28

CLASS ACTION COMPLAINT - 139
Case No.:
010549-11  973652 V1

**B.     The Emissions Enterprise Sought to Increase Defendants' Profits and Revenues**

472.     The Emissions Enterprise began as early as 2005, when an internal feasibility study at VW AG identified Bosch's EDC17 as a solution to their engineering dilemma by reducing diesel vehicle emissions of nitrogen oxides ("NOx") through a change in engine electronics. Starting in mid-2005, Volkswagen and Bosch entered into a series of agreements to develop what ultimately became the defeat device for the Class Vehicles. The Emissions Enterprise continued without interruption for a decade, as Defendants successfully installed Bosch EDC Unit 17s in hundreds of thousands of the Class Vehicles sold in the U.S. It was not until September 2015 that the Emissions Enterprise began to unravel, when U.S. regulators finally uncovered Defendants' scheme.

473.     At all relevant times, the Emissions Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Volkswagen Defendants, their network of dealerships, the Bosch Defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles to Plaintiffs and the Nationwide Class through fraudulent COCs and EOs, false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the Emissions Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.[190]

474.     The Emissions Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to

---

[190] The Volkswagen Defendants sold more Class Vehicles by utilizing an emissions control system that was cheaper than SCRs, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" Class Vehicles. Bosch, in turn, sold more EDC Units because the Volkswagen Defendants manufactured and sold more Class Vehicles.

CLASS ACTION COMPLAINT - 140
Case No.:
010549-11  973652 V1

1   increase revenue for Defendants and the other entities and individuals associated-in-fact with the

2   Enterprise's activities through the illegal scheme to sell the Class Vehicles.

3        475.    The Emissions Enterprise engaged in, and its activities affected, interstate and foreign

4   commerce, because it involved commercial activities across state boundaries, such as the marketing,

5   promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the

6   receipt of monies from the sale of the same.

7        476.    Within the Emissions Enterprise, there was a common communication network by

8   which co-conspirators shared information regularly. The Emissions Enterprise used this common

9   communication network to manufacture, market, test, and sell the Class Vehicles to the general

10  public nationwide.

11       477.    Each participant in the Emissions Enterprise had a systematic linkage to each other

12  through corporate ties, contractual relationships, financial ties, and continuing coordination of

13  activities. Through the Emissions Enterprise, the RICO Defendants functioned as a continuing unit to

14  further the illegal scheme and their common purposes of increasing their revenues and market share,

15  and minimizing losses.

16       478.    The RICO Defendants participated in the operation and management of the Emissions

17  Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in,

18  and are members of, the enterprise, they have a separate existence from the enterprise, including

19  distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees,

20  individual personhood, reporting requirements, and financial statements.

21       479.    The Volkswagen RICO Defendants exerted substantial control over the Emissions

22  Enterprise, and participated in the affairs of the Emissions Enterprise by:

23       a.    transitioning their diesel vehicle design away from an effective SCR emissions
              control system and adopting instead the ineffective $NO_X$ trap technology that
24            generates high levels of toxic pollutants;

25       b.    designing the Class Vehicles with defeat devices;

26       c.    failing to correct or disable the defeat devices when warned;

27       d.    manufacturing, distributing, and selling the Class Vehicles that emitted greater
              pollution than allowable under the applicable regulations;
28

CLASS ACTION COMPLAINT - 141
Case No.:
010549-11  973652 V1

e.  misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

f.  introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

g.  concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

h.  persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

i.  misleading government regulators as to the nature of the defeat devices and the defects in the Class Vehicles;

j.  misleading the driving public as to the nature of the defeat devices and the defects in the Class Vehicles;

k.  designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

l.  otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

m.  illegally selling and/or distributing the Class Vehicles;

n.  collecting revenues and profits from the sale of such products; and

o.  ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

480.  Bosch GmbH and Bosch LLC also participated in, operated and/or directed the Emissions Enterprise. Bosch GmbH participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 which operated as a "defeat device" in the Class Vehicles. Bosch GmbH exercised tight control over the coding and other aspects of the defeat device software and closely collaborated with Volkswagen to develop, customize, and calibrate the defeat devices. Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the Volkswagen Defendants to ensure that the EDC Unit 17 was fully integrated into the Class Vehicles. Bosch GmbH and Bosch LLC also participated in the affairs of the Enterprise by concealing the defeat devices on U.S. documentation and in communications with U.S. regulators. Finally, Bosch GmbH and Bosch LLC actively lobbied lawmakers in the U.S. on Volkswagen's

1    behalf. Bosch GmbH collected tens of millions of dollars in revenues and profits from the hidden

2    defeat devices installed in the Class Vehicles.

3         481.    Without the RICO Defendants' willing participation, including Bosch's active

4    involvement in developing and supplying the critical defeat devices for the Class Vehicles, and

5    Bosch LLC's active promotion of diesel technology and concealment of the defrauding of regulators,

6    the Emissions Enterprise's scheme and common course of conduct would not have succeeded.

7         482.    The RICO Defendants directed and controlled the ongoing organization necessary to

8    implement the scheme at meetings and through communications of which Plaintiffs cannot fully

9    know at present, because such information lies in the Defendants' and others' hands.

10   **C.    Mail and Wire Fraud**

11        483.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants,

12   each of whom is a person associated-in-fact with the Emissions Enterprise, did knowingly conduct or

13   participate, directly or indirectly, in the conduct of the affairs of the Emissions Enterprise through a

14   pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c),

15   and which used the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343

16   (wire fraud).

17        484.    Specifically, the RICO Defendants have committed, conspired to commit, and/or

18   aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*,

19   violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of

20   racketeering activity which the RICO Defendants committed, or aided or abetted in the commission

21   of, were related to each other, posed a threat of continued racketeering activity, and therefore

22   constitute a "pattern of racketeering activity." The racketeering activity was made possible by the

23   RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the

24   Emissions Enterprise. The RICO Defendants participated in the scheme to defraud by using mail,

25   telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

26        485.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands

27   of interstate mail and wire communications in service of their scheme through virtually uniform

28   misrepresentations, concealments and material omissions.

CLASS ACTION COMPLAINT - 143
Case No.:
010549-11  973652 V1

486.     In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. To execute the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

487.     The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.     Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers to execute the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b.     Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

488.     The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent because of Defendants' illegal scheme:

a.     the Class Vehicles themselves;

b.     component parts for the defeat devices;

c.     essential hardware for the Class Vehicles;

d.     falsified emission tests;

e.     fraudulent applications for EPA COCs and CARB EOs;

f.     fraudulently-obtained EPA COCs and CARB EOs;

g.     vehicle registrations and plates because of the fraudulently-obtained EPA COCs and CARB EOs;

h.     documents and communications that facilitated the falsified emission tests;

i.     false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

j.      sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

k.      documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

l.      documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

m.      payments to Bosch GmbH;

o.      deposits of proceeds; and

p.      other documents and things, including electronic communications.

489.    As part of the certification process for each new model year, the VW Defendants and their co-conspirators falsely and fraudulently certified, and/or caused to be certified, to the EPA and CARB that the Subject Vehicles met U.S. emissions standards and complied with standards prescribed by the Clean Air Act.

490.    The RICO Defendants (or their agents), to execute the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Class Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|------|------|------|
| Bosch LLC | VW America | December 2009 | Documents and communications related to Volkswagen "Clean Diesel" Partnership, 2009 Review and 2010 Opportunities, Bosch Diesel Systems North America Marketing.[191] |
| Bosch LLC | CARB | September 2009 | Documents and communications related to Diesel Tech Day in El Monte, CA.[192] |
| VW America Manufacturing Plant | South Bay VW | October 2011 | Shipment of Volkswagen Jetta TDI Class Vehicles. |

---

[191] *See* VW-MDL2672-06900942.

[192] *See* VW-MDL2672-07672454.

| From | To | Date | Description |
|------|-----|------|-------------|
| Washington State Department of Licensing | Dan Clements | October 2011 | Mailed registration card for 2012 Volkswagen Toareg TDI based on false emission test due to concealed defeat device. |
| CARB | VW America | July 2014 | Mailed EO for 2015 Class Vehicles based on fraudulent application. |
| California Department of Motor Vehicles | Phillip Clark | December 2014 | Mailed registration card for 2014 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Caroline Hoag | December 2014 | Mailed renewed registration for 2011 Jetta SportWagen TDI based on false emission test due to concealed defeat device. |
| Washington State Department of Licensing | Dan Clements | February 2015 | Mailed registration certificate for 2012 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Lena Brook | March 2015 | Mailed validated vehicle registration for 2015 Audi Q5 TDI based on false emission test due to concealed defeat device.[193] |

491. The RICO Defendants (or their agents), to execute the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce with wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| CARB, California | VW America, Virginia | May 2014 | Email communications concerning WVU study. |
| VW America, Michigan | EPA, Michigan; CARB, California | May 2012 | Misleading application(s) for COC and EO for 2013 VW Passat TDI. |
| Bosch America, Farmington Hills, Michigan | Volkswagen, Virginia | January 2013 | Email communications regarding Bosch's promotion of VW Passat TDI through trip from Atlanta to Washington, D.C.[194] |
| VW LLC, Michigan | EPA, Michigan; CARB, California | January 2013 | Misleading application(s) for COCs and EOs for 2014 Audi A6, A7, A8L, A8, and Q5. |

---

[193] Volkswagen caused hundreds of thousands of similar registration cards to be mailed via the U.S. Mail to Class members nationwide.

[194] VW-MDL2672-08348204.

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| VW America, Virginia | CARB, California | October 2014 | Misleading communications about discrepancies identified in WVU study. |
| Audi of Lynnbrook, New York | American Express, North Carolina | December 2014 | Credit card transaction in the amount of $2,586.45 for down payment on lease of 2015 Audi A3 by Kevin and Elizabeth Bedard. |
| VW America, Virginia | EPA, District of Columbia | December 2014 | Misleading communications about software patch for the Class Vehicles without revealing fact of the defeat device. |
| Bosch LLC, Michigan | CARB, California | January 2015 | Email communication re: meeting with CARB[195] |
| VW America, Michigan | Audi AG, Germany | February 2015 | Email communication concerning meeting with Bosch and CARB re: fault codes.[196] |

492.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, the American Volkswagen Defendants, under the direction and control of the German Volkswagen, made misrepresentations about the Class Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

493.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

494.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

---

[195] VW-MDL-2672-02461438.

[196] VW-MDL2672-00902633.

495.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

496.     The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as Defendants, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

497.     On January 11, 2013, Volkswagen AG agreed to plead guilty to participating in a conspiracy to defraud the United States and VW's U.S. customers and to violate the Clean Air Act by lying and misleading the EPA and U.S. customers about whether certain VW and Audi branded diesel vehicles complied with U.S. emissions standards, using cheating software to circumvent the U.S. testing process and concealing material facts about its cheating from U.S. regulators. VW also plead guilty to obstruction of justice for destroying documents related to the scheme, and with a separate crime of importing these cars into the U.S. by means of false statements about the vehicles' compliance with emissions limits. In addition, a federal grand jury in the Eastern District of Michigan returned an indictment charging the Individual RICO Defendants for their roles in the conspiracy.  Each Individual Defendant is charged with one count of conspiracy to defraud the United States, defraud VW's U.S. customers and violate the Clean Air Act by making false representations to regulators and the public about the ability of VW's supposedly "clean diesel" vehicles to comply with U.S. emissions requirements. The indictment also charges Dorenkamp,

1   Neusser, Schmidt and Peter with Clean Air Act violations and charges Neusser, Gottweis, Schmidt

2   and Peter with wire fraud counts.

3       498.    The RICO Defendants aided and abetted others in the violations of the above laws,

4   thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

5       499.    To achieve their common goals, the RICO Defendants hid from the general public the

6   unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect

7   even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings

8   from third parties, whistleblowers, and governmental entities about the discrepancies in emissions

9   testing and the defeat devices present in the Class Vehicles.

10       500.    The RICO Defendants and each member of the conspiracy, with knowledge and

11   intent, have agreed to the overall objectives of the conspiracy and participated in the common course

12   of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing,

13   marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

14       501.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-

15   conspirators had to agree to implement and use the similar devices and fraudulent tactics—

16   specifically complete secrecy about the defeat devices in the Class Vehicles.

17       502.    The RICO Defendants knew and intended that government regulators, as well as

18   Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by

19   them and the American Volkswagen Defendants about the Class Vehicles. The RICO Defendants

20   knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiffs,

21   along with tens of thousands of other consumers, relied upon Defendants' representations and

22   omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that

23   they purchased illegal vehicles that never should have been introduced into the U.S. stream of

24   commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and

25   material omissions made or caused to be made by the RICO Defendants; otherwise Volkswagen

26   could not have obtained valid COCs and EOs to sell the Class Vehicles.

27       503.    As described herein, the RICO Defendants engaged in a pattern of related and

28   continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities,

each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

504. The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Emissions Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

505. During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared technical, marketing, and financial information that revealed the existence of the defeat devices contained therein. Nevertheless, the RICO Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient."

506. By reason of, and because of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

    a. The lost expectation of driving an environmentally friendly vehicle.

    b. Overpayment for a Class Vehicle because Plaintiffs and Class members paid a price premium for a "clean diesel" vehicle that surpassed emission standards but obtained a vehicle that flaunted them. Absent Defendants' fraudulent scheme, Class members would have paid less for similar (or better) performing vehicles that were actually environmentally friendly.

    c. Overpayment of the premium for a clean diesel.

d.  Other incidental and consequential expenses linked to the price premiums on Class

Vehicles, including, but not limited to, additional interest on financing, loan and lease

fees, and other financial harms.

507.   The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and

proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class

members may sue for three times their actual damages, as well as equitable relief, costs, and

reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**FEDERAL COUNT II:**

**Violations of 15 U.S.C. §§ 2301,** *et seq.*,
**The Magnuson-Moss Warranty Act ("MMWA")**

508.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth

herein.

509.   Plaintiffs bring this Count on behalf of the Nationwide Class and against these

Defendants: VW AG, VW America, Audi AG and Audi America (collectively, the "VW Entity

Defendants").

510.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue

of 28 U.S.C. § 1332 (a)-(d).

511.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act,

15 U.S.C. § 2301(3).

512.   The VW Entity Defendants are "supplier[s]" and "warrantor[s]" within the meaning

of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

513.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-

Moss Warranty Act, 15 U.S.C. § 2301(1).

514.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer damaged by the

failure of a warrantor to comply with an implied warranty.

515.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

516.   The VW Entity Defendants breached these warranties as described in more detail

above. Without limitation, the Class Vehicles share a common design defect because they emit more

pollutants than (a) is allowable under the applicable regulations and (b) the VW Entity Defendants repeatedly represented were emitted to their customers, the public, and regulators. The VW Entity Defendants have admitted that the Class Vehicles are illegal, defective and of lesser quality than advertised.

517.     Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with the VW Entity Defendants or their agents (dealerships) to establish privity of contract between the VW Entity Defendants, on the one hand, and Plaintiffs and other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the VW Entity Defendants or their dealers, and of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

518.     The amount in controversy of Plaintiffs' individual claims meets or exceeds $25. The amount in controversy exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined. Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including (but not limited to) those for the lost expectation of driving an environmentally friendly vehicle, overpaying for a vehicle which did not perform as advertised, and restitution for fraud, in an amount to be proven.

## IX.     STATE LAW CLAIMS

### COUNT 1

**VIOLATIONS OF ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**(ALA. CODE § 8-19-1, *ET SEQ.*)**
**(ON BEHALF OF ALABAMA CLASS)**

519.     Plaintiff Jennifer Nemet (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

520.     Plaintiff sues on behalf of herself and the Alabama Class against Volkswagen Group of America, and Volkswagen AG ("VW" for the remaining State Law counts).

521.     Plaintiff intends to assert a claim under the Alabama Deceptive Trade Practices Act ("Alabama DTPA") which proscribes: "(5) Representing that goods or services have sponsorship,

CLASS ACTION COMPLAINT - 152
Case No.:
010549-11  973652 V1

1    approval, characteristics, ingredients, uses, benefits, or qualities that they do not have, . . . (7)

2    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of

3    a particular style or model, if they are of another, [and] . . . (27) Engaging in any other

4    unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

5    ALA. CODE § 8-19-5.

6         522.   Plaintiff has made a demand in satisfaction of ALA. CODE § 8-19-10(e), and may

7    amend this Complaint to assert claims under the DTPA once the required 15 days have elapsed. This

8    paragraph is included for purposes of notice only and is not intended to actually assert a claim under

9    the DTPA.

10                                    **COUNT 2**

11                   **VIOLATIONS OF THE CONSUMER FRAUD ACT**
                      **(ARIZ. REV. STAT. §§ 44-1521, *ET SEQ.*)**
12                       **(ON BEHALF OF ARIZONA CLASS)**

13        523.   Plaintiff Norbert Kahlert (for the purpose of this section, "Plaintiff,") incorporates by

14    reference all preceding allegations as though fully set forth herein.

15        524.   Plaintiff sues on behalf of himself and the Arizona Class against VW.

16        525.   Plaintiff and VW are each "persons" as defined by ARIZ. REV. STAT. § 44-1521(6).

17    The Class Vehicles are "merchandise" as defined by ARIZ. REV. STAT. § 44-1521(5).

18        526.   The Arizona Consumer Fraud Act proscribes "[t]he act, use or employment by any

19    person of any deception, deceptive act or practice, fraud, false pretense, false promise,

20    misrepresentation, or concealment, suppression or omission of any material fact with intent that

21    others rely upon such concealment, suppression or omission, in connection with the sale or

22    advertisement of any merchandise whether or not any person has in fact been misled, deceived or

23    damaged thereby." ARIZ. REV. STAT. § 44-1522(A).

24        527.   By failing to disclose and actively concealing that the Clean Diesel engine systems

25    were not EPA-compliant and used software that caused the vehicles to operate in a low-emission test

26    mode only during emissions testing, VW engaged in unfair, unlawful, and deceptive business

27    practices prohibited by the Arizona Consumer Fraud Act, ARIZ. REV. STAT. § 44-1522(A), including

28    (1) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do

1    not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade when

2    they are not, (3) advertising Class Vehicles with the intent not to sell them as advertised, and (4)

3    engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the

4    consumer.

5          528.    As alleged above, VW made numerous material statements about the benefits and

6    characteristics of the Clean Diesel system that were either false or misleading. Each of these

7    statements contributed to the deceptive context of VW's unlawful advertising and representations as

8    a whole.

9          529.    VW knew that the Clean Diesel engine systems in the Class Vehicles were defectively

10   designed or manufactured, did not comply with EPA regulations, used software that caused the

11   vehicles to operate in a low-emission test mode only during emissions testing, and were not suitable

12   for their intended use. VW nevertheless failed to warn Plaintiff about these defects despite having a

13   duty to do so.

14         530.    VW owed Plaintiff a duty to disclose the defective nature of the Clean Diesel engine

15   system in the Class Vehicles, because VW:

16         a.   Possessed exclusive knowledge of the defects rendering the Class Vehicles illegal

17              under EPA regulations;

18         b.   Intentionally concealed the defects associated with Clean Diesel engine systems

19              through its deceptive marketing campaigns and use of software that caused the

20              vehicles to operate in a low-emission test mode only during emissions testing; and/or

21         c.   Made incomplete representations about the characteristics and performance of the

22              Clean Diesel engine system generally, while purposefully withholding material facts

23              from Plaintiff and Class members that contradicted these representations.

24         531.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive

25   reasonable consumers, including Plaintiff, about the true performance and characteristics of the

26   Clean Diesel engine system in Class Vehicles.

27         532.    Plaintiff owned or leased, within the class period, a Class Vehicle that was defective.

28

CLASS ACTION COMPLAINT - 154
Case No.:
010549-11  973652 V1

533.    As a direct and proximate result of VW's violations of the Arizona CFA, Plaintiff and the Arizona Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Arizona Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

534.    Plaintiff and Class members sustained damages as a result of the VW's unlawful acts and are, therefore, entitled to damages and other relief as provided under the Arizona Consumer Fraud Act.

535.    Plaintiff also seeks court costs and attorneys' fees as a result of VW's violation of the Arizona Consumer Fraud Act as provided in ARIZ. REV. STAT. § 12-341.01.

## COUNT 3

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *ET SEQ.*)

536.    Plaintiffs Angela Matt Architect, Inc., Bryan Sheffield, Eddie Field, Tonya Dreher, and Adam Schell incorporate by reference each preceding paragraph as though fully set forth herein.

537.    Plaintiffs (for the purpose of the California claims, "Plaintiffs") sue on behalf of themselves and a California Class (for purposes of this Count, "Class") against VW.

538.    VW are "person[s]" under Cal. Civ. Code § 1761(c).

539.    Plaintiffs and Class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

540.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). VW has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles was supplied in accordance with a previous representation when it has not.

541.    In the course of their business, VW concealed and suppressed material facts concerning the Class Vehicles. VW accomplished this by installing software in the Class Vehicles that caused the vehicles to operate in a low-emission test mode only during emissions testing, and during normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. Plaintiffs and Class members had no way of discerning that VW's representations were false and misleading. Plaintiffs and Class members did not and could not unravel VW's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected VW's cheat using sophisticated, expensive equipment and applying decades of combined experience.

542.    VW engaged in misleading, false, unfair or deceptive acts or practices that violated the CLRA by installing, failing to disclose and actively concealing the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

543.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

544.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

545.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and Class members.

546.    VW knew or should have known that its conduct violated the CLRA.

547.    VW owed Plaintiffs and Class members a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they made incomplete representations about the

1    environmental cleanliness and efficiency of the Class Vehicles while purposefully withholding

2    material facts from Plaintiffs that contradicted these representations.

3        548.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive

4    reasonable consumers, including Plaintiffs, about the true environmental cleanliness, efficiency, and

5    true value of the Class Vehicles.

6        549.    As a direct and proximate result of VW's violations of the CLRA, Plaintiffs and the

7    California Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth

8    been disclosed, Plaintiff and California Class members would not have purchased or leased their

9    Class Vehicles at all, or alternatively, would have paid less for them.

10       550.    Under Cal. Civ. Code § 1780(a), Plaintiffs and the Class seek monetary relief against

11   VW for the economic harm caused by VW's violations of the CLRA as alleged herein, including the

12   lost expectation of driving a vehicle with the enhanced environmental performance of a "clean

13   diesel" engine, overpayment for the vehicles they did receive, and restitution for unjust enrichment.

14       551.    Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against VW of up

15   to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the

16   CLRA. VW knew or should have known that their conduct was directed to one or more Class

17   members who are senior citizens or disabled persons. One or more Class members who are senior

18   citizens or disabled persons are substantially more vulnerable to VW's conduct because of age, poor

19   health or infirmity, impaired understanding, restricted mobility, or disability, and each of them

20   suffered substantial physical, emotional, or economic damage resulting from VW's conduct.

21       552.    Plaintiffs also seek punitive damages against VW because it carried out reprehensible

22   conduct with willful and conscious disregard of the rights of others. VW intentionally and willfully

23   deceived Plaintiffs and Class members, concealing material facts that only VW knew. VW's

24   unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal.

25   Civ. Code § 3294.

26       553.    Plaintiffs further seek an order enjoining VW's unfair or deceptive acts or practices,

27   restitution, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any

28   other just and proper relief available under the CLRA.

554.    Plaintiffs have sent a letter complying with Cal. Civ. Code § 1782(a).

**COUNT 4**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)**

555.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

556.    This claim is brought on behalf of the California Class against VW.

557.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." VW has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

558.    VW's conduct, as described herein, was and is in violation of the UCL. VW's conduct violates the UCL in at least the following ways:

    a.  By knowingly and intentionally concealing from Plaintiffs and Class members that the Class Vehicles suffer from a design defect, while obtaining money from Plaintiffs and Class members;

    b.  By marketing Class Vehicles as possessing EPA- and CARB-compliant "clean" diesel engine systems;

    c.  By purposefully using software that allowed vehicles to pollute more than legally allowable under real world driving conditions.

559.    VW's misrepresentations and omissions alleged herein caused Plaintiffs and Class members to purchase or lease their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them.

560.    Accordingly, Plaintiffs and the other California Class members have suffered injury in fact including lost money or property because of VW's misrepresentations and omissions.

561.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200.

562.    Plaintiffs requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and members of the Class any money it acquired by unfair competition,

including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## COUNT 5

### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*)

563.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

564.    Plaintiffs bring this Count on behalf of the California Class against VW.

565.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

566.    VW caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to VW, to be untrue and misleading to consumers, including Plaintiffs and other Class members.

567.    VW has violated § 17500 because the misrepresentations and omissions regarding the functionality of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

568.    Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of VW's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and Class members relied on the misrepresentations and/or omissions of VW with respect to the environmental and other performance of the Class Vehicles. VW's representations were false because the Class Vehicles were distributed with faulty and defective "clean" diesel engine systems, rendering certain safety and emissions

functions inoperative. Had Plaintiffs and Class members known this, they would not have purchased or leased their Class Vehicles, or would have paid less for them. Accordingly, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

569. All of the wrongful conduct alleged herein occurred in the conduct of VW's business, and as part of a pattern or generalized course of conduct in the State of California and nationwide.

570. Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and Class members any money VW acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT 6**

**VIOLATIONS OF THE UNFAIR TRADE PRACTICES ACT**
**(CONN. GEN. STAT. ANN. §§ 42-110A, *ET SEQ.*)**
**(ON BEHALF OF CONNECTICUT CLASS)**

571. Plaintiff Darryl Lecours (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

572. Plaintiff sues on behalf of himself and the Connecticut Class against VW.

573. Plaintiff and VW are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

574. The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). The CUTPA further provides for a private right of action under Conn. Gen. Stat. Ann. § 42-110g(a).

575. VW engaged in unfair, unlawful, and deceptive business practices prohibited by the CUTPA, including (1) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Class Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

576.    VW engaged in misleading, unfair, and/or deceptive acts that violated the CUTPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

577.    VW knew that the Clean Diesel engine system in the Class Vehicles were defectively designed or manufactured, were not EPA-compliant, and were not suitable for their intended use. VW nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

578.    VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

a.    Possessed exclusive knowledge of the defects rendering the Class Vehicles illegal under EPA standards;

b.    Intentionally concealed the defects associated with Clean Diesel through its deceptive marketing campaigns designed to hide the defects in the Clean Diesel engine system; and/or

c.    Made incomplete representations about the characteristics and performance of the Clean Diesel engine system generally, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

579.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and Connecticut Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

580.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true performance and characteristics of the Clean Diesel engine system.

CLASS ACTION COMPLAINT - 161
Case No.:
010549-11  973652 V1

581.   As a direct and proximate result of VW's violations of the CUTPA, Plaintiff and the Connecticut Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Connecticut Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

582.   Plaintiff and the Connecticut Class are, therefore, entitled to damages and other relief as provided under the CUTPA.

583.   Plaintiff also seeks court costs and attorneys' fees as a result of VW's violation of the CUTPA as provided in Conn. Gen. Stat. Ann. § 42-110g(d). A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with Conn. Gen. Stat. Ann. § 42-110g(c).

**COUNT 7**

**VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**(GA. CODE ANN. § 10-1-390, *ET SEQ*.)**
**(ON BEHALF OF GEORGIA CLASS)**

584.   Plaintiff Gisbel De La Cruz (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

585.   Plaintiff sues on behalf of herself and the Georgia Class against VW.

586.   Plaintiff intends to assert a claim under the Georgia Fair Business Practices Act ("Georgia FBPA") which declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code. Ann. § 10-1-393(b). Plaintiff has made a demand in satisfaction of Ga. Code. Ann. § 10-1-399, and may amend this Complaint to assert claims under the Georgia FBPA once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Georgia FBPA.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT 8**

**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *ET SEQ*. AND 720 ILCS 295/1A)
(ON BEHALF OF ILLINOIS CLASS)**

587.     Plaintiff Derek Winebaugh (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

588.     Plaintiff brings this claim on behalf of himself and the Illinois Class against VW.

589.     VW is a "person" as that term is defined in 815 ILCS 505/1(c).

590.     Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

591.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

592.     VW engaged in misleading, unfair, and/or deceptive acts that violated the Illinois CFA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

593.     VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

594.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

595.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the VW and Audi brands, the devaluing of environmental cleanliness and integrity at VW, and the true value of the Class Vehicles.

596.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Illinois Class.

597.    VW knew or should have known that its conduct violated the Illinois CFA.

598.    VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

    a.  Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.  Intentionally concealed the foregoing from Plaintiff; and/or

    c.  Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software that caused the vehicles to operate in a low-emission test mode only during emissions testing and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

599.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and the Illinois Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

600.    VW's unlawful acts and practices complained of herein affect the public interest.

601.    As a direct and proximate result of VW's violations of the Illinois CFA, Plaintiff and Illinois Class members have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Illinois Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

602.    Pursuant to 815 ILCS 505/10a(a), on behalf of the Illinois Class Plaintiff seeks monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

603.    Plaintiff also seeks an order enjoining VW's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq*.

**COUNT 9**

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
(MD. CODE COM. LAW § 13-101, *ET SEQ*.)
(ON BEHALF OF MARYLAND CLASS)**

604.    Plaintiff Michael Skena (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

605.    Plaintiff sues on behalf of himself and the Maryland Class against VW.

606.    VW, Plaintiff, and the Maryland Class are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

607.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. MD. COM. LAW CODE § 13-303.

608.    VW's actions as set forth above occurred in the conduct of trade or commerce.

609.    VW engaged in misleading, unfair, and/or deceptive acts that violated the Maryland CPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of

high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

610.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

611.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

612.    VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

    a.    Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    Intentionally concealed the foregoing from Plaintiff; and/or

    c.    Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of the software and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

613.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and the Maryland Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

614.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Maryland Class.

615.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean

1   Diesel engine system, the quality of the VW brand, the devaluing of environmental cleanliness and

2   integrity at VW, and the true value of the Class Vehicles.

3       616.    VW knew or should have known that its conduct violated the Maryland CPA.

4       617.    VW's unlawful acts and practices complained of herein affect the public interest.

5       618.    As a direct and proximate result of VW's violations of the Maryland CPA, Plaintiff

6   and the Maryland Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the

7   truth been disclosed, Plaintiff and Maryland Class members would not have purchased or leased their

8   Class Vehicles at all, or alternatively, would have paid less for them.

9       619.    Pursuant to MD. CODE COM. LAW § 13-408, on behalf of the Maryland Class, Plaintiff

10  seeks actual damages, attorneys' fees, and any other just and proper relief available under the

11  Maryland CPA.

12                          **COUNT 10**

13              **VIOLATIONS OF MASSACHUSETTS LAW**
                **(MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*)**
14              **(ON BEHALF OF MASSACHUSETTS CLASS)**

15      620.    Plaintiff Melissa St. Croix incorporates by reference each preceding paragraph as

16  though fully set forth herein.

17      621.    Plaintiff (for the purpose of this section, "Plaintiff") sues on behalf of themselves and

18  the Massachusetts Class against VW.

19      622.    VW, Plaintiff, and the Massachusetts Class are "persons" within the meaning of

20  Mass. Gen. Laws ch. 93A, § 1(a).

21      623.    VW engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch.

22  93A, § 1(b).

23      624.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or

24  practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.  VW participated

25  in misleading, false, or deceptive acts that violated the Massachusetts Act.

26      625.    In the course of their business, VW concealed and suppressed material facts

27  concerning the Class Vehicles. VW accomplished this by installing software in the Class Vehicles

28  that caused the vehicles to operate in a low emission test mode only during emissions testing. During

CLASS ACTION COMPLAINT - 167
Case No.:
010549-11  973652 V1

normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  Plaintiff and Class members did not expect that their vehicles were polluting in real world conditions.  Plaintiff and Massachusetts Class members had no way of discerning that VW's representations were false and misleading because VW's manipulation of the emissions system was hidden beyond discovery by a reasonable consumer. Plaintiff and Massachusetts Class members did not and could not unravel VW's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected VW's cheat using sophisticated, expensive equipment and applying decades of combined experience.

626.     VW thus violated the Act by, at minimum, employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

627.     Bosch played a critical role in facilitating, and itself contributed to, VW's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that VW would use and had used the Bosch technology as to manipulate the emissions system.

628.     VW engaged in misleading, false, unfair or deceptive acts or practices that violated the Massachusetts Act by installing, failing to disclose and actively concealing the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

629.     VW knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. VW also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. VW concealed this information as well.

CLASS ACTION COMPLAINT - 168
Case No.:
010549-11  973652 V1

630.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Massachusetts Class.

631.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true environmental cleanliness, efficiency, and true value of the Class Vehicles.

632.    Plaintiff and the Massachusetts Class suffered ascertainable loss and actual damages as a direct and proximate result of VW's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Massachusetts Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

633.    As a direct and proximate result of VW's violations of the Massachusetts Act, Plaintiff and the Massachusetts Class have suffered injury-in-fact and/or actual damage.

634.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff and the Massachusetts Class seek monetary relief against VW measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Class member. Because VW's conduct was committed willfully and knowingly, Plaintiff are entitled to recover, for each Plaintiff and each Massachusetts Class member, up to three times actual damages, but no less than two times actual damages.

635.    Plaintiff also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

636.    On July 24, 2017, Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3). Plaintiff has made a demand in satisfaction of Mass. Gen. Laws ch. 93A, § 9(3), and may amend this Complaint to assert claims under the Massachusetts Act once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Massachusetts Act.

637.    As a result of VW's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

1

**COUNT 11**

2

**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(MICH. COMP. LAWS § 445.903, *ET SEQ.*)**

3

**(ON BEHALF OF MICHIGAN CLASS)**

4       638.    Plaintiff Andrew Olson (for the purpose of this section, "Plaintiff") incorporates by

5   reference each preceding paragraph as though fully set forth herein.

6       639.    Plaintiff sues on behalf of himself and the Michigan Class against VW.

7       640.    Plaintiff and the Michigan Class members are "person[s]" within the meaning of the

8   Mich. Comp. Laws § 445.902(1)(d).

9       641.    At all relevant times, VW was a "person" engaged in "trade or commerce" within the

10  meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

11      642.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,

12  unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich.

13  Comp. Laws § 445.903(1).

14      643.    VW engaged in unfair, unconscionable, or deceptive methods, acts or practices

15  prohibited by the Michigan CPA, including: "(c) Representing that goods or services have

16  . . . characteristics . . . that they do not have; . . . (e) Representing that goods or services are of a

17  particular standard . . . if they are of another; . . . (s) Failing to reveal a material fact, the omission of

18  which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the

19  the consumer; . . .  (bb) Making a representation of fact or statement of fact material to the

20  transaction such that a person reasonably believes the represented or suggested state of affairs to be

21  other than it actually is; . . . [and] (cc) Failing to reveal facts that are material to the transaction in

22  light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

23      644.    VW engaged in misleading, unfair, and/or deceptive acts that violated the Michigan

24  CPA by, in the course of its business, installing software that caused the vehicles to operate in a low-

25  emission test mode only during emissions testing; willfully failing to disclose and actively

26  concealing the software, the fact that the Class Vehicles' emissions systems did not work as

27  promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel

28  engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of

1    high quality; and by presenting itself as a reputable manufacturer that valued environmental

2    cleanliness and efficiency.

3        645.    VW knew of, and concealed, the fact that the Class Vehicles used software that

4    caused the vehicles to operate in a low-emission test mode only during emissions testing, and the

5    true nature of its Clean Diesel engine system, for at least six years.

6        646.    VW was also aware of the facts, which it concealed, that it valued profits over

7    environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and

8    distributing vehicles throughout the United States that did not comply with EPA regulations.

9        647.    VW intentionally and knowingly misrepresented material facts regarding the Class

10   Vehicles with intent to mislead Plaintiff and the Michigan Class.

11       648.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff

12   and Michigan Class members. A vehicle made by a reputable manufacturer of environmentally clean

13   vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest

14   manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make

15   environmentally friendly vehicles.

16       649.    VW knew or should have known that its conduct violated the Michigan CPA.

17       650.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive

18   reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean

19   Diesel engine system, the quality of the VW and Audi brands, the devaluing of environmental

20   cleanliness and integrity at VW, and the true value of the Class Vehicles.

21       651.    As a direct and proximate result of VW's violations of the Michigan CPA Plaintiff

22   and the Michigan Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the

23   truth been disclosed, Plaintiff and Michigan Class members would not have purchased or leased their

24   Class Vehicles at all, or alternatively, would have paid less for them.

25       652.    Plaintiff seeks monetary relief against VW measured as the greater of (a) actual

26   damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for

27   Plaintiff and each Michigan Class member; reasonable attorneys' fees; and any other just and proper

28   relief available under Mich. Comp. Laws § 445.911.

653.    Plaintiff also seeks punitive damages against VW because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. VW intentionally and willfully misrepresented the safety and reliability of the Class Vehicles, concealed material facts that only they knew, and repeatedly promised Plaintiff and Michigan Class members that all vehicles were environmentally friendly—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Class Vehicles. VW's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### COUNT 12

**VIOLATIONS OF MISSISSIPPI CONSUMER PROTECTION ACT**
**(MISS. CODE. ANN. § 75-24-1, *ET SEQ.*)**
**(ON BEHALF OF THE MISSISSIPPI CLASS)**

654.    Plaintiff John Kubala (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

655.    Plaintiff sues on behalf of himself and the Mississippi Class against VW.

656.    The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; . . . (g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . [and] "(i) Advertising goods or services with intent not to sell them as advertised." *Id*.

657.    VW participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; and advertising Class Vehicles with the intent not to sell them as advertised.

658.    VW engaged in misleading, unfair, and/or deceptive acts that violated the Mississippi CPA by, in the course of its business, installing software that caused the vehicles to operate in a low-

emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

659.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

660.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

661.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the VW brand, the devaluing of environmental cleanliness and integrity at VW, and the true value of the Class Vehicles.

662.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Mississippi Class.

663.    VW knew or should have known that its conduct violated the Mississippi CPA.

664.    VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

    a.  Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.  Intentionally concealed the foregoing from Plaintiff; and/or

    c.  Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software and true nature of

the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

665. The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and the Mississippi Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

666. As a direct and proximate result of VW's violations of the Mississippi CPA, Plaintiff and the Mississippi Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Mississippi Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

667. VW's unlawful acts and practices complained of herein affect the public interest.

668. Plaintiff's actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

### COUNT 13

**VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT**
**(MO. REV. STAT. § 407.010, *ET SEQ.*)**
**(ON BEHALF OF MISSOURI CLASS)**

669. Plaintiff Brendan Daly (for the purpose of this section, "Plaintiff") incorporates by reference each preceding paragraph as though fully set forth herein.

670. Plaintiff sues on behalf of himself and the Missouri Class against VW.

671. VW, Plaintiff and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

672. VW engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

673. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

674.     VW engaged in misleading, unfair, and/or deceptive acts that violated the Missouri MPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

675.     VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

676.     VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

677.     VW's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of State Reg. 60-8.020.

678.     VW knew or should have known that its conduct violated the Missouri MPA.

679.     VW owed Plaintiff a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.   Possessed exclusive knowledge of the pollution caused by their cars;

    b.   Intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

    c.   Made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

680.     The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and Missouri Class members. A vehicle made by a reputable manufacturer of environmentally clean

1    vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest

2    manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make

3    environmentally friendly vehicles.

4         681.    VW intentionally and knowingly misrepresented material facts regarding the Class

5    Vehicles with an intent to mislead Plaintiff and the Class.

6         682.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive

7    reasonable consumers, including Plaintiff, about the true environmental cleanliness, efficiency, and

8    true value of the Class Vehicles.

9         683.    As a direct and proximate result of VW's violations of the Missouri MPA, Plaintiff

10   and the Missouri Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the

11   truth been disclosed, Plaintiff and Missouri Class members would not have purchased or leased their

12   Class Vehicles at all, or alternatively, would have paid less for them.

13        684.    VW is liable to Plaintiff and the Missouri Class for damages in amounts to be proven

14   at trial, including attorneys' fees, costs, and punitive damages, as well as any other just and proper

15   relief under Mo. Rev. Stat. § 407.025.

16                                        **COUNT 14**

17              **VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
                     **(N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)**
18                    **(ON BEHALF OF NEW JERSEY CLASS)**

19        685.    Plaintiff Steven Ferdinand (for the purpose of this section, "Plaintiff,") incorporates

20   by reference all preceding allegations as though fully set forth herein.

21        686.    Plaintiff sues on behalf of himself and the New Jersey Class against VW.

22        687.    The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.* ("NJ CFA"),

23   prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

24        688.    VW engaged in misleading, unfair, and/or deceptive acts that violated the NJ CFA by,

25   in the course of its business, installing software that caused the vehicles to operate in a low-emission

26   test mode only during emissions testing; willfully failing to disclose and actively concealing the

27   software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving

28   conditions, and the true cleanliness and performance of the "clean" diesel engine system; by

CLASS ACTION COMPLAINT - 176
Case No.:
010549-11  973652 V1

marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

689.    VW's actions as set forth above occurred in the conduct of trade or commerce.

690.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Class.

691.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the VW and Audi brands, the devaluing of environmental cleanliness and integrity at VW, and the true value of the Class Vehicles.

692.    VW owed Plaintiff a duty to disclose the true safety, cleanliness, efficiency and reliability of the Class Vehicles and the devaluing of environmental cleanliness and integrity at VW, because VW:

    a.   Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.   Intentionally concealed the foregoing from Plaintiff; and/or

    c.   Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software that caused the vehicles to operate in a low-emission test mode only during emissions testing and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

693.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and New Jersey Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

694.    As a direct and proximate result of VW's violations of the NJ CFA, Plaintiff and the New Jersey Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth

1    been disclosed, Plaintiff and New Jersey Class members would not have purchased or leased their

2    Class Vehicles at all, or alternatively, would have paid less for them.

3          695.    Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiff seeks treble damages, along with

4    attorneys' fees and costs, punitive damages, and any other appropriate legal or equitable relief.

5          696.    Pursuant TO N.J. STAT. ANN. § 56:8-20, Plaintiff will serve the New Jersey Attorney

6    General with a copy of this Complaint.

7                                        **COUNT 15**

8            **VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
                              **(N.Y. GEN. BUS. LAW § 349)**
9                          **(ON BEHALF OF NEW YORK CLASS)**

10         697.    Plaintiffs Ken Galluccio and Steven Rawczak (for the purpose of the New York

11   claims, "Plaintiffs") incorporate by reference each preceding paragraph as though fully set forth

12   herein.

13         698.    Plaintiffs sue on behalf of themselves and the New York Class against all VW.

14         699.    Plaintiffs, the New York Class members, and VW are "persons" under N.Y. Gen.

15   Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

16         700.    VW's actions as set forth herein occurred in the conduct of trade or commerce under

17   the NY DAPA.

18         701.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any

19   business, trade or commerce." N.Y. Gen. Bus. Law § 349. VW's conduct, as set forth herein,

20   constitutes deceptive acts or practices under this section.

21         702.    VW violated the provisions of the NY DAPA by, at a minimum: (1) representing that

22   the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2)

23   representing that the Class Vehicles are of a particular standard, quality, and grade when they are

24   not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to

25   disclose information concerning the Class Vehicles with the intent to induce consumers to purchase

26   or lease the Class Vehicles.

27         703.    VW engaged in misleading, unfair, and/or deceptive acts that violated the NY DAPA

28   by, in the course of its business, installing software that caused the vehicles to operate in a low-

emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

704.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

705.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

706.    VW owed Plaintiffs and New York Class members a duty to disclose, truthfully, all the facts concerning the illegality, emissions, efficiency and reliability of the Class Vehicles because they:

    a.  Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.  Intentionally concealed the foregoing from Plaintiff; and/or

    c.  Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiffs and Class members contradicted these representations.

707.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiffs and New York Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

CLASS ACTION COMPLAINT - 179
Case No.:
010549-11  973652 V1

708.     VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Class.

709.     VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and New York Class members, about the and true characteristics of VW Clean Diesel vehicles, the quality of the VW brand and the value of the Class Vehicles.

710.     As a direct and proximate result of VW's violations of the NY DAPA, Plaintiff and the New York Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiffs and New York Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

711.     As a result of the foregoing willful, knowing, and wrongful conduct of VW, Plaintiffs and the New York Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs and all other just and appropriate relief available under the NY DAPA.

**COUNT 16**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. GEN. BUS. LAW § 350)**
**(ON BEHALF OF NEW YORK CLASS)**

712.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

713.     Plaintiffs bring this claim only on behalf of the New York Class against VW.

714.     VW was engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

715.     The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

CLASS ACTION COMPLAINT - 180
Case No.:
010549-11  973652 V1

716.    VW caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by VW, or that through the exercise of reasonable care should have been known by VW, to be untrue and misleading to Plaintiffs and the New York class.

717.    VW made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the efficacy and functioning of the emissions systems on their Clean Diesel vehicles. Specifically, VW intentionally concealed and suppressed material facts concerning the quality of the Class Vehicles in order to intentionally and grossly defraud and mislead the Plaintiffs and the New York Class members concerning the true emissions produced by the misnamed "Clean Diesel" engines in the Class Vehicles.

718.    The misrepresentations and omissions set forth above were material and likely to deceive a reasonable consumer.

719.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New York Class.

720.    VW's false advertising was likely to and did in fact deceive reasonable consumers, including Plaintiffs and New York Class members, about the true characteristics of VW Clean Diesel vehicles, the quality of the VW brand and the true value of the Class Vehicles.

721.    The Class Vehicles did not perform as advertised and were not compliant with EPA regulations, making them far less valuable than advertised.

722.    As a direct and proximate result of VW's violations of the NY FAA, Plaintiff and the New York Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and New York Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

723.    Plaintiffs, on behalf of the New York Class, seek monetary relief against VW measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York Class members.

724.     Because VW's conduct was committed willingly and knowingly, New York Class members are entitled to recover three times actual damages, up to $10,000.

725.     Plaintiffs, on behalf of the New York Class, also seek an order enjoining VW's false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**COUNT 17**

**VIOLATIONS OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT
(N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*)
(ON BEHALF OF NORTH CAROLINA CLASS)**

726.     Plaintiffs Mark Miller and Sven Hofmann (for the purpose of this section, "Plaintiffs") incorporate by reference each preceding paragraph as though fully set forth herein.

727.     Plaintiffs sue on behalf of themselves and the North Carolina Class against VW.

728.     Plaintiffs and North Carolina Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* ("NCUDTPA").

729.     VW's acts and practices complained of herein were performed in the course of VW's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

730.     The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

731.     VW engaged in misleading, unfair, and/or deceptive acts that violated the NCUDTPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

732.    VW thus violated the provisions of the NCUDTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

733.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

734.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

735.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the North Carolina Class.

736.    VW knew or should have known that its conduct violated the North Carolina CPA.

737.    VW owed Plaintiffs and North Carolina Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.   Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that had manipulated emissions;

    b.   Intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

738.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiffs and North Carolina Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and

1   dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than

2   make environmentally friendly vehicles.

3        739.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive

4   reasonable consumers, including Plaintiffs and North Carolina Class members, about the true

5   environmental cleanliness, efficiency, and true value of the Class Vehicles.

6        740.    As a direct and proximate result of VW's violations of the NCUDTPA, Plaintiffs and

7   the North Carolina Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the

8   truth been disclosed, Plaintiffs and North Carolina Class members would not have purchased or

9   leased their Class Vehicles at all, or alternatively, would have paid less for them.

10       741.    As a result of the foregoing wrongful conduct of VW, Plaintiffs and the North

11  Carolina Class have been damaged in an amount to be proven at trial, and seek all just and proper

12  remedies, including but not limited to treble damages, court costs and reasonable attorneys' fees, and

13  any other just and proper relief available under N.C. Gen. Stat. § 75-16.

14                             **COUNT 18**

15           **VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
                     **(OHIO REV. CODE §§ 1345.01, *ET SEQ.*)**
16                         **(ON BEHALF OF OHIO CLASS)**

17       742.    Plaintiff Thomas Siehl, III (for the purpose of the Ohio claims, "Plaintiff")

18  incorporates by reference each preceding paragraph as though fully set forth herein.

19       743.    Plaintiff sues on behalf of himself and the Ohio Class against VW.

20       744.    VW, Plaintiff and the Ohio Class are "persons" within the meaning of Ohio Rev.

21  Code § 1345.01(B). VW is a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

22       745.    Plaintiff and the Ohio Class are "consumers" as that term is defined in Ohio Rev.

23  Code § 1345.01(D), and the purchase and leases of the Class Vehicles are "consumer transactions"

24  within the meaning of Ohio Rev. Code § 1345.01(A).

25       746.    Ohio Rev. Code § 1345.01, *et seq.* ("Ohio CSPA") prohibits unfair or deceptive acts

26  or practices in connection with a consumer transaction.

27       747.    VW engaged in misleading, unfair, and/or deceptive acts that violated the Ohio CSPA

28  by, in the course of its business, installing software that caused the vehicles to operate in a low-

emission test mode only during emissions testing; willfully failing to disclose and actively

concealing the software, the fact that the Class Vehicles' emissions systems did not work as

promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel

engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of

high quality; and by presenting itself as a reputable manufacturer that valued environmental

cleanliness and efficiency.

748.    VW thus violated the provisions of the Ohio CSPA, at a minimum by: (1)

representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do

not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade

when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised;

(4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers

to purchase or lease the Class Vehicles. Ohio Rev. Code § 1345.02.

749.    VW knew of, and concealed, the fact that the Class Vehicles used software that

caused the vehicles to operate in a low-emission test mode only during emissions testing, and the

true nature of its Clean Diesel engine system, for at least six years.

750.    VW was also aware of the facts, which it concealed, that it valued profits over

environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and

distributing vehicles throughout the United States that did not comply with EPA regulations.

751.    VW intentionally and knowingly misrepresented material facts regarding the Class

Vehicles with intent to mislead Plaintiff and the Ohio Class.

752.    VW knew or should have known that its conduct violated the Ohio CSPA.

753.    The Ohio Attorney General has made available for public inspection prior state court

decisions which have held that the acts and omissions of VW in this Complaint, including, but not

limited to, the failure to honor both implied warranties and express warranties, the making and

distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-

disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These

cases include, but are not limited to, the following:

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

CLASS ACTION COMPLAINT - 185
Case No.:
010549-11  973652 V1

b.  *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

c.  *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.  *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.  *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.  *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g.  *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.  *Brown v. Spears* (OPIF #10000403);

i.  *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.  *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

k.  *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

754.   VW owed Plaintiff and Ohio Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a.  Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout Ohio that contained software that manipulated emissions;

b.  Intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

c.  Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

755.   The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and Ohio Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

756.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Ohio Class members, about the true environmental cleanliness, efficiency, and true value of the Class Vehicles.

757.    As a direct and proximate result of VW's violations of the Ohio CSPA, Plaintiff and the Ohio Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Ohio Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

758.    Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio Class seek actual damages—trebled, and attorneys' fees, costs, and any other just and proper relief, to the extent available under the Ohio CSPA.

**COUNT 19**

**VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT**
**(OHIO REV. CODE § 4165.01, *ET SEQ.*)**
**(ON BEHALF OF OHIO CLASS)**

759.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

760.    This claim is brought on behalf of the Ohio Class against VW.

761.    VW, Plaintiff, and the Ohio Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

762.    VW engaged in all the acts alleged herein in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A).

763.    The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.01, *et seq*. ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; . . . (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a

particular style or model, if they are of another; . . . [or] (11) Advertises goods or services with intent not to sell them as advertised." Ohio Rev. Code § 4165.02(A).

764.    VW thus violated the provisions of the Ohio DTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

765.    VW engaged in misleading, unfair, and/or deceptive acts that violated the Ohio DTPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

766.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

767.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

768.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Ohio Class.

769.    VW knew or should have known that its conduct violated the Ohio DTPA.

770.    VW owed Plaintiff and Ohio Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

CLASS ACTION COMPLAINT - 188
Case No.:
010549-11  973652 V1

a.   Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that had software that manipulated emissions;

b.   Intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

771.   The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and Ohio Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

772.   VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Ohio Class members, about the true environmental cleanliness, efficiency, and true value of the Class Vehicles.

773.   As a direct and proximate result of VW's violations of the Ohio DTPA, Plaintiff and the Ohio Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Ohio Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

774.   Pursuant to Ohio Rev. Code § 4165.03, Plaintiff and the Ohio Class seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

**COUNT 20**

**VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(OR. REV. STAT. §§ 646.605, *ET SEQ.*)**
**(ON BEHALF OF OREGON CLASS)**

775.   Plaintiff Adam Schell (for the purpose of this section, "Plaintiff") incorporates by reference each preceding paragraph as though fully set forth herein.

CLASS ACTION COMPLAINT - 189
Case No.:
010549-11  973652 V1

776.     Plaintiff sues on behalf of himself and the Oregon Class against VW.

777.     VW, Plaintiff, and the Oregon Class are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

778.     VW is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

779.     The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or deceptive acts conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

780.     VW engaged in misleading, unfair, and/or deceptive acts that violated the Oregon UTPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

781.     VW thus violated the provisions of the Oregon UTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

782.     VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

783.     VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

784.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Oregon Class.

785.    VW knew or should have known that its conduct violated the Oregon UTPA.

786.    VW owed Plaintiff and Oregon Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.   Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles that manipulated emissions;

    b.   Intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

    c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

787.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and Oregon Class members. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

788.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Oregon Class members, about the true environmental cleanliness, efficiency, and true value of the Class Vehicles.

789.    As a direct and proximate result of VW's violations of the Oregon UTPA, Plaintiff and the Oregon Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Oregon Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

790.    Pursuant to Or. Rev. Stat. § 646.638, on behalf of the Oregon Class, Plaintiff seeks damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

**COUNT 21**

**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
(73 P.S. § 201-1, *ET SEQ.*)
(ON BEHALF OF PENNSYLVANIA CLASS)**

791.    Plaintiff Bradley Conner (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

792.    Plaintiff sues on behalf of himself and the Pennsylvania Class against VW.

793.    Plaintiff and Class members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

794.    All of the acts complained of herein were perpetrated by VW in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

795.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

796.    VW engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

797.    VW knew of, and concealed, the fact that the Class Vehicles used software and the true nature of its Clean Diesel engine system for at least six years.

798.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

799.    VW engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL by, in the course of its business, willfully failing to disclose and actively concealing that the Class Vehicles' emissions systems did not work in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

800.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the VW and Audi brands, the devaluing of environmental cleanliness and integrity at VW, and the true value of the Class Vehicles.

801.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Pennsylvania Subclass.

802.    VW knew or should have known that its conduct violated the Pennsylvania CPL.

803.    VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

    a.   Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.   Intentionally concealed the foregoing from Plaintiff; and/or

    c.   Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

804.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and the Pennsylvania Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest

1   manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make

2   environmentally friendly vehicles.

3       805.    As a direct and proximate result of VW's violations of the Pennsylvania CPL,

4   Plaintiff and the Pennsylvania Class have suffered injury-in-fact, actual damage, and ascertainable

5   loss. Had the truth been disclosed, Plaintiff and Pennsylvania Class members would not have

6   purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

7       806.    VW is liable to Plaintiff and the Pennsylvania Class for treble their actual damages or

8   $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff and the

9   Pennsylvania Class are also entitled to an award of punitive damages given that VW's conduct was

10   malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT 22**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION ACT
(TEX. BUS. & COM. CODE § 17.4, *et seq.*)
(ON BEHALF OF TEXAS CLASS)**

14

15       807.    Plaintiff Benjamin Tyler Dunn ("Plaintiff" for purposes of Texas Class Counts)

incorporates by reference all paragraphs as though fully set forth herein.

16

17       808.    Plaintiff brings this Count on behalf of the Texas Class.

18       809.    Plaintiff and the Texas Class are individuals with assets of less than $25 million (or

19   are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM.

CODE § 17.41.

20

21       810.    The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA")

22   provides a private right of action to a consumer where the consumer suffers economic damage as the

23   result of either (i) the use of false, misleading, or deceptive act or practice specifically enumerated in

24   TEX. BUS. & COM. CODE § 17.46(b); or (ii) "an unconscionable action or course of action by any

25   person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3). The Texas DTPA declares several specific

26   actions to be unlawful, including: "(5) Representing that goods or services have sponsorship,

27   approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7)

28   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of

a particular style or model, if they are of another," and "(9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, VW has engaged in an unconscionable action or course of action and thereby caused economic damages to the Texas Class.

811.   VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Texas Class members, about the true performance of clean diesel vehicles, and the true value of these cars.

812.   VW intentionally and knowingly misrepresented material facts regarding the clean diesels with intent to mislead Plaintiff and the Texas Class.

813.   VW knew or should have known that their conduct violated the Texas DTPA.

814.   As alleged above, VW made material statements about the safety and performance of the Class Vehicles and the VW brand that were either false or misleading.

815.   VW owed Plaintiff and Texas Class members a duty to disclose the true safety, performance, and reliability of the Class Vehicles, because they:

    a.   possessed exclusive knowledge that they were selling and distributing vehicles throughout the United States that did not perform as advertised;

    b.   intentionally concealed the foregoing from Plaintiff and the Texas Class; and/or

    c.   Made incomplete representations about the safety and performance of the "clean diesels" while purposefully withholding material facts from Plaintiff and the Texas Class that contradicted these representations.

816.   VW's omissions and/or misrepresentations about the clean diesels were material to Plaintiff and the Texas Class.

817.   Plaintiff and the Texas Class suffered ascertainable loss caused by VW's misrepresentations and their concealment of and failure to disclose material information. Class members who purchased the clean diesels either would have paid less or would not have purchased or leased them at all but for VW's violations of the Texas DTPA.

818. VW had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of clean vehicles suffered ascertainable loss in the form of the overpayment for their vehicles as a result of VW's deceptive and unfair acts and practices made in the course of VW's business.

819. VW's violations present a continuing risk to Plaintiff as well as to the general public. VW's unlawful acts and practices complained of herein affect the public interest.

820. As a direct and proximate result of VW's violations of the Texas DTPA, Plaintiff and the Texas Class have suffered injury-in-fact and/or actual damage.

821. Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), Plaintiff seeks monetary relief against VW measured as actual damages in an amount to be determined at trial, treble damages for VW's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

822. Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Plaintiff is also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

**COUNT 23**

**VIOLATIONS OF UTAH CONSUMER SALES PRACTICES ACT**
**(UTAH CODE ANN. § 13-11-1, *ET SEQ.*)**
**(ON BEHALF OF UTAH CLASS)**

823. Plaintiff Ingrid Salgado (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

824. Plaintiff brings this claim on behalf of herself and the Utah Class against VW.

825. VW is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

826. Utah Class Members are "persons" under UTAH CODE ANN. § 13-11-3.

827. The sale of the Class Vehicles to the Utah Class Members was a "consumer transaction" within the meaning of UTAH CODE ANN. § 13-11-3.

828.    The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. UTAH CODE ANN. § 13-11-5.

829.    VW engaged in misleading, unfair, and/or deceptive acts that violated the Utah CSPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

830.    VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

831.    VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

832.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the VW brand, the devaluing of environmental cleanliness and integrity at VW, and the true value of the Class Vehicles.

833.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Utah Class.

834. VW knew or should have known that its conduct violated the Utah CSPA.

835. VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

    a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b. Intentionally concealed the foregoing from Plaintiff; and/or

    c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software that caused the vehicles to operate in a low-emission test mode only during emissions testing and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

836. The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and the Utah Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

837. VW's unlawful acts and practices complained of herein affect the public interest.

838. As a direct and proximate result of VW's violations of the Utah CSPA, Plaintiff and the Utah Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Utah Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

839. Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiff and the Utah Class seek monetary relief against VW measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff and each Utah Class member; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

**COUNT 24**

**VIOLATIONS OF VERMONT CONSUMER FRAUD ACT**
**(VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)**
**(ON BEHALF OF VERMONT CLASS)**

840.     Plaintiff Michael Bowman (for the purpose of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

841.     Plaintiff sues on behalf of himself and the Vermont Class against VW.

842.     VW is a seller within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

843.     The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…" Vt. Stat. Ann. tit. 9, § 2453(a).

844.     VW engaged in misleading, unfair, and/or deceptive acts that violated the Vermont CFA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

845.     VW knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission test mode only during emissions testing, and the true nature of its Clean Diesel engine system, for at least six years.

846.     VW was also aware of the facts, which it concealed, that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

847.     VW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the VW and Audi brands, the devaluing of environmental cleanliness and integrity at VW, and the true value of the Class Vehicles.

848.    VW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Vermont Subclass.

849.    VW knew or should have known that its conduct violated the Vermont CFA.

850.    As alleged above, VW made material statements about the safety, cleanliness, efficiency and reliability of the Class Vehicles and the VW and Audi brands that were either false or misleading.

851.    VW owed Plaintiff and Class members a duty to disclose the defective nature of the Clean Diesel engine system in the Class Vehicles because VW:

  a.  Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

  b.  Intentionally concealed the foregoing from Plaintiff; and/or

  c.  Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of software that caused the vehicles to operate in a low-emission test mode only during emissions testing and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from Plaintiff and Class members contradicted these representations.

852.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff and the Vermont Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

853.    VW's unlawful acts and practices complained of herein affect the public interest.

854.    As a direct and proximate result of VW's violations of the Vermont CFA, Plaintiff and the Vermont Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Vermont Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

855.     Plaintiff and the Vermont Class are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to Vt. Stat. Ann. tit. 9, § 2461(b)

**COUNT 25**

**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(VA. CODE ANN. §§ 59.1-196, *ET SEQ*.)**
**(ON BEHALF OF VIRGINIA CLASS)**

856.     Plaintiff Jon Mosley (for the purpose of this section, "Plaintiff") incorporates by reference each preceding paragraph as though fully set forth herein.

857.     Plaintiff sues on behalf of himself and the Virginia Class against VW.

858.     VW, Plaintiff, and the Virginia Class are "persons" within the meaning of Va. Code § 59.1-198.

859.     VW is a "supplier" within the meaning of Va. Code § 59.1-198.

860.     The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices." Va. Code § 59.1-200(A).

861.     VW engaged in misleading, unfair, and/or deceptive acts that violated the Virginia CPA by, in the course of its business, installing software that caused the vehicles to operate in a low-emission test mode only during emissions testing; willfully failing to disclose and actively concealing the software, the fact that the Class Vehicles' emissions systems did not work as promised in real driving conditions, and the true cleanliness and performance of the "clean" diesel engine system; by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality; and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency.

862.     VW thus violated the Act, at a minimum by: (1) misrepresenting the source, sponsorship, approval, or certification of goods or services; (2) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (3) misrepresenting that goods or services are of a particular standard, quality, grade, style or model; (4) advertising goods or services with intent not to sell them as advertised; and (5) using any other deception, fraud,

1   false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va.

2   Code § 59.1-200(A).

3         863.    VW knew of, and concealed, the fact that the Class Vehicles used software that

4   caused the vehicles to operate in a low-emission test mode only during emissions testing, and the

5   true nature of its Clean Diesel engine system, for at least six years.

6         864.    VW was also aware of the facts, which it concealed, that it valued profits over

7   environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and

8   distributing vehicles throughout the United States that did not comply with EPA regulations.

9         865.    VW intentionally and knowingly misrepresented material facts regarding the Class

10  Vehicles with intent to mislead Plaintiff and the Virginia Class.

11        866.    VW knew or should have known that its conduct violated the Virginia CPA.

12        867.    VW owed Plaintiff and Virginia Class members a duty to disclose, truthfully, all the

13  facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

14            a.   Possessed exclusive knowledge that they were manufacturing, selling, and

15                distributing vehicles throughout the United States that manipulated emissions;

16            b.   Intentionally concealed the foregoing from regulators, Plaintiff, Class members;

17                and/or

18            c.   Made incomplete or negligent representations about the environmental cleanliness

19                and efficiency of the Class Vehicles generally while purposefully withholding

20                material facts from Plaintiff and Class members contradicted these representations.

21        868.    The facts that VW misrepresented, omitted, and concealed were material to Plaintiff

22  and Virginia Class members. A vehicle made by a reputable manufacturer of environmentally clean

23  vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest

24  manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make

25  environmentally friendly vehicles.

26        869.    VW's unfair or deceptive acts or practices were likely to and did in fact deceive

27  reasonable consumers, including Plaintiff and Virginia Class members, about the true environmental

28  cleanliness, efficiency, and true value of the Class Vehicles.

CLASS ACTION COMPLAINT - 202
Case No.:
010549-11  973652 V1

870.     As a direct and proximate result of VW's violations of the Virginia CPA, Plaintiff and the Virginia Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiff and Virginia Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

871.     Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiff and the Virginia Class are entitled to the greater of actual damages or $500 for each Virginia Class member, attorneys' fees, and costs. Because VW's actions were willful, Plaintiff and the Virginia Class should each receive the greater of treble damages or $1,000. *Id.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A.     Equitable relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses;

B.     A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

C.     Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

D.     Any and applicable statutory and civil penalties;

E.     An order requiring Defendants to pay both pre-and post-judgment interest on any amounts awarded;

F.     An award of costs and attorneys' fees, as allowed by law;

G.     Leave to amend this Complaint to conform to the evidence produced at trial; and

H.     Such other or further relief as the Court may deem appropriate, just, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED:  August 2, 2017.

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By    /s/ Shana E. Scarlett
  Shana E. Scarlett (SBN 217895)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (*Pro Hac Vice*
  *in Related MDL 2672*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
steve@hbsslaw.com
Telephone:  206) 623-7292
Facsimile:  (206) 623-0594

THE PAYNTER LAW FIRM, PLLC
Stuart M. Paynter (SBN 226147)
stuart@paynterlawfirm.com
1200 G Street NW Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622