1   Matthew D. Slater (pro hac vice)
2   2000 Pennsylvania Ave., NW
    Washington, DC 20006
3   (202) 974-1500 (Phone)
    (202) 974-1999 (Facsimile)
4   mslater@cgsh.com

5   David L. Anderson (SBN 149604)
    555 California Street
6   San Francisco, CA 94104
7   (415) 772-1200 (Phone)
    (415) 772-7400 (Facsimile)
8   dlanderson@sidley.com

9   Counsel for Defendants
    Robert Bosch LLC and Robert Bosch GmbH
10

11

12

13                    **UNITED STATES DISTRICT COURT**

14                  **NORTHERN DISTRICT OF CALIFORNIA**

15  IN RE: VOLKSWAGEN "CLEAN DIESEL"     | MDL DOCKET NO. 2672 CRB (JSC)
    MARKETING, SALES PRACTICES AND
16  PRODUCT LIABILITY LITIGATION

17

18  This Document Relates to:              | **ROBERT BOSCH LLC'S AND
                                           | ROBERT BOSCH GMBH'S NOTICE
19  *Nemet v. Volkswagen Group of America, Inc.*, | OF MOTION AND MOTION TO
                                           | DISMISS CLASS ACTION
20  Case No. 17-cv-04372-CRB              | COMPLAINT AND MEMORANDUM
                                           | OF POINTS AND AUTHORITIES IN
21                                         | SUPPORT THEREOF**

22                                         | Date:    March 16, 2018
                                           | Time:    10:00 A.M.
23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

NOTICE OF MOTION AND MOTION.......................................................................... 1

REQUEST FOR RELIEF .................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES.................................................. 1

SUMMARY OF THE ARGUMENT ................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................... 3

   A.   Plaintiffs' Ownership, Or Leasing, Of Affected Vehicles Ended Before September 18, 2015................................................................................................................................ 3

   B.   The Court's Decision On The Motion To Dismiss The VW-Branded Franchise Dealer Complaint. .................................................................................................................... 4

ISSUES TO BE DECIDED ................................................................................................ 6

ARGUMENT ...................................................................................................................... 6

I.     PLAINTIFFS LACK RICO STANDING............................................................. 6

   A.   Plaintiffs Fail To Allege A Cognizable RICO Injury. ....................................... 6

   B.   Plaintiffs Have Failed To Allege That Their Claimed Injuries Were Caused "By Reason Of" A RICO Violation By The Bosch Defendants. .................................. 9

II.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RICO CLAIM. ................... 12

   A.   Plaintiffs Fail To Allege That The Bosch Defendants Engaged In A Pattern Of Racketeering. ..................................................................................................... 13

       1.   Plaintiffs Fail To Allege That The Bosch Defendants Knowingly Participated In A Scheme To Defraud. .............................................. 14

       2.   The Complaint Does Not Plausibly Allege That Bosch LLC or Bosch GmbH Acted With Specific Intent To Defraud.................................... 20

       3.   Plaintiffs Have Not Alleged That Bosch LLC or Bosch GmbH Used A Mailing Or Wiring In Furtherance Of A Scheme To Defraud. .............. 22

       4.   Plaintiffs' Allegations Of Aiding And Abetting Predicate Acts Cannot Support A Civil RICO Claim Against The Bosch Defendants................ 25

   B.   Plaintiffs Fail To Adequately Allege That The Bosch Defendants Were Part Of A RICO Enterprise ................................................................................................ 26

       1.   Plaintiffs Failed To Allege That The Bosch Defendants Participated In A RICO Enterprise. .......................................................................... 27

       2.   Plaintiffs Fail To Allege The Bosch Defendants Conducted The Affairs Of The Alleged Enterprise.................................................................. 29

   C.   Plaintiffs Fail To Allege A RICO Conspiracy. ................................................ 31

III.   PLAINTIFFS FAIL TO SUPPORT PERSONAL JURISDICTION OVER BOSCH GMBH................................................................................................................... 32

# TABLE OF AUTHORITIES

**Federal Cases**

*Allied Tube & Conduit Corp. v. Indian Head,*
    486 U.S. 492 (1988) .................................................................................22, 31

*Anza v. Ideal Steel Supply Corp.,*
    547 U.S. 451 (2006) ................................................................................. 10-11

*Axiom Foods, Inc. v. Acerchem Int'l., Inc.,*
    874 F.3d 1064 (9th Cir. 2017)................................................................. 33-34

*Baumer v. Pachl,*
    8 F.3d 1341 (9th Cir. 1993)........................................................................... 31

*Berg v. First State Ins. Co.,*
    915 F.2d 460 (9th Cir. 1990).......................................................................... 7

*Bitton v. Gencor Nutrientes, Inc.,*
    No. 14-56381, 2016 WL 3545346 (9th Cir. June 28, 2016)....................12, 27

*Boyle v. United States,*
    556 U.S. 938 (2009) .............................................................................. 27-28

*Bridge v. Phx. Bond & Indem. Co.,*
    553 U.S. 639 (2008) ...................................................................................... 7

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.,*
    116 F.3d 1364 (11th Cir. 1997)..................................................................... 13

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) ..................................................................................... 25

*Chevron Corp. v. Naranjo,*
    667 F.3d 232 (2d Cir. 2012)......................................................................... 32

*Craig Outdoor Advert, Inc. v. Viacom Outdoor, Inc.,*
    528 F.3d 1001 (8th Cir. 2008)...................................................................... 13

*Daimler AG v. Bauman,*
    134 S. Ct. 746 (2014).................................................................................... 32

*Doe v. Unocal Corp.,*
    248 F.3d 915 (9th Cir. 2001)........................................................................ 33

*Dole Food Co. v. Watts*,
    303 F.3d 1104 (9th Cir. 2002)................................................................. 34

*Dufour v. BE LLC*,
    No. 09-3770, 2010 WL 2560409 (N.D. Cal. June 22, 2010)................................20, 26

*Eclectic Properties East, LLC v. The Marcus & Millichap Co.*,
    No. C-09-00511 RMW, 2012 WL 713289 (N.D. Cal. Mar. 5, 2012)........................ 23

*Eclectic Props. East, LLC v. Marcus & Millchap Co.*,
    751 F.3d 990 (9th Cir. 2014)........................................................... *passim*

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004).........................................................12, 14

*Eller v. EquiTrust Life Ins. Co.*,
    778 F.3d 1089 (9th Cir. 2015)............................................................ 19

*Ellis v. J.P. Morgan Chase & Co.*,
    No. 12-CV-03897-YGR, 2015 WL 78190 (N.D. Cal. Jan. 6, 2015)........................ 13

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014)............................................................. 23

*Ferrari v. Mercedes-Benz USA, LLC*,
    15-CV-4379 YGR, 2016 WL 658966 (N.D. Cal. Feb. 18, 2016)........................ 25-26

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)............................................................. 27

*Gomez v. Guthy-Renker, LLC*,
    No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042 (C.D. Cal. July 13, 2015)........ 27

*H.J., Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) .................................................................... 13

*Hemi Grp., LLC v. City of N.Y.*,
    559 U.S. 1 (2010) .................................................................... 3, 9

*Hoffman v. Zenith Ins. Co.*,
    487 F. App'x 365 (9th Cir. 2012)........................................................ 14

*Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*,
    485 F.3d 450 (9th Cir. 2007)............................................................ 33

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ................................................................................................. 9, 11

*Howard v. Am. Online Inc.*,
    208 F.3d 741 (9th Cir. 2000)................................................................................... 31

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013).............................................................................15, 17

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MD-2543 (JMF), 2017 WL 2839154 (S.D.N.Y. June 30, 2017) .............................. 2, 7-8

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MD-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017)....................................... 8

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016)................................... 4, 7

*In re Volkswagen "Clean" Diesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
    MDL No. 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)........................ *passim*

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ........................................................... 11, 29-30

*Koch v. Royal Wine Merchants, Ltd.*,
    907 F. Supp. 2d 1332 (S.D. Fla. 2012) ................................................................... 12

*Kottle v. Nw. Kidney Centers*,
    146 F.3d (9th Cir. 1998) ..................................................................................... 21

*Mahurin v. Lehman Bros.*,
    No. 99-5128, 2000 WL 356377 (N.D. Cal. Mar. 30, 2000) ......................................... 19

*Martinez v. Aero Caribbean*,
    764 F.3d 1062 (9th Cir. 2014)................................................................................ 32

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008).................................................................................... 7

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002)........................................................................ 2, 9-10

*Neder v. United States*,
    527 U.S. 1 (1999) .............................................................................................. 14

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007)..................................................................... 25

*Oregon Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999)..................................................................... 10

*Oscar v. Univ. Students Co-Operative Ass'n*,
    965 F.2d 783 (9th Cir. 1992)....................................................................... 9

*Pennsylvania Ass'n of Edwards Heirs v. Rightenour*,
    235 F.3d 839 (3d Cir. 2000)..................................................................... 25

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015)................................................................... 32

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ................................................................................. 29

*Salas v. Int'l Union of Operating Eng'rs*,
    CV 12-10506 DDP (VBKx), 2015 WL 728365, (C.D. Cal. Feb. 18, 2015) ............................. 26

*Schmuck v. United States*,
    489 U.S. 705 (1989) ................................................................................. 22

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004)..................................................................... 32

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985) ................................................................................. 12

*Shaw v. Nissan N. Am.*, 220 F. Supp. 3d 1046
     (C.D. Cal. 2016) ................................................................................28, 31

*Sosa v. Directv, Inc.*,
    437 F.3d 923 (9th Cir. 2006)..................................................................... 22

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2009)..................................................................... 13

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008)................................................................... 10

*Tech. Patents LLC v. T-Mobile (UK) Ltd.*,
    700 F.3d 482 (Fed. Cir. 2012)................................................................... 32

*United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v.*
*Walgreen Co.,*
719 F.3d 849 (7th Cir. 2013).............................................................................. 30-31

*United States v. Kazzaz,*
592 F. App'x 553 (9th Cir. 2014)........................................................................ 22

*United States v. Lothian,*
976 F.2d 1257 (9th Cir. 1992)............................................................................ 26

*United States v. Shipsey,*
363 F.3d 962 (9th Cir. 2004).............................................................................. 22

*United States v. Wood,*
259 F. App'x 48 (9th Cir. 2007).......................................................................... 24

*Vaugh v. Diaz,*
No. 12-CV-1181 BEN JMA, 2013 WL 150487 (S.D. Cal. Jan. 14, 2013) ................. 27

*Walden v. Fiore,*
134 S. Ct. 1122 (2014)....................................................................................... 34

**Federal Statutes**

18 U.S.C. § 1961(1) ........................................................................................... 26

18 U.S.C. § 1961(4) ........................................................................................... 27

18 U.S.C. § 1962(c) ........................................................................................... 12

18 U.S.C. § 1964(c).......................................................................................... 6, 9

**Other Authorities**

40 C.F.R. § 86.1803-01 ...................................................................................... 20

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 16, 2018 at 10:00 a.m. or at such other date as may be agreed upon or ordered, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Robert Bosch LLC ("Bosch LLC") and Robert Bosch GmbH ("Bosch GmbH") (together, the "Bosch Defendants") will and hereby do move this Court to dismiss the Class Action Complaint (the "Complaint"), ECF No. 7.  This Motion is made pursuant to Rules 9(b), 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure, and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, all pleadings and papers filed herein, oral argument of counsel, and any other matter that may be submitted at any hearing of this Motion.

**REQUEST FOR RELIEF**

The Bosch Defendants respectfully request that the Court dismiss all claims in the Complaint against them with prejudice.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**SUMMARY OF THE ARGUMENT**

In *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4890594, at *6-7 (N.D. Cal. Oct. 30, 2017) ("*Napleton*"), this Court recognized that the RICO statute's requirement of an actual injury to "business or property" is not satisfied by purported injuries that are intangible, and that harm to a consumer's expectation interests is not a harm to a business or property interest for RICO purposes.  The present Complaint – on behalf of individuals whose ownership or lease of an Affected Vehicle ended before Volkswagen AG admitted to employing an emissions defeat device in September 2015 – runs afoul of these basic principles.  Plaintiffs charge that the revelation of the defeat device meant that "they never received the clean emissions performance" allegedly promised them, Compl. ¶ 4, but that is simply not an injury to "business or property" cognizable under RICO.  Accordingly, Plaintiffs' urging in the Complaint that their "expectation that their driving was environmentally conscious was not spurious or subjective," Compl. ¶ 12, is legally irrelevant.

Plaintiffs do not and cannot dispute that, as far as they knew while they owned or leased them, their cars performed as expected, and that disclosures about impaired emissions performance were made only after their cars had been sold or leased to someone else (directly or indirectly an owner or lessee who was eligible for compensation by the multi-billion dollar consumer settlements approved by this Court). Indeed, since Plaintiffs bought and sold their vehicles in a market where car values were allegedly inflated by the undisclosed presence of the defeat device, they cannot (and do not) plausibly allege any economic injury. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 2839154, at *10 (S.D.N.Y. June 30, 2017) ("*General Motors*") ("a plaintiff who resold her car before the recall suffered no economic loss damages, as the then-unknown defect could not have affected the resale price"). Plaintiffs' claims are thus utterly unlike those of the *Napleton* plaintiffs ("Franchise Dealers"), which the Court found plausibly alleged injury arising from VW's[1] stop-sale order leaving them with unsellable inventory.

The Complaint also fails to allege that any act by the Bosch Defendants was the proximate cause of Plaintiffs' purported injury. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002). Plaintiffs argue that for any given Affected Vehicle[2] sold and resold during the years preceding September 2015 (transactions that could have happened multiple times for any given Affected Vehicle), the relevant seller plaintiff(s) would have been unable to recover the allegedly depreciated value of a supposed "clean diesel premium." Compl. ¶ 13. Setting aside that this is not a cognizable RICO injury, there is no plausible allegation that the Bosch Defendants did anything to cause such an alleged premium or how much of it remained at resale, much less did anything that affected the negotiation/resale dynamic of any given pre-September 2015 sale. Moreover, Plaintiffs' speculative claims risk multiple recoveries among multiple plaintiffs in respect of each and every Affected Vehicle – in addition to the recoveries already provided as to such vehicles in the prior

---

[1] VW Group of America, Inc., Volkswagen AG, Audi AG, and Audi of America, LLC (collectively "VW" or "VW Defendants").

[2] VW and Audi 2.0-liter and 3.0-liter TDI vehicles for model years 2009-2016 sold in the U.S. ("Affected Vehicles").

consumer settlements – which is precisely the type of morass that the doctrine of RICO proximate cause instructs courts to avoid.  As the controlling precedent demonstrates beyond dispute, courts here must not go beyond the "first step."  *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 10 (2010).  Plaintiffs' theories by contrast would take RICO (and its treble damages remedy) well beyond that.

Plaintiffs' RICO pleading also fails on other fronts, including failure to allege that the Bosch Defendants conducted the affairs of a RICO enterprise or were knowing participants in Volkswagen AG's and Audi AG's ("VW German Defendants") alleged fraudulent scheme, as well as a failure to establish personal jurisdiction over Bosch GmbH.  While the Court in *Napleton* rejected similar arguments, they are preserved here.  Given the fundamental pleading deficiencies identified above, however, the Court need not reach these issues here and the Complaint should be dismissed with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.  Plaintiffs' Ownership, Or Leasing, Of Affected Vehicles Ended Before September 18, 2015.**

Plaintiffs here purport to represent a class of "all persons or entities whose ownership or leases [of Affected Vehicles] ended before September 18, 2015, and were not part of the class in the 2.0-liter and 3.0-liter settlements which used that date as a cut off for eligibility."  Compl. ¶ 401.  Plaintiffs admit that when the Environmental Protection Agency ("EPA") issued its Notice of Violations ("NOV") to VW AG, Audi AG, and VWGoA, Plaintiffs had no property interest in any Affected Vehicle, the very same cars that were later the subject of the 2.0-liter and 3.0-liter settlements approved by the Court in October 2016 and May 2017.  Compl. ¶ 3.  *See also* Order Granting Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealership Class Action Settlement, 3:15-md-02672-CRB (N.D. Cal. Oct. 25, 2016), ECF No. 2102 (providing for a $10.033 billion funding pool to provide restitution, vehicle buybacks, and repairs to eligible 2.0-Liter Class Members); Order Granting Final Approval of the Consumer and Reseller 3.0-Liter Class Action Settlement, 3:15-md-02672-CRB (N.D. Cal. May 17, 2017), ECF No. 3229 (creating an initial fund of $252 million to provide similar relief to eligible 3.0-Liter Class Members); Order Granting Final Approval of the Bosch Class Action Settlement, 3:15-md-02672-CRB (N.D. Cal. May 17, 2017),

ECF No. 3230 (establishing settlement fund of $327.5 million for owners of "Eligible Vehicles"). These settlements addressed any and all injuries associated with the Affected Vehicles. *See* Plaintiffs' Notice of Motion, and Memorandum in Support of Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealer Class Action Settlement, 3:15-md-02672-CRB (N.D. Cal. Aug. 26. 2016), ECF No. 1784 at 17 ("[PSC's expert's] analysis demonstrates that the Settlement restores the Eligible Vehicles to pre-scandal market value, in addition to redressing environmental harms from excess emissions.").

**B.  The Court's Decision On The Motion To Dismiss The VW-Branded Franchise Dealer Complaint.**

The Court issued a ruling on October 30, 2017 denying the Bosch Defendants' motion to dismiss the Franchise Dealer complaint. *Napleton*, 2017 WL 4890594.  The Court held that the Franchise Dealers – who engage in the business of acquiring vehicles from VW for sale to consumers – had plausibly alleged injury to their "business and property interests" because VW's stop-sale order had "prevented the Franchise Dealers from selling their inventory of affected vehicles." *Id.* at *6.  In its reasoning, the Court acknowledged that *General Motors*, 14-MD-2543 (JMF), 2016 WL 3920353, at *7, 16-17 (S.D.N.Y. July 15, 2016), rejected "harm to a consumer's expectation interest" as harm to property under RICO, but distinguished the situation of Franchise Dealers whose business it was "to sell their stock at a certain price and [who] received lower prices when [VW's alleged fraud] was revealed." *Napleton*, 2017 WL 4890594, at *7.  The Court accordingly found that the Franchise Dealers plausibly alleged that the stop-sale order caused tangible injuries pertaining to the blocked inventory. *Id.* at *6.  But the Court rejected as insufficient under RICO any "intangible" injury, however characterized.  Thus, while noting that California law recognized goodwill as a property interest, the Court rejected it as a category of RICO injury given that it is "intangible." *Id.* at *6.  The Court looked to the substance of the Franchise Dealers' purported injury, finding insufficient, for example, allegations based on the claim that the emissions fraud "reduced the likelihood that old customers would return," as that was simply an alleged loss of goodwill "cast in different language." *Id.* at *7.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In analyzing the issue of proximate causation, the Court noted the "central question" of "whether the alleged violation led directly to the plaintiff's injuries." *Id.* at \*8 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  The Court found that the Franchise Dealers satisfied each of the non-exhaustive factors set forth in *Mendoza*, 301 F.3d 163.  First, the Court held that there were "no more direct victims of the wrongful conduct because the Franchise Dealers bought the Affected Vehicles directly from co-schemer Volkswagen." *Napleton*, 2017 WL 4890594, at \*8.  Second, the Court explained that it was not necessary to engage in undue speculation to ascertain the damages attributable to the wrongful conduct because the VW stop-sale order "led directly to the Franchise Dealers' inability to sell their inventory of 'clean-diesel' vehicles." *Id.*  Finally, the Court held that the Franchise Dealers' claims did not create the need for "complicated rules apportioning damages to obviate the risk of multiple recoveries," both because the Franchise Dealers purchased their vehicles directly from VW (and so their claims were not derivative of others') and because there were no other similarly situated plaintiffs. *Id.* at \*8-9 (citations omitted).  As discussed *infra* Section I.B, Plaintiffs here cannot demonstrate that any of these factors weigh in favor of a finding of proximate causation on the distinct facts of this case.

The Court also held that the Franchise Dealers plausibly alleged the existence of a RICO enterprise and the requisite predicate acts of mail and wire fraud.  The Court based its decision on the Franchise Dealers' conclusory allegations that "Bosch exercised near-total control over modifications to the [Electronic Diesel Control Unit 17 ("EDC17")]" and three emails which the Court found "support that Bosch was involved in the scheme." *Id.* at \*13-14.  Plaintiffs here make similar allegations that the EDC17 ran on "highly proprietary engine management software over which Bosch LLC and Bosch GmbH exert near-total control," Compl. ¶ 225, and describe the same documents that the Court relied upon in *Napleton*, Compl. ¶¶ 240-43.  The Bosch Defendants preserve their arguments *infra* concerning the mischaracterization of the cited documents.  In light of the inability of Plaintiffs to meet the RICO requirements of an injury to "business or property" or proximate causation, the Court need not reach these other arguments.

1

**ISSUES TO BE DECIDED**

2

3

   1.   Whether the Complaint alleges an injury to Plaintiffs' "business or property" as required to

       state a claim under the RICO statute.[3]

4

5

   2.   Whether the Complaint alleges that the Bosch Defendants proximately caused Plaintiffs'

       purported injuries.

6

   3.   Whether the Complaint otherwise fails to state a claim for relief.

7

   4.   Whether the Complaint fails to support personal jurisdiction over Bosch GmbH.

8

**ARGUMENT**

9

**I.     PLAINTIFFS LACK RICO STANDING.**

10

11

     "Congress has narrowed the scope of injuries that can trigger a civil RICO violation,

specifically limiting standing to those who have suffered (1) an injury to 'business or property,' that

12

is (2) 'by reason of' a RICO violation" (*i.e.*, proximate causation). *Napleton*, 2017 WL 4890594, at

13

*4. Plaintiffs fail to meet either of these requirements.

14

**A. Plaintiffs Fail To Allege A Cognizable RICO Injury.**

15

     RICO provides civil remedies only for injuries to "business or property." 18 U.S.C.

16

§ 1964(c). This injury standard "requires the plaintiff to plead 'a harm to a specific business or

17

property interest,'" *Napleton*, 2017 WL 4890594, at *5 (quoting *Diaz v. Gates*, 420 F.3d 897, 900

18

(9th Cir. 2005)), and "requires more than 'mere injury to a valuable intangible property interest.'"

19

*Id.* at *6 (quoting *Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en

20

banc), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005)). To support

21

RICO standing, an injury must "result in a 'tangible' or 'concrete' financial loss." *Id.* at *7 (citations

22

omitted). Plaintiffs cannot meet that standard.

23

     *First*, Plaintiffs attempt an expectancy-based claim that has been repeatedly rejected. They

24

25

26

27

[3] The Bosch Defendants adopt the VW Defendants' arguments demonstrating that Plaintiffs' alleged injuries for benefit of the bargain and overpayment are also insufficient to confer Article III standing. *See* Volkswagen Defendants' Motion to Dismiss the Class Action Complaint ("Volkswagen Br.") Part I.

28

6

1   assert that, although they drove their cars without incident during the period prior to September 18,

2   2015, *see generally* Complaint,[4] they nonetheless "never received the cars they bargained for or

3   enjoyed the environmental performance they were promised."  Compl. ¶ 10.  *See* Compl. ¶¶ 4

4   (claiming "lost opportunity to drive a clean car"), 12 (claiming denial of "specific element of

5   performance"), 14 ("lessees never received the cars they bargained for").  But this type of dashed

6   expectation injury is not cognizable under RICO.  *General Motors*, No. 14-MD-2543 (JMF), 2016

7   WL 3920353, at *16 (S.D.N.Y. July 15, 2016) (collecting cases) ("courts . . . have found speculative,

8   expectation-based, benefit-of-the-bargain damages to be incompatible with RICO").[5]  *See also*

9   *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228-29 (2d Cir. 2008) (rejecting benefit of the

10  bargain damages based on plaintiffs' expectation regarding "light" cigarettes), *abrogated on other*

11  *grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *Berg v. First State Ins. Co.*, 915

12  F.2d 460, 464 (9th Cir. 1990) (loss of expected insurance coverage was not RICO injury where no

13  financial loss occurred).

14          *Second*, to the extent Plaintiffs try to assert economic injury based on their alleged

15  "[o]verpayment for a[n] [Affected] Vehicle," or "[o]verpayment of the premium for a clean diesel,"

16  their allegations are similarly insufficient.  Compl. ¶ 506.  *General Motors* is instructive.  In that

17  case, plaintiffs sought recovery for, among other things, a loss in the value of their cars after ignition

18  switch defects became public knowledge.  2017 WL 2839154, at *1 (S.D.N.Y. June 30, 2017).  One

---

[4] To the extent Plaintiffs identify any issues that occurred during the period they had the vehicles, they are unrelated to allegations of a purported defeat device or any wrongdoing by the Bosch Defendants.  Compl. ¶¶ 33 (alleging "mechanical issues with the vehicle such as the windows not rolling down when the weather was hot and a sound coming from the front of the car"), 88 ("Plaintiff had difficulty getting the vehicle to pass inspection in June 2011"), 109 ("Plaintiff no longer owns the Vehicle as the clutch wore out when the Vehicle was not very old."), 150 ("Plaintiff had numerous issues with the Vehicle including recurrent appearances of the 'check engine' light and failed inspections due to the vehicle's emissions level.").

[5] In *Napleton*, this Court noted the holding in *General Motors* that "a consumer's expectation interest is not a harm to 'property' interest for purposes of RICO," but distinguished the circumstances of the Franchise Dealers, whose business it was to resell vehicles directly purchased from VW and who therefore might be able to assert an injury to their business due to a loss of the benefit of the bargain.  *Napleton,* 2017 WL 4890594, at *7 (citing *General Motors*, 2016 WL 3920353, at *17).

set of plaintiffs in that multidistrict litigation was situated exactly as Plaintiffs here, namely, they were those "who sold, traded in, or returned their vehicles prior to the announcement of the recalls." *Id.* at \*10; *cf.* Compl. ¶ 401 (defining *Nemet* class as individuals who "no longer owned, held an active lease for, or otherwise had a legal interest in," an Affected Vehicle on September 18, 2015, the date of the NOVs). The *General Motors* court held that such plaintiffs had no injury (let alone a RICO injury) because "a plaintiff who resold her car before the recall suffered no economic loss damages, as the then-unknown defect could not have affected the resale price." 2017 WL 2839154, at \*10. On re-argument, in rejecting plaintiffs' argument that they suffered an injury at the time of sale because they did not receive the benefit of their bargain, the *General Motors* court explained that "a plaintiff who is ***injured*** at one point in time by a defendant's conduct does not necessarily suffer cognizable ***damages*** at that same time for purposes of an economic loss claim." 2017 WL 3443623, at \*2 (S.D.N.Y. Aug. 9, 2017).

Like the plaintiffs in *General Motors*, Plaintiffs here have suffered no cognizable injury. *See id.* Just as in that case, there is no plausible basis to credit a claim that Plaintiffs did not enjoy the same supposed "clean diesel premium" when they sold their Affected Vehicles that they obtained when they bought their vehicles, since both the purchase and sale occurred prior to September 18, 2015, when there was no information in the market concerning the "defeat device." Nor are Plaintiffs helped by their speculative allegations concerning so-called "unrecoverable" depreciation. Compl. ¶¶ 13-14 (setting forth hypothetical assumed "depreciation" associated with "clean diesel" feature). As an initial matter, such an alleged overpayment, whether at purchase or sale, is the sort of expectancy-based intangible that the cases have rejected as a RICO injury. Moreover, perhaps evidencing the implausibility and unsustainability of their argument, Plaintiffs cannot allege it without at the same time contradicting themselves, as for example when they allege that "Class Vehicles were worth slightly ***more*** at the time of resale because of the perceived environmental benefits," Compl. ¶ 382 (emphasis added), and that Plaintiffs "escaped the additional injury of lost resale value," Compl. ¶ 4. Plaintiffs' own mathematical computations assume that the "clean diesel" premium did not depreciate. *See* Volkswagen Br. at 13-14, 27-28; Compl. ¶¶ 87-92 (applying same

"$6,000" premium following a three year lease).  And as for lessees, their situation is exactly parallel to the renter in *Oscar*, where the Ninth Circuit affirmed the lack of any injury cognizable under the RICO statute.  *Oscar*, 965 F.2d at 786-87.  Both owners and lessees lack any injury to "business or property" as required to have standing to assert a claim for violation of RICO.

**B.  Plaintiffs Have Failed To Allege That Their Claimed Injuries Were Caused "By Reason Of" A RICO Violation By The Bosch Defendants.**

Even if the Court accepts Plaintiffs' claims of injury, the Complaint contains no allegations to demonstrate that Plaintiffs were injured "by reason of" a § 1962 violation by the Bosch Defendants.  *See* 18 U.S.C. § 1964(c).  The "by reason of" language imposes a heightened causation requirement for civil RICO plaintiffs to show that a predicate offense was not only a "but for" cause, but also a proximate cause of an alleged injury.  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 267-68 (1992).  To determine whether proximate cause exists "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm."  *See Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 12 (2010).

In assessing whether there is a sufficiently direct causal relationship between the conduct and the alleged harm, courts consider (1) "whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general"; (2) "whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct"; and (3) "whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries."  *Mendoza,* 301 F.3d at 1169 (citation omitted).  The "general tendency" of the law with respect to "proximate cause inquiries under RICO" is "not to go beyond the first step."  *Hemi*, 559 U.S. at 10 (citation omitted).  Plaintiffs fail to allege a direct relationship between their alleged injuries and the Bosch Defendants' purported conduct.

*First*, there can be no question that there are more direct victims of the alleged fraud.  In fact, Plaintiffs did not even buy directly from VW – as the Court previously noted, the parties who did that were the Franchise Dealers, *Napleton*, 2017 WL 4890594, at *8.  Moreover, Plaintiffs acknowledge that the post-NOV "decline in resale value" of the Affected Vehicles only harmed

consumers who had an Affected Vehicle on September 18, 2015, *see* Compl. ¶ 12, which by definition excludes these Plaintiffs.  *See also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (defendant did not proximately cause injury to competitor where "direct victim" of defendant's misconduct was the tax authority).  Indeed, in view of the claims brought by the Franchise Dealers and by consumer owners and lessees of Affected Vehicles after September 18, 2015 – not to mention the government's claims against VW – it is clear that there are already a plethora of "direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private [or indeed, actual] attorneys general."  *Mendoza*, 301 F.3d at 1169 (citation omitted). Plaintiffs' "piling on" is in direct contravention of the limitations on RICO liability created by the requirement of proximate causation.  *Anza*, 547 U.S. at 460 ("The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims."); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008) (dismissing RICO claim where "more direct victims" pursued claims against defendants); *Oregon Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 964 (9th Cir. 1999) (noting that the existence of "more direct victims . . . who can be counted on to vindicate the injury" defendants allegedly caused "weighs heavily in favor of barring plaintiffs' actions").

  *Second*, the next *Mendoza* factor – which this Court in *Napleton* characterized as requiring a non-speculative showing between plaintiff's alleged injury and the alleged RICO violation, *Napleton*, 2017 WL 4890594 at *8 – also cuts against a finding of proximate causation.  In *Napleton*, the Court explained what it saw as the direct relationship between the alleged RICO violation and the Franchise Dealers' injury – "the emissions fraud led directly to the stop-sale order, which led directly to the Franchise Dealers' inability to sell their inventory of 'clean diesel' vehicles."  *Id.*  Of course here, Plaintiffs do not – and cannot – allege any such direct injury from the fallout of September 18, 2015, because at that point these Plaintiffs had no interest of any kind in any Affected Vehicle.  Compl. ¶¶ 1, 12.  Instead, Plaintiffs' alleged injury rests on the payment of an alleged premium for Affected Vehicles prior to September 2015.  Setting aside that that is not a viable claim,

there is no meaningful way to connect that claimed harm and any alleged conduct of the Bosch Defendants.  Plaintiffs had no dealings of any kind with the Bosch Defendants, and the Bosch Defendants had no role in determining the prices Plaintiffs negotiated for their vehicles, much less in charging Plaintiffs an alleged premium for their cars.  *Cf.* Compl. ¶ 320 ("Volkswagen reaped considerable benefit from their fraud, [by] charging premiums of thousands of dollars for the 'clean' diesel models of the [Affected] Vehicles.").  *See Anza*, 547 U.S. at 458 (defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud").  Indeed, the alleged decision to charge a premium for the Affected Vehicles is contrary to the Bosch Defendants' purported goal to sell more EDC17s, *see* Compl. ¶ 463, because raising prices typically reduces demand, which would result in fewer EDC17s being sold than if VW charged lower prices for the Affected Vehicles.

*Finally*, allowing Plaintiffs' RICO claim to proceed creates the risk of double recoveries and difficulties "apportioning damages ***among plaintiffs*** removed at different levels of injury from the violative acts." *Holmes*, 503 U.S. at 269 (emphasis added).  *See Napleton*, 2017 WL 4890594, at *9 (quoting *Holmes* as well as observation of Ninth Circuit in *Newcal Industries, Inc. v Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) that "the existence of other ***injured parties*** creates difficulties of apportionment or risk of multiple recovery").  The putative class of Plaintiffs in this case claim injuries in respect of Affected Vehicles for which, by definition, compensation has already been provided by the VW Defendants and the Bosch Defendants to other parties.  *See* final settlement approval orders, ECF Nos. 3230, 2102, & 3229.[6]  *See also In re WellPoint Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012) (potential for duplicative

---

[6] The VW and Bosch Settlements in turn made allocations between current and former owners and lessees within the post-September 2015 time period, which was itself a complicated arrangement and demonstrates the difficulty and complexity of superimposing additional layers of multiple former owners and lessees, each claiming injury in respect of the same vehicles.  *See, e.g.*, Class Action Settlement Agreement and Release (Amended), 3:15-md-02672-CRB (N.D. Cal. Feb. 16, 2017), ECF No. 2918, ¶¶ 2.17, 2.27-33 (definition of Bosch Settlement class, including groups of "Eligible Owners," "Eligible Sellers," "Eligible Lessees," "Eligible Former Owners," and "Eligible Former Lessees," incorporating definitions from 2.0-liter and 3.0-liter VW settlements).

**BOSCH DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (MDL NO. 2672 CRB)**

discovery weighed against standing where other plaintiffs brought other claims for same conduct); *Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp. 2d 1332, 1343 (S.D. Fla. 2012) (dismissing for lack of proximate causation where plaintiff could recover against multiple parties). Plaintiffs' RICO claim should accordingly be dismissed for failing to allege proximate causation.

## II.     PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RICO CLAIM.

To adequately plead a RICO claim, Plaintiffs must set forth plausible allegations that the defendant participated in the conduct of an enterprise that affects interstate commerce through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496-97 (1985). The Bosch Defendants acknowledge that the Court has ruled that allegations similar to the ones that Plaintiffs make here are adequate to plausibly allege the existence of an enterprise and a pattern of racketeering. *Napleton*, 2017 WL 4890594. The Bosch Defendants respectfully submit the arguments below to address *Napleton* and to preserve the issues in the event of appellate review.

Because Plaintiffs' claims sound in fraud, they must make their allegations with the particularity required by Rule 9(b). *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) ("Rule 9(b)'s requirement that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity' applies to civil RICO fraud claims." (citing *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989))). That is, Plaintiffs must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 1066. In addition, Plaintiffs' allegations "that are merely consistent with a defendant's liability" do not plausibly state a claim; "courts must also consider an 'obvious alternative explanation' for defendant's behavior." *Eclectic Props. E., LLC v. Marcus & Millchap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (citation omitted). For example, a plausible claim for fraud cannot be based on allegations consistent with ordinary business activity. *Bitton v. Gencor Nutrientes, Inc.*, No. 14-56381, 2016 WL 3545346, at *3 (9th Cir. June 28, 2016) ("Taken as a whole, the complaint's allegations are insufficient to allow us to 'infer reasonably' that the conduct at issue—the purchase, marketing, and sale of legal goods by legitimate businesses—is

plausibly part of a fraudulent scheme." (citation omitted)).  Plaintiffs fail to allege a pattern of racketeering or the existence of an enterprise with the particularity required by Rule 9(b).[7]

**A. Plaintiffs Fail To Allege That The Bosch Defendants Engaged In A Pattern Of Racketeering.**

Plaintiffs allege that the "RICO Defendants," including the Bosch Defendants, engaged in a pattern of racketeering activity by committing multiple counts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.  Compl. ¶ 483.  To plead a pattern of racketeering activity under this theory, Plaintiffs must state facts sufficient to allege that each of Bosch LLC and Bosch GmbH engaged in two or more predicate offenses, no more than ten years apart.  18 U.S.C. § 1961(5). Plaintiffs must also allege that the predicate offenses are related.  *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

To sufficiently allege a RICO claim based on predicate acts of mail or wire fraud, Plaintiffs must adequately plead "(A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud."  *Eclectic Props. E.*, 751 F.3d at 997 (citation omitted).  Further, to plead these fraudulent predicate acts with the requisite particularity under Rule 9(b), Plaintiffs must allege:  "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled Plaintiffs; and (4) what the defendants gained by the alleged fraud."  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81

---

[7] Rule 9(b) also requires that allegations supporting an inference of fraud be pled as to each defendant with particularity.  *Ellis v. J.P. Morgan Chase & Co.*, No. 12-CV-03897-YGR, 2015 WL 78190, at *5 n.5 (N.D. Cal. Jan. 6, 2015).  *See also Craig Outdoor Advert, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008) ("The requirements of § 1962(c) must be established as to each individual defendant.").  Throughout the Complaint, Plaintiffs repeatedly refer to "Defendants," Compl. ¶¶ 1-154, to the cross-entity "Bosch Diesel Systems," *see* Compl. ¶¶ 182, 208-09, 214, 216-17, 219, 221, 223-24, 237-38, 240, 245, 263, 266, 273, 275, 277, 281, 465, or to the generic "Bosch," which Plaintiffs alternatively define as "[b]oth Bosch GmbH and Bosch LLC," Compl. ¶ 164, and "Robert Bosch GmbH, Robert Bosch LLC, and currently unnamed Bosch employees," Compl. ¶ 165.  This does not satisfy Plaintiffs' burden to "identify the role of each defendant in the alleged fraudulent scheme."  *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2009) (quoting *Moore v. Kayport Packaging Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

(11th Cir. 1997) (citation omitted) (applying Rule 9(b) to a RICO claim based upon a fraudulent predicate act).  Plaintiffs fail to allege with the requisite particularity that either Bosch LLC or Bosch GmbH committed mail or wire fraud, nor have they pled adequate facts to demonstrate that the Bosch Defendants are liable for the alleged conduct of VW German Defendants.

### 1.  Plaintiffs Fail To Allege That The Bosch Defendants Knowingly Participated In A Scheme To Defraud.

"The 'scheme to defraud' element requires 'an affirmative, material misrepresentation.'" *Napleton*, 2017 WL 4890594, at *11 (quoting *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010)).  Plaintiffs, however, do not adequately plead that Bosch LLC or Bosch GmbH made even a single misrepresentation with the specificity required by Rule 9(b).  *See Edwards*, 356 F.3d at 1066 ("To avoid dismissal for inadequacy under Rule 9(b)" Plaintiffs must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." (quoting *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir.1989))).[8]

Even assuming that Plaintiffs adequately allege a misrepresentation by ***VW German Defendants*** – not the Bosch Defendants – Plaintiffs fail to plausibly allege that the Bosch Defendants knowingly participated in the VW German Defendants' alleged scheme.  *Napleton*, 2017 WL 4890594, at *12 ("knowing participants in the scheme are legally liable" (quoting *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002))).  As a preliminary matter, if "faced with two possible explanations, only one of which can be true and only one of which results in liability,

---

[8] Plaintiffs' failure to identify any alleged misrepresentation by Bosch GmbH or Bosch LLC necessarily means that they also fail to establish reliance by any person on such a misrepresentation or that such a statement was material.  *See Neder v. United States*, 527 U.S. 1, 16 (1999) (to support a claim for mail or wire fraud, falsehood must be material, meaning that it has "a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed" (citation omitted)); *see also Hoffman v. Zenith Ins. Co.*, 487 F. App'x 365, 365 (9th Cir. 2012) ("[P]roving reliance is necessary where it is integral to Plaintiffs' theory of causation.").  The Bosch Defendants preserve their argument with respect to this Court's prior conclusion in *Napleton* that "each member of the scheme does not need to make a separate misrepresentation."  2017 WL 4890594, at *12.  *See Edwards*, 356 F.3d at 1066 (must identify "identities of the parties to the misrepresentation" (citation omitted)).

plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citation omitted); *see Eclectic Props. E.*, 751 F.3d at 996-98.  Here, Plaintiffs rely on two categories of allegations to establish the Bosch Defendants' alleged knowing participation:  (1) that the Bosch Defendants "exert[ed] near-total control" over "highly proprietary engine management software" in the EDC17, Compl. ¶ 225, and (2) the documents that Plaintiffs allege reflect communications involving the Bosch Defendants regarding the "akustikfunktion."  Compl. ¶¶ 240-43.  But the statements and documents on which Plaintiffs rely to support these conclusory allegations reflect conduct that is consistent with ordinary and legitimate business practices and do not plausibly allege that the Bosch Defendants knowingly participated in the VW German Defendants' alleged scheme.

   *First*, Plaintiffs allege that the Bosch Defendants "exert[ed] near-total control" over ***Bosch's*** "highly proprietary engine management software," Compl. ¶ 225, and security measures prevented customers from making "significant changes to ***Bosch software***," Compl. ¶ 226 (emphasis added), but Plaintiffs acknowledge that the "akustikfunktion" was not "Bosch software."  Plaintiffs allege that the "'akustikfunktion' – and likely the cheating – can be traced back to the late 1990's [sic] when ***Audi*** devised software called the 'akustikfunktion' that could switch off certain functions when the vehicle was in a test mode."  Compl. ¶ 239 (emphasis added).  "***VW AG*** further developed this 'akustikfunktion' for the [Affected] Vehicles."  Compl. ¶ 239 (emphasis added).  Plaintiffs' reference to allegations by an unidentified "car-company engineer" who claimed that "Bosch" sought to maintain "absolute control over ***its*** software as part of its regular business practices," Compl. ¶ 227 (emphasis added), again concerns only Bosch control over software it – as opposed to its customers – developed.[9]  This Court previously acknowledged that the EDC17 developed by the

---

[9] This "car-company engineer," like Plaintiffs, acknowledges that automakers also developed software that was combined with software that Bosch GmbH developed, Compl. ¶ 227 ("[Bosch] certainly own the dataset software and let their customers tune the curves.").  In any event, Plaintiffs fail to identify the engineer's relationship to the Bosch Defendants, the time period to which the engineer is referring, or the context in which the engineer's comment was made, including whether it

Bosch Defendants "is not inherently a tool for deceit," *Napleton*, 2017 WL 4890594, at *2, and Plaintiffs recognize that the software in the EDC17s provided to the VW German Defendants contained a combination of code that Bosch GmbH and the VW German Defendants developed, Compl. ¶¶ 232-33 ("While Bosch GmbH provided (and owned) the object code, [] Volkswagen developed (and owned) the modules"). That the Bosch Defendants would seek to maintain a measure of control over its proprietary software is unsurprising and does not add plausibility to the allegation that the Bosch Defendants knowingly participated in the VW German Defendants' alleged scheme to create a defeat device in the software the VW German Defendants developed.

The alleged software sharing agreements between Bosch GmbH and the VW German Defendants further demonstrate that Bosch GmbH's control was over software it developed, rather than what the VW German Defendants developed. For example, Plaintiffs quote language from a 2005 agreement reflecting that Bosch GmbH shared its software so that "VW can use this BOSCH software as a basis for developing VW modules for specific EDC/ME(D)17 projects using software development environments from BOSCH." Compl. ¶ 232. In a 2011 agreement, "Bosch GmbH granted VW AG a license to further develop Bosch Denoxtronic functions for the treatment of exhaust from diesel engines." Compl. ¶ 236. In the agreements, Bosch GmbH retained the right to carry "out any modifications to the BOSCH software that are necessary in order to integrate the intended VW modules . . . ." Compl. ¶ 233. That agreement reflects Bosch GmbH's right to control its software to the extent needed to integrate its customer's software – it does not purport ownership or control over software that the VW German Defendants developed, and from which the defeat device arose.

Plaintiffs' allegation that the Bosch Defendants integrated their software with software that the VW German Defendants developed and tested the software "implementation," Compl. ¶¶ 233-35, does not add any plausibility to the assertion that the Bosch Defendants knowingly participated in the VW German Defendants' alleged scheme, or even knowledge of a defeat device. Plaintiffs do

---

even relates to the Affected Vehicles, or even to diesel vehicles generally.

not allege what such testing and implementation would have involved, or explain why such testing would have revealed the nature of the software that the VW German Defendants developed when the purpose of such testing and implementation was only to ensure compatibility between the software that Bosch GmbH developed and the software that the VW German Defendants developed.  *See* Compl. ¶ 233.  *See also* Compl. ¶227 ("car-company engineer" noting that "Bosch" conducts "validation" and "software verification").  In fact, Plaintiffs detail how numerous VW AG and IAV employees had broad access to the EDC17 emissions functions.  Compl. ¶ 234.  It is therefore implausible to leap to the conclusion that Bosch LLC or Bosch GmbH must have been aware of VW German Defendants' secret activities.  Rather, the allegations are more consistent with the view that the Bosch Defendants did not have knowledge of the overall emissions strategies of its customer.

When examined closely, Plaintiffs' allegations amount to nothing more than an assertion that a supplier worked closely with its customer to develop a complex product.  Such conduct is unobjectionable and is – at best – equally consistent with a supplier innocently supplying a product that was misused by VW AG as it is with Bosch LLC or Bosch GmbH knowingly participating in the alleged scheme.  Such an equipoise in the plausibility of the allegations mandates dismissal because permitting Plaintiffs' claims to proceed would make a fraud claim out of any conduct that is wholly consistent with ordinary and legitimate business practices.  *Eclectic Props. E.*, 751 F.3d at 996-98; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108 ("To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation.").

*Second*, the documents that Plaintiffs allege reflect communications involving the Bosch Defendants regarding the "akustikfunktion," Compl. ¶¶ 240-43, do nothing to add plausibility to the allegation that the Bosch Defendants knowingly participated in the VW German Defendants' alleged scheme.  Plaintiffs refer to a written communication which they contend describes the "akustikfunktion in surprising detail . . . as early as July 2005" in the context of U.S. compliance.  Compl. ¶ 240 (citing VW- MDL2672-02559611).  Yet the cited communication makes no reference to the "akustikfunktion."  In *Napleton*, this Court noted that the email referred to "'Emission

1   Result[s] of the Current Acoustic / Driving Behavior Calibration' with respect to 'Baseline

2   Measurement . . . without NOx Catalyst.'"  2017 WL 4890594, at *14.  The Bosch Defendants

3   respectfully draw the Court's attention to the fact that the quoted line refers to "acoustic," meaning

4   noise, and not the defeat device "akustikfunktion," and that the documents refers to a "Baseline

5   measurement (Current Status) without NOx Catalyst," meaning cars not yet equipped with *any* of

6   the treatment systems, let alone a defeat device to affect the operation of that system.  VW-

7   MDL2672-02559611 (describing the calibration of "Acoustic/Driving Behavior Calibration" in

8   "concept vehicles" fitted with "empty tube[s]").  In addition, the July 2005 date of the email is

9   inconsistent with Plaintiffs' purported timeline for the development of the "akustikfunktion," which

10  they allege began in 2006 as the VW German Defendants faced pressure to meet a 2007 launch date

11  for a clean diesel car.  Compl. ¶ 199.

12          Next, Plaintiffs describe a November 20, 2006 communication from a VW AG employee to

13  other VW AG employees that purportedly "emphasized the importance of not getting caught by U.S.

14  regulators using the [acoustic function]" and relayed that a VW AG employee was skeptical about

15  using the function "in the U.S. market due to potential regulatory and legal exposure . . . ."  Compl. ¶

16  242.  In *Napleton*, this Court excerpted the line, "Have you spoken with Bosch about the issue of

17  US07" and suggested that "[t]he 'issue' discussed appears to be how to implement the 'acoustic

18  function' in the U.S. without being discovered."  2017 WL 4890594, at *14.  The Bosch Defendants

19  respectfully note that the full sentence of the email states, "Have you spoken with Bosch about the

20  issue of US07 SW capacity for the PVS SW in CW 06/07?"  VW-MDL2672-02559526.  The full

21  sentence reflects that the "issue" was whether "Bosch" had personnel capacity to implement certain

22  software in calendar weeks 06-07, not the akustikfunktion.  Although the document also states that

23  "[t]he FP sheet for the expansion has been submitted to Bosch," the document does not suggest an

24  inference that "Bosch" was aware of the nature of the function requested or its legality.  In fact, the

25  document suggests the opposite because it reflects that the VW AG employees were conscious of

26  concealing their actions.  *Id.* ("it should have the appearance that won't get us in trouble").  This

27

28

**BOSCH DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (MDL NO. 2672 CRB)**

1   internal VW AG email chain speaks to the knowledge and fraudulent intent of VW AG, not the

2   Bosch Defendants.

3          Plaintiffs also claim that both Bosch GmbH and VW German Defendants were involved in

4   the calibration of the defeat devices in the [Affected] Vehicles" based upon a November 2014 email

5   entitled "Akustikfunktion."  Compl. ¶ 243.  But the very subject line of the email chain makes clear

6   that the referenced communications related to a gasoline engine, and are therefore unrelated to the

7   Affected Vehicles.  VW-MDL2672-02569895 ("Acoustic function for Delphi HDP in gasoline

8   engines: Team 1").  In *Napleton*, the Court suggested that the email "supports the inference that

9   Bosch knew about the 'acoustic function' more generally, and that Volkswagen collaborated with

10  Bosch on its use."  2017 WL 4890594, at *14.  The Bosch Defendants respectfully submit that the

11  reference to an "acoustic function" adds no plausibility to Plaintiffs' allegations in this context.  The

12  document concerns a gasoline engine, and Plaintiffs acknowledge that there are legitimate, acoustic-

13  related functions to reduce noise.  *See* Compl. ¶ 198.  In addition, the document does not even

14  support Plaintiffs' allegation that "Bosch GmbH was responsible" for the calibration of the function

15  referenced in the email.  Compl. ¶ 243.  The document on its face says "Bosch will not assume

16  responsibility for the function and calibration."  VW-MDL2672-02569895.

17         *Finally*, even assuming that Plaintiffs adequately allege that the Bosch Defendants had

18  knowledge of the VW German Defendants' alleged scheme, Plaintiffs at most argue that the Bosch

19  Defendants failed to disclose that knowledge.  But a failure to disclose "can support a fraud charge

20  only 'when there exists an independent duty that has been breached by the person so charged.'"

21  *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) (quoting *United States v.

22  Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984)).  Knowledge of, or even complicity in, wrongdoing

23  does not establish a duty to disclose.  Rather, the duty to disclose must be tied to a separate

24  relationship between the plaintiff and the defendant, such as a fiduciary relationship, or to statements

25  made by the defendant that are misleading in the absence of the additional information.  *See, e.g.*,

26  *Mahurin v. Lehman Bros.*, No. 99-5128, 2000 WL 356377, at *2-3 (N.D. Cal. Mar. 30, 2000);

27

28

*Dufour v. BE LLC*, No. 09-3770, 2010 WL 2560409, at *5 (N.D. Cal. June 22, 2010).  Plaintiffs

have not alleged any facts to support the existence of a duty to disclose.

### 2.   The Complaint Does Not Plausibly Allege That Bosch LLC or Bosch GmbH Acted With Specific Intent To Defraud.

Plaintiffs' RICO claim against Bosch LLC and Bosch GmbH also fails for the separate and

independent reason that the Complaint does not offer any non-conclusory allegations against Bosch

LLC or Bosch GmbH that plausibly indicate the required intent to defraud.  When defendants are

engaged "as routine participants in American commerce, a significant level of factual specificity is

required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent

scheme."  *Eclectic Props. E.*, 751 F.3d at 998.

Here, that specificity is lacking because even assuming Plaintiffs adequately allege that the

Bosch Defendants learned of a software function that affected emissions controls when integrating

the VW German Defendants' software into the EDC17, Compl. ¶¶ 233-35, such knowledge alone

does not establish a plausible allegation that the Bosch Defendants had the specific intent to defraud

because the EPA permits automakers to install auxiliary emission control devices ("AECDs").  *See*

Compl. ¶ 207 (citing 40 C.F.R. § 86.1803-01 defining "defeat device" and AECD).  An AECD is

"any element of design" which affects the "operation of any part of the emission control system"

based on sensory input.  40 C.F.R. § 86.1803-01.  A "defeat device" is an undisclosed AECD that

impairs emissions controls.  *See id.*  The Bosch Defendants did not submit applications for

certificates of conformity ("COCs") for the Affected Vehicles, Compl. ¶ 207 ("to obtain a COC,

automakers must submit an application"), and therefore did not have the information to determine

whether any function was a defeat device or an AECD permitted by the EPA.  Thus, even if the

Bosch Defendants did become aware of a function affecting emissions controls that the VW German

Defendants sought to incorporate in the EDC17, the fact that the Bosch Defendants "allowed its

EDC17 to be used for years in Volkswagen's vehicles," *Napleton*, 2017 WL 4890594, at *15, does

not establish a specific intent to defraud.[10]

---

[10] In *Napleton*, the Court stated, "No one to date in this multidistrict litigation has sought to justify,

1   Plaintiffs suggest that the Bosch Defendants' specific intent to defraud can be inferred from

2   efforts to conceal the "akustikfunktion" from U.S. regulators, Compl. ¶¶ 245-77, but as this Court

3   has recognized, the "link between Bosch's communications with regulators and the fraudulent

4   scheme is [] missing," *Napleton*, 2017 WL 4890594, at *15 n.5.  None of the regulatory

5   communications cited by Plaintiffs and involving the Bosch Defendants relate to the akustikfunktion

6   or any other issue relevant to Plaintiffs' claims.  *See e.g.*, Compl. ¶¶ 253-64.  With no adequately

7   pleaded allegations that Bosch LLC or Bosch GmbH knew that VW AG was deploying a defeat

8   device in the Affected Vehicles, these communications amount to nothing more than ordinary

9   business activities that cannot give rise to a plausible claim for mail or wire fraud.  The same can be

10  said for Bosch LLC's and Bosch GmbH's alleged marketing of "Clean Diesel" in the U.S.  *See e.g.*

11  Compl. ¶¶ 265-77.  These lobbying activities focus on broad promotion of clean diesel involving

12  multiple automobile and engineering companies as part of Bosch LLC's legitimate business

13  partnerships.  *See, e.g.*, VW-MDL-2672-06136030; VW-MDL2672-03331605 (involving multiple

14  automakers and engineering companies).  The exchanges cited by Plaintiffs between Bosch LLC and

15  a California lobbyist reflect similar efforts to broadly promote diesel technology among regulators,

16  lawmakers, journalists, and NGOs.  Compl. ¶¶ 268, 272.  Such lobbying actions cannot support

17  Plaintiffs' mail and wire fraud (and thus RICO) claims against Bosch LLC and Bosch GmbH.

18  Even if the Complaint's allegations regarding efforts by the Bosch Defendants to develop a

19  more favorable regulatory environment for diesel technology in the U.S. were relevant to the Court's

20  plausibility analysis, they would nonetheless not be actionable because of the *Noerr-Pennington*

21  doctrine, which "sweeps broadly" to provide immunity to such acts under the First Amendment.

22  *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1058, 1059 (9th Cir. 1998).[11]  Even a "publicity campaign

23  _____

24  or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off
    depending on whether the vehicle is undergoing emissions testing or being operated under normal

25  driving conditions."  2017 WL 4890594, at *15.  The Bosch Defendants explain here in the
    accompanying text that AECDs may be accepted and approved by the EPA under its regulatory

26  authority.

27  [11] *Noerr-Pennington* applies in the civil RICO context to protect the various activities cited in the

28

1   directed at the general public, seeking legislation or executive action" that employs "unethical and

2   deceptive methods" is immune where it takes place in the political arena.  *Allied Tube & Conduit*

3   *Corp. v. Indian Head*, 486 U.S. 492, 499-505 (1988).  Further, Plaintiffs fail to allege how such

4   lobbying activity differs from Bosch LLC's and Bosch GmbH's normal business conduct, and do not

5   allege how lobbying for generic "clean diesel" plausibly demonstrates that the Bosch Defendants

6   knew of *Volkswagen German Defendants'* alleged fraud.

### 3.   Plaintiffs Have Not Alleged That Bosch LLC or Bosch GmbH Used A Mailing Or Wiring In Furtherance Of A Scheme To Defraud.

8            A viable claim of mail or wire fraud requires at least one use of the domestic mails and wires

9   in furtherance of the scheme.  Although the domestic mailing or wiring need not be false, it must be

10  in furtherance of and an essential element of the purported scheme to defraud.  *United States v.*

11  *Kazzaz*, 592 F. App'x 553, 554 (9th Cir. 2014) (explaining that an element of mail fraud is "using or

12  causing the use of the mails to further the scheme" and an element of wire fraud is the "use of the

13  wires in furtherance of the scheme") (citations omitted); *Schmuck v. United States*, 489 U.S. 705,

14  710-11 (1989).[12]  Here, while Plaintiffs have alluded to a number of mailings and wirings by Bosch

---

Complaint—commissioned studies, conferences with legislators and regulators, and promotional events, Compl. ¶¶ 265-77, 480.  *Sosa v. Directv, Inc.*, 437 F.3d 923, 934-35 (9th Cir. 2006).  In *Napleton*, this Court held the *Noerr-Pennington* doctrine did not apply to similar allegations because the "Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful" and instead "contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud."  2017 WL 4890594, at *15 n.4.  The Bosch Defendants respectfully note, however, that, as discussed above, none of the purported communications with regulators relate to the akustikfunktion, *see generally* Compl. ¶¶ 253-64, so the communications by themselves in no way further Plaintiffs' assertion that the Bosch Defendants were aware of the VW German Defendants' alleged scheme.

[12] Although *Schmuck* involved an analysis of the mail fraud statute, "[i]t is well settled that cases construing the mail fraud and wire fraud statutes are applicable to either."  *United States v. Shipsey*, 363 F.3d 962, 971 n.10 (9th Cir. 2004) (citation omitted).

22

1   LLC and Bosch GmbH, none of those are instrumental to the purported scheme to defraud regulators

2   and consumers about the existence of a defeat device in the Affected Vehicles.

3        *Bosch GmbH.*   As a threshold matter, Plaintiffs' allegations of the use of mails and wires fail

4   to identify with particularity a single ***domestic*** mailing or wiring involving Bosch GmbH, let alone

5   any facts sufficient to demonstrate that the wiring or mailing was used to further a fraudulent

6   scheme.  While the Complaint contains sporadic references to communications between Bosch

7   GmbH and Volkswagen AG, *e.g.*, Compl. ¶¶ 217, 240, 243, 245-47 (referencing letters, emails and

8   telephone call between Bosch GmbH and Volkswagen AG), it lacks any factual allegations, much

9   less plausible ones, that these communications between individuals based in Germany and Austria

10  used the U.S. mail or wires.  *See European Cmty v. RJR Nabisco, Inc*., 764 F.3d 129, 141 (2d Cir.

11  2014) (mail fraud and wire fraud require the use of U.S. mail or wire), *rev'd and remanded on other*

12  *grounds*, 136 S. Ct. 2090 (2016).

13       Although the Complaint claims that Bosch GmbH communicated with regulators in the U.S.,

14  the only pleaded facts involve Bosch LLC employees, and the Complaint even identifies them as

15  such.  Compl. ¶ 260.  Domestic use of the mail and wires by Bosch LLC cannot satisfy the

16  requirement that Plaintiffs plead use of the mail or wires within the U.S. by Bosch GmbH.  *See, e.g.*,

17  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, No. C-09-00511 RMW, 2012 WL 713289, at

18  *4-5 (N.D. Cal. Mar. 5, 2012) (dismissing RICO claims against a parent company where plaintiffs

19  "attribute[d] no predicate acts of mail or wire fraud directly to [the parent company]" and did not

20  "adequately allege that acts of mail or wire fraud may be attributed to [the parent company] under an

21  alter ego theory.").

22       Further, even if Plaintiffs sufficiently alleged that Bosch GmbH used the U.S. mail or wires,

23  they have failed to show that Bosch GmbH did so in furtherance of the alleged scheme to defraud.

24  To the extent Plaintiffs have identified the use of U.S. mail or wires by Bosch GmbH, the

25  communications on their face are completely unrelated to the purported defeat device at issue in this

26  case, the software in the Affected Vehicles, or even diesel vehicles.  *See, e.g.*, Compl. ¶¶ 263, 460

27  (letters and emails regarding ***gasoline*** engine software functions).  In other instances, Plaintiffs cite

28

**BOSCH DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (MDL NO. 2672 CRB)**

to strictly internal VW discussions, which cannot support their allegations that Bosch GmbH was working to conceal the defeat device from U.S. regulators.  Compl. ¶¶ 241-42, 251, 254.

The Complaint fails to provide any cogent explanation of how any of this conduct could be relevant to the claims in the Complaint, let alone be "incident to an essential part of the scheme." *See United States v. Wood*, 259 F. App'x 48, 49 (9th Cir. 2007) (wire fraud conviction reversed where "[t]he government indicted [defendant] on a scheme to defraud PTH" but "the wire transfer at issue here was in furtherance of . . . an investment opportunity unrelated to PTH").  Plaintiffs have therefore failed to establish that Bosch GmbH engaged in any domestic predicate act for RICO purposes.

*Bosch LLC.*  Plaintiffs' allegations concerning Bosch LLC similarly fail because all of the mailings and wirings invoked in the Complaint that directly involve Bosch LLC relate to components and functionalities other than the defeat devices in the Affected Vehicles, and Plaintiffs have pled no facts alleging that those communications are, in any way, related to the purported scheme.  *See* Compl. ¶¶ 258 (email regarding "in-use ratios"), 260 (conference call regarding "faulty fuel pumps"), 263(b) (referring to a letter regarding "high-pressure fuel pump failures"), 263(c) (discussions between "Bosch" and CARB regarding an "IDE hot monitor"), 263(d) (phone call regarding "wire faults" in a NOx and particulate matter sensor), 263(e) (email regarding a "fuel pump electronic driver stage diagnostic"), 263(f) (CARB and VW meeting minutes including follow-up request to Bosch on particulate matter and "Fe-doping").[13]  Contrary to Plaintiffs' insinuation, the "Bosch strategies," Compl. ¶ 262, refer to technical fixes to technical issues regarding non-NOx emissions issues, not plans for obtaining regulatory approval or to advance any fraudulent scheme.  *See e.g.*, VW-MDL-2672-02464246 (internal VW email discussing fuel rail pressure disablement mentioning a "[B]osch ZFC strategy"); VW-MDL2672-00530556 (internal VW email regarding Bosch and Simos "running change" strategies on technical matters).

---

[13] As noted *supra* Section II.A.2, this Court has previously held that these same allegations do not support an intent to defraud because they "do not explicitly reference emissions, or otherwise plausibly relate to emission-control systems or the defeat device."  *Napleton*, 2017 WL 4890594, at *15 n.5

**BOSCH DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (MDL NO. 2672 CRB)**

1    In sum, while Plaintiffs have identified a hodgepodge of communications between Bosch

2    LLC and regulators concerning vehicle components supplied by Bosch LLC – an unsurprising

3    eventuality given that Bosch LLC is a motor vehicle component supplier – they have failed to

4    plausibly allege that any of these communications related in any way to the alleged fraudulent

5    scheme.[14]   Plaintiffs fail to plead that Bosch LLC engaged in a predicate act for RICO purposes.

6    **4.   Plaintiffs' Allegations Of Aiding And Abetting Predicate Acts Cannot Support A Civil RICO Claim Against The Bosch Defendants.**

7    Plaintiffs allege that the "RICO Defendants" aided and abetted predicate acts of mail and

8    wire fraud, Compl. ¶¶ 484, 498, but civil RICO does not permit aiding and abetting liability.

9    "Aiding and abetting is an ancient criminal law doctrine," and Congress has "taken a statute-by-

10   statute approach to civil aiding and abetting liability."  *Central Bank of Denver, N.A. v. First*

11   *Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181-82 (1994).  The Supreme Court has recognized

12   that there is no implicit aiding and abetting liability in federal statutes, and such civil claims may

13   only be brought when Congress has expressly authorized them.  *Id.* at 183 (a private plaintiff could

14   not maintain an aiding and abetting claim under § 10(b) because the statute did not explicitly

15   prohibit aiding and abetting); *Pennsylvania Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839,

16   840 (3d Cir. 2000) (applying *Cent. Bank of Denver* to RICO: "because RICO's statutory text does

17   not provide for a private cause of action for aiding and abetting and 18 U.S.C. § 2 cannot be used to

18   imply this private right, no such cause of action exists under RICO"); *Ferrari v. Mercedes-Benz*

19   *USA, LLC*, 15-CV-4379 YGR, 2016 WL 658966, at *2 (N.D. Cal. Feb. 18, 2016) ("The civil RICO

20

21

22

23   _____

[14] Many of these allegations are inactionable for the separate reason that they rely on documents that
merely indicate that "Bosch" had or was expected to communicate information in the future, without
any specificity as to which Bosch GmbH or Bosch LLC employees would be involved, and when
and under what circumstances the communication would be made, if at all.  *See, e.g.*, Compl.
¶¶ 263(a) (citing VW-MDL2672-07235955 ("Bosch presented you with a strategy . . . .")); 263(b)
(citing VW-MDL2672-00762181 ("Robert Bosch GmbH will provide . . .")).  This falls far short of
the particularity mandated by Rule 9(b) as to the time, place, specific content, and the identities of
the parties to a fraudulent communication.  *See Odom v. Microsoft Corp.,* 486 F.3d 541, 554 (9th
Cir. 2007).

24

25

26

27

28

1    statute does not provide for aiding and abetting liability, and courts have found that the statute's

2    silence precludes such a claim.").

3         Plaintiffs may not escape this well-established law simply by alleging that a Bosch

4    Defendant aided and abetted the alleged underlying predicate acts of mail fraud or wire fraud rather

5    than the overall RICO offense.  As an initial matter, aiding and abetting, 18 U.S.C. § 2, is not among

6    the qualifying predicate acts for RICO.  *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to

7    include thirty-five crimes that do not include 18 U.S.C. § 2).  Moreover, "[a]n exception allowing

8    civil RICO claims to be premised upon the aiding and abetting of underlying predicate acts would

9    swallow *Central Bank of Denver*'s rule foreclosing implicit civil aiding and abetting liability."  *Salas*

10   *v. Int'l Union of Operating Eng'rs*, CV 12-10506 DDP (VBKx), 2015 WL 728365, at *8 (C.D. Cal.

11   Feb. 18, 2015); *see also Ferrari*, 2016 WL 658966, at *2 (dismissing RICO claim premised on

12   allegation that a defendant aided and abetted the fraudulent conduct of another defendant).

13        In addition, Plaintiffs cannot hold Bosch LLC or Bosch GmbH vicariously liable for VW's

14   alleged acts of mail fraud and wire fraud.  A defendant may be held vicariously liable for an alleged

15   co-schemer's acts of mail and wire fraud only if it was a "knowing participant in a scheme to

16   defraud . . ."  *Dufour*, 2010 WL 2560409, at *11 (quoting *United States v. Stapleton*, 293 F.3d 1111,

17   1117-18 (9th Cir.2002)).  To succeed on that theory, Plaintiffs would need to allege plausibly that

18   Bosch LLC and Bosch GmbH participated in the VW German Defendants' scheme knowingly and

19   with a specific intent to defraud, and that the other defendants' acts of mail and wire fraud were the

20   foreseeable result of that scheme.  *See United States v. Lothian*, 976 F.2d 1257, 1265 (9th Cir. 1992).

21   As discussed, Plaintiffs have failed to show that either Bosch LLC or Bosch GmbH was a participant

22   in the alleged scheme – or that either had knowledge or intent – with the requisite specificity and

23   plausibility.  Consequently, Plaintiffs cannot avail themselves of a "co-schemer" claim against either

24   Bosch LLC or Bosch GmbH.

25   **B.  Plaintiffs Fail To Adequately Allege That The Bosch Defendants Were Part Of A RICO Enterprise**

26        To state a RICO claim against either Bosch entity, Plaintiffs must plausibly allege the

27   existence of a RICO enterprise (1) in which that entity "participated" and (2) whose affairs that

28

entity "conducted." *Eclectic Props. E., LLC*, 751 F.3d at 997.  A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Plaintiffs allege that Bosch LLC and Bosch GmbH were part of an "association-in-fact" enterprise "formed for the purpose of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to import and sell the [Affected] Vehicles containing the defeat devices throughout the U.S."  Compl. ¶¶  418, 421.

### 1. Plaintiffs Failed To Allege That The Bosch Defendants Participated In A RICO Enterprise.

An associated-in-fact enterprise must have at minimum three structural elements:  (i) a common purpose; (ii) a structure or organization; and (iii) a longevity necessary to accomplish the purpose.  *Boyle v. United States*, 556 U.S. 938, 946 (2009).  To survive a motion to dismiss, Plaintiffs must allege "facts plausibly implying the existence of an enterprise with" each one of these structural elements.  *Vaugh v. Diaz*, No. 12-CV-1181 BEN JMA, 2013 WL 150487, at *2 (S.D. Cal. Jan. 14, 2013).  In addition, allegations regarding the "marketing, and sale of legal goods by legitimate businesses" are insufficient to provide a plausible basis for a RICO enterprise.  *Bitton*, No. 14-56381, 2016 WL 3545346, at *3.  *See also Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042, at *8 (C.D. Cal. July 13, 2015) ("Courts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises.").

Here, Plaintiffs fail to plausibly allege that the Bosch Defendants had the necessary "common purpose" to form an enterprise with the VW German Defendants.  As discussed *supra* Section II.A.1, Plaintiffs fail to allege that the Bosch Defendants knowingly participated in the VW German Defendants' scheme.  Instead, Plaintiffs make allegations that are consistent with normal business relations without anything more that would add the requisite plausibility to their allegations as required by Rule 9(b).  *See, e.g.*, Compl. ¶¶ 202, 218-44 (Bosch Defendants developed and supplied EDC17 units to VW German Defendants), 245 (Bosch GmbH and VW AG communicated regarding product documentation), 252 (top executives at Bosch Defendants and VW AG were in communication), 281 (the Bosch Defendants profited from EDC17 sales).  *See also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (a "common purpose" must

1   be a "fraudulent course of conduct").  The allegation that the Bosch Defendants worked closely with

2   VW and maintained close control over its software, *id.* ¶¶ 218-36, *supra* Section II.A.1, merely

3   reflects a supplier working closely with a customer to develop a complex product and lends no

4   support to the conclusory allegation that the Bosch Defendants "were in on the secret and knew."

5   Compl. ¶ 238.  *See Eclectic Props. E.*, 751 F.3d at 998.

6       Plaintiffs' conclusory allegation that the Bosch Defendants and others associated for the

7   purpose of "fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to import

8   and sell the [Affected] Vehicles containing the defeat devices throughout the U.S.," Compl. ¶ 421,

9   does not plausibly allege a RICO enterprise.  *Shaw v. Nissan N. Am.*, 220 F. Supp. 3d 1046, 1055

10  (C.D. Cal. 2016) (allegation that "Defendants' primary business activity—the design, manufacture,

11  and sale or lease of Toyota vehicles—was conducted fraudulently" was insufficient).

12      Even if Plaintiffs have plausibly alleged the existence of a common purpose, Plaintiffs fail to

13  allege that the common purpose of that RICO enterprise caused their injury.  As discussed *supra*

14  Section I.A, the crux of Plaintiffs' alleged injury is that they "purchase[d] or lease[d] the [Affected]

15  Vehicles—at a cost premium."  Compl. ¶ 10.  But the Bosch Defendants had no role in determining

16  this alleged premium, Compl. ¶ 320 ("Volkswagen reaped considerable benefit from their fraud, [by]

17  charging premiums"), which ran contrary to the Bosch Defendants' alleged purpose to sell more

18  EDC17s, Compl. ¶ 463, because such premiums raised the cost of cars containing them.

19      Plaintiffs also fail to allege the requisite structure and organization for a RICO enterprise.

20  *Boyle*, 556 U.S. at 946.  Although Plaintiffs assert that the alleged enterprise had a "common

21  communication network" through which the Bosch Defendants and the VW German Defendants

22  shared information, they plead no facts indicating how, when, where, or why this network was

23  employed by the Bosch Defendants, or any other defendants, much less that it existed to commit

24  fraud.  Compl. ¶ 476.  Further, their allegations that the Bosch Defendants were linked to VW

25  German Defendants "through corporate ties, contractual relationships, financial ties, and continuing

26  coordination of activities," Compl. ¶ 477, and that selling the Affected Vehicles would "increase[]

27  [Bosch Defendants'] revenues and market share," Compl. ¶ 348, do nothing to transform an ordinary

28

supplier relationship into evidence of a RICO enterprise. *See Gomez*, 2015 WL 4270042, at *8-9 (finding "widespread consensus among courts that . . . routine business relationships are insufficient to impose RICO liability").

> **2. Plaintiffs Fail To Allege The Bosch Defendants Conducted The Affairs Of The Alleged Enterprise.**

The Complaint also does not plausibly allege that either Bosch LLC or Bosch GmbH participated in the "conduct" of the alleged enterprise by "directing [the enterprise's] affairs," as is required to make out a plausible civil RICO claim. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) ("In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."). As Judge Gutierrez has summarized, under Ninth Circuit precedent, "it is not enough that a defendant failed to stop illegal activity." *WellPoint Inc.*, 903 F. Supp. 2d at 910 (*citing Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)).

Here, Plaintiffs fail to explain how the Bosch Defendants, as parts suppliers, could have directed the affairs of an enterprise whose purpose was to fraudulently sell Affected Vehicles in the U.S., when those vehicles were designed and manufactured by the VW German Defendants, and marketed by VW and dealers. As discussed *supra* Section II.A.1, the Bosch Defendants purportedly developed and maintained control over software it developed, but not software that the VW German Defendants developed and from which the alleged defeat device originated. Although the Bosch Defendants allegedly integrated the VW German Defendants' software in the EDC17, Plaintiffs never allege how or why the integration process would have revealed the nature of the their "akustikfunktion," or how the Bosch Defendants would have known it was a defeat device or not disclosed in connection with VW's applications for COCs to the EPA. Thus, the Complaint contains no allegations that the Bosch Defendants occupied any "position in the chain of command through which the affairs of the enterprise" were conducted. *WellPoint*, 903 F. Supp. 2d at 911 (certain defendants were not part of enterprise because complaint had failed to plead "any decision-making regarding or direct involvement" with the purpose of that enterprise).

That Bosch LLC or Bosch GmbH sold ECUs that were used in the Affected Vehicles does not amount to directing the affairs of an enterprise for the fraudulent sale of the Affected Vehicles.

*Id.* at 910 ("the existence of a business relationship between [the defendants] without more does not show that [the defendant] conducted the enterprise"). "The [plaintiffs] cannot bootstrap its allegations of illegal conduct into allegations that [the defendants] conducted the affairs of an enterprise by asking us to infer that because the activities were illegal, they therefore must also have been coordinated activity undertaken on behalf of [an] enterprise." *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). Plaintiffs' allegations amount only to the insufficient claim that Bosch LLC and Bosch GmbH provided goods and services to the VW Defendants. *See id.* ("This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for [improper] purposes . . . ."). Similarly, their reference to Bosch GmbH's contracts with VW AG, Compl. ¶¶ 233, 236, and the spreadsheet tracking the Bosch Defendants' work for VW on the EDC 17, Compl. ¶ 230, are mere documentations of a standard business relationship insufficient to suggest that the Bosch Defendants "directed" the affairs of the alleged enterprise. Compl. ¶ 230.

Plaintiffs also fail to allege how the Bosch Defendants could have directed or conducted the affairs of the enterprise under their alternative theory that VWGoA constitutes an enterprise "through which the RICO Defendants conducted their pattern of racketeering activity." Compl. ¶ 230. Plaintiffs make no non-conclusory allegations to explain how the Bosch Defendants could have directed or conducted the affairs of VWGoA, a separate legal entity that is part of a corporate family completely unrelated to Bosch. While it would not suffice to show direction or conducting an enterprise, Plaintiffs do not even allege that the Bosch Defendants supplied EDC17s to VWGoA. *United Food*, 719 F.3d at 855.

Plaintiffs fault Bosch GmbH for allegedly warning VW AG that its conduct might be illegal and then not stopping that conduct. *See, e.g.*, Compl. ¶¶ 246-50. Even if the allegations were supported – and they are not – this does not suffice to satisfy the "conducting" prong of a RICO claim. "[I]t is not enough that a defendant failed to stop illegal activity." *WellPoint*, 903 F. Supp. 2d at 910. Finally, Plaintiffs' allegations that the "Bosch entities" lobbied lawmakers "to push

'Clean Diesel' in the U.S." does nothing to support a plausible inference that the Bosch Defendants directed an enterprise's affairs.  Compl. ¶ 265.  "[N]othing in the complaint reveals how one might infer that these communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of [Bosch LLC or Bosch GmbH] in their individual capacities, to advance their individual self-interests."  *See United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013).  The Bosch Defendants, as suppliers of various components for diesel vehicles, had their own non-fraudulent incentives to lobby, and Plaintiffs offer no allegations to support that the Bosch Defendants did not act on their own in service of ordinary commercial interests.  *See Shaw*, 220 F. Supp. 3d at 1056 ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation.").  In addition, Plaintiffs' allegations regarding the Bosch Defendants' lobbying for a more favorable regulatory environment, even if relevant, cannot support any claim because the *Noerr-Pennington* doctrine protects lobbying.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500-05 (1988).

**C.  Plaintiffs Fail To Allege A RICO Conspiracy.**

Plaintiffs fail to adequately plead that the Bosch Defendants participated in a conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d).  Plaintiffs' conspiracy claim should be dismissed because, for the reasons described above, Plaintiffs have failed to plead a substantive RICO violation, which precludes their claim for conspiracy.  *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  Alternatively, for the reasons set out in Section II.A, the conspiracy claim should be dismissed because Plaintiffs have not adequately pled that the Bosch Defendants agreed to commit or participate in two or more predicate offenses or that the Bosch Defendants "[were] aware of the essential nature and scope of the [alleged RICO] enterprise and intended to participate in it."  *See Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (citation omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   PLAINTIFFS FAIL TO SUPPORT PERSONAL JURISDICTION OVER BOSCH GMBH.

The Complaint against Bosch GmbH should also be dismissed for lack of personal jurisdiction.[15]  Under Federal Rule of Civil Procedure 12(b)(2), Plaintiffs bear the burden of demonstrating that this Court may properly exercise personal jurisdiction and must make a prima facie showing of jurisdictional facts as to each defendant.  *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015).  Plaintiffs' conclusory statements about this Court's personal jurisdiction over Bosch GmbH fail to meet this minimum requirement.

Although the California long-arm statute authorizes the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution, *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014), Plaintiffs make insufficient factual allegations to support jurisdiction over Bosch GmbH consistent with constitutional due process requirements.

*First*, Bosch GmbH can be "at home," *Daimler*, 134 S. Ct. at 760, 761, only in its place of incorporation and its principal place of business, each of which is in Germany, Compl. ¶ 162. Beyond these forums, general jurisdiction is permissible only in an "exceptional case."  *Daimler*, 134 S. Ct. at 760, 761 n.19; *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014). Plaintiffs allege no potentially "exceptional" circumstances that could warrant the exercise of general jurisdiction.

*Second*, specific jurisdiction is not available because Plaintiffs do not allege that (1) Bosch GmbH purposefully directed its activities at California and (2) Plaintiffs' claims arose out of those California-directed activities.  *See Daimler*, 134 S. Ct. at 755; *Schwarzenegger v. Fred Martin Motor*

---

[15] The Court need not reach the question of personal jurisdiction over Bosch GmbH in order to dismiss the Complaint for failure to state a claim on the grounds raised by Bosch LLC and Bosch GmbH.  *See Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482, 503 n.1 (Fed. Cir. 2012) ("[W]here the court plainly has . . . personal jurisdiction over the domestic [defendants], and where the merits issues are the same for both the domestic and foreign [defendants], it is permissible for the court to address the merits of the claims against the foreign [defendants] before addressing the issue of personal jurisdiction as to those defendants."); *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012) ("[W]e may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants.").

*Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  The Complaint asserts that Bosch GmbH's alleged "management and control" over "the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the [Affected] Vehicles sold or leased in the U.S." subjects it to personal jurisdiction.  Compl. ¶ 162.  This non-specific and sweeping allegation tellingly points to no California conduct on the part of Bosch GmbH that was a part of the so-called "defeat device scheme," and Bosch GmbH's conduct overseas is not alleged to have been directed at California customers, California consumers, or California regulators.  Alleging in a general way that Bosch GmbH "worked with" VW AG as it adapted the akustikfunktion for vehicle models to be sold in the United States, Compl. ¶ 199, similarly fails to show Bosch GmbH's own purposeful direction at California.  *See Axiom Foods, Inc. v. Acerchem Int'l., Inc*., 874 F.3d 1064, 1068 (9th Cir. 2017) ("The relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the defendant himself creates with the forum state.' . . . It follows that 'a defendant's relationship with a plaintiff *or third party*, standing alone, is an insufficient basis for jurisdiction." (quoting *Walden v. Fiore*, 134 S. Ct. 1122 (2014) (emphasis added)); *see also Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (asserting that a defendant's "awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state").  Far from presenting a clear allegation that Bosch GmbH purposefully directed its behavior toward California, the Complaint alleges that the EDC17 engine control unit at the center of the claims against Bosch GmbH "can be used very flexibly in any vehicle segment on all the world's markets."  Compl. ¶ 220.

Nor do Plaintiffs demonstrate that their claims would not have arisen "but for" Bosch GmbH's contacts with California.  *See Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001).  As discussed *supra* Sections II.A and II.B, to the extent that Plaintiffs allege that the non-specific "Bosch" engaged in sporadic activity that might be viewed as having some connection to California, none of the activity has any connection to Plaintiffs' alleged claims.  None relates to the "defeat devices" allegedly installed in the Affected Vehicles, and indeed most do not even relate to diesel

1  engines or NOx emissions at all.  Further, while Plaintiffs make the bare assertion that "Bosch

2  GmbH employees directly participated in meetings with CARB," their cited support references

3  discussions between Bosch LLC employees and CARB, and subjects unrelated to the claims in this

4  case.  Compl. ¶ 260.  The fact that VW sold its vehicles to California residents (or, more broadly,

5  U.S. residents) cannot confer jurisdiction over Bosch GmbH:  "[T]he plaintiff cannot be the only

6  link between the defendant and the forum.  Rather, it is the defendant's conduct that must form the

7  necessary connection."  *Walden v. Fiore*, 134 S. Ct. 1122 (2014).

8         This conclusion does not change if the Court considers the United States, rather than

9  California, to be the appropriate forum under Federal Rule 4(k)(2), an argument which Plaintiffs

10 have not advanced.  *See* Compl. ¶ 17 (asserting personal jurisdiction on the basis of 18 U.S.C.

11 §§ 1965(b) and (d) and Cal. Code Civ. P. § 410.10).  Bosch GmbH's alleged contacts with the

12 United States are equally "scant, fleeting, and attenuated."  *Axiom Foods*, 874 F.3d 1064, 1072.[16]

13                                          **CONCLUSION**

14        For the reasons stated, Plaintiffs' claims should be dismissed with prejudice.

15

16

17

18

19

20

21

22

23

24 _____

25 [16] Exercising personal jurisdiction over Bosch GmbH also would not be reasonable in this context.
   *See, e.g., Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) (listing reasonableness
26 factors).  The "primary concern" of the Court in assessing personal jurisdiction must be "the burden
   on the defendant," which is substantial in this case.  *Axiom Foods*, 874 F.3d 1064, 1068 (quoting
27 *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017)).

28

1     Dated:          December 8, 2017

2                             Respectfully submitted,

3                             CLEARY GOTTLIEB STEEN & HAMILTON LLP

4

5                     By:  _____/s/ Matthew D. Slater_____

6                             Matthew D. Slater (pro hac vice)
                              2000 Pennsylvania Ave, NW
7                             Washington, DC 20006
                              (202) 974-1500 (Phone)
8                             (202) 974-1999 (Facsimile)

9                             Carmine D. Boccuzzi Jr. (pro hac vice)
                              One Liberty Plaza
10                            New York, NY 10006
                              (212) 225-2508
11                            (212) 225-3999
                              cboccuzzi@cgsh.com
12

13                            David L. Anderson (SBN 149604)
                              555 California Street
14                            San Francisco, CA 94104
                              (415) 772-1200 (Phone)
15                            (415) 772-7400 (Facsimile)
                              dlanderson@sidley.com
16

17                            Counsel for Defendants
                              Robert Bosch LLC and Robert Bosch GmbH
18

19

20

21

22

23

24

25

26

27

28

**BOSCH DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (MDL NO. 2672 CRB)**